IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | Case No. 10-18071 |
| COLTS RUN, L.L.C., ) | Chapter 11 |
| an Illinois Limited Liability Company, ) | Judge Hollis |
| ) | |
| Debtor/Debtor-in-Possession. ) | |

## DEBTOR'S DISCLOSURE STATEMENT

**DEBTOR'S COUNSEL:**
David K. Welch, Esq.
(Atty. No. 06183621)
Arthur G. Simon, Esq.
(Atty. No. 03124481)
Scott R. Clar, Esq.
(Atty. No. 06183741)
Jeffrey C. Dan, Esq.
(Atty. No. 06242750)
Crane, Heyman, Simon, Welch & Clar
135 South LaSalle Street, Suite 3705
Chicago, IL 60603
TEL: (312) 641-6777
FAX: (312) 641-7114
W:\GRACE\Colts\Disclosure Statement.wpd

IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | Case No. 10-18071 |
| COLTS RUN, L.L.C., ) | Chapter 11 |
| an Illinois Limited Liability Company, ) | Judge Hollis |
| ) | |
| Debtor/Debtor-in-Possession. ) | |

## DEBTOR'S DISCLOSURE STATEMENT

COLTS RUN, L.L.C., a Illinois limited liability company, Debtor/Debtor-in-Possession herein, by and through its Attorneys, submits this Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code and in conjunction with its Plan of Reorganization ("Plan"). A copy of the Plan is attached to this Disclosure Statement as **Exhibit A**.[1]

## INTRODUCTION

The Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on April 23, 2010 ("Petition Date"). The Debtor is operating its business and managing its financial affairs as Debtor in Possession pursuant to Sections 1101, 1107 and 1108 of the Bankruptcy Code. No trustee, examiner or committee of unsecured creditors has been appointed to serve in this Chapter 11 Case. The Plan was filed within the exclusive periods established under Sections 1121(b) and 1121(d) of the Bankruptcy Code and the prior Orders of the Bankruptcy Court. The Debtor is the owner of a residential apartment complex in Lexington, Kentucky known as "Colts Run Apartments."

The Debtor is the proponent of the Plan. The Plan provides for distributions to the holders of Allowed Claims from funds realized from the continued operation of the Debtor's

---

[1] Capitalized terms not defined in this Disclosure Statement shall have the meanings ascribed to them in the Plan.

business as well as from existing cash deposits and cash resources of the Debtor. To the extent necessary, the balloon payment to PNC Bank, National Association ("PNC") required under the Plan may be made from the proceeds of the refinancing of the underlying mortgage indebtedness.

## SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

The Plan has one (1) category of Administrative Claims, one (1) category of Tax Claims, 5 Classes of creditors (Classes 1 through 5) and one (1) Class of Interests (Class 6). These Claims and Interests, and the treatment thereof, under the Plan consist of the following:[2]

### Administrative Claims[3]

Administrative Claims are provided for in Article IV, Section 4.1 of the Plan, are unimpaired under the Plan and primarily consist of Allowed Claims comprised of fees and expenses of the various professionals employed pursuant to Orders entered by the Bankruptcy Court. These fees and expenses are projected as follows:

**Professional**                                              **Amount[4]**

---

[2] This chart is intended to provide the information required by Rule 3016-1 of the Local Rules of this Court.

[3] Since the Debtor's Chapter 11 Case was commenced as a voluntary proceeding, no claims under Sections 507(a)(3) and 502(f) of the Bankruptcy Code exist.

[4] All of these amounts are merely the Debtor's estimates and are, therefore, subject to change. Furthermore, in projecting these amounts, the Debtor does not expect a contested Confirmation hearing. In the event of a contested Confirmation hearing, Administrative Claims of professionals will significantly increase.

| | |
|---|---|
| Crane, Heyman, Simon, Welch & Clar<br>Debtor's Counsel | $100,000.00 |
| William Huml & Co., Debtor's Accountant | $ 50,000.00 |

The amounts projected to professionals holding Allowed Administrative Claims are in addition to amounts previously paid as retainers to such professionals. The retainers previously allowed and paid to these professionals are as follows:

| Professional | Amounts Previously Paid | Basis for Prior Payment |
|---|---|---|
| Crane, Heyman, Simon, Welch & Clar<br>Debtor's Counsel | $50,000.00 | Pre-Petition Retainer |
| William Huml & Co.<br>Debtor's Accountant | $10,000.00 | Post-Petition Retainer |

No professional shall be paid unless and until the Bankruptcy Court has entered appropriate Orders allowing the compensation and reimbursement of expenses requested by such professionals.

Also included in this category of Administrative Claims are post-petition trade payables. Under the Plan, post-petition trade payables will be paid in the ordinary course of business pursuant to the credit terms existing at the time the Claim was incurred.

Other than post-petition trade payables, all Administrative Claims, to the extent allowed, will be paid in full in cash on the Effective Date or as soon as practicable thereafter (and in the case of professionals, after allowance by the Bankruptcy Court) or as agreed to by the holder of each Allowed Administrative Claim. The source of funds for payment of such Administrative Claims will be the cash resources of the Debtor or

such other cash as may be generated by the Debtor from the operation of its business in the ordinary course.

**Tax Claims**

The Plan has a specific provision for the payment of taxes which are of the type entitled to priority under Section 507(a)(8) of the Bankruptcy Code (Article IV, Section 4.2 of the Plan).  The Plan provides that to the extent any Tax Claim is allowed, such Tax Claims shall be paid in full, in cash inclusive of interest at the applicable statutory interest rate on the Effective Date, unless the holder of a Tax Claim agrees to a different treatment.  This treatment of Allowed Tax Claims is intended to comply with the requirements of Section 1129(a)(9)(C) of the Bankruptcy Code.  The Debtor believes that there are no Allowed Tax Claims.

**The Allowed Secured Claim of PNC**

PNC is the holder of the Allowed Class 1 Claims.  The Class 1 Claims are impaired under the Plan and are provided for in the Article VI, Section 6.1 of the Plan.

As of the filing of the Plan, PNC had not filed any proof of claim in this Chapter 11 Case.  For purposes of the Plan, the Debtor estimates (based upon information from PNC) that PNC's Allowed Class 1 Claims are comprised of $15,550,793.78 with respect to its senior mortgage indebtedness and $7,420,126.75 with respect to its junior mortgage indebtedness.  The actual allowed amount of the Class 1 Claims may be determined pursuant to the further Order of the Bankruptcy Court if the Debtor has objections to the allowance of the Class 1 Claims.  The nature and extent of such objections, if any, are unknown unless and until PNC files a proper proof of claim or otherwise makes known the amounts of such Class 1 Claims.

Under the Plan, the Allowed Class 1 Claims are treated in the following manner:

A. **Application of Adequate Protection Payments:** Adequate Protection Payments received by PNC during the course of this Chapter 11 Case shall be applied in the following priority:

1. Payment of interest due to PNC on the principal indebtedness due at the non default interest rate provided for in its loan documents;

2. Payment of any pre-petition unpaid arrearage due to PNC under its loan documents;

3. Payment of PNC's professional fees and costs to the extent allowable under its loan documents, and approved by the Court;[5] and,

4. Payment of the balance, if any, to reduce the principal balance due on the Allowed Class 1 Claim.

5. To the extent that the Adequate Protection Payments received by PNC are not sufficient to satisfy amounts due under subparagraphs **A1, A2 or A3** above, any deficiency shall be added to the unpaid principal balance due PNC, and shall be paid in accordance with subparagraph **B3** below:

B. **Treatment:** In full satisfaction, settlement, release, and discharge of and in exchange for the Allowed Claims in Class 1:

1. The holder of the Allowed Class 1 Claims shall receive and/or retain:

    a. Its liens on the real and personal property owned by the Debtor, to the same extent and with the same validity, enforceability, perfection and priority as it had on the Petition Date and as may have been acquired by PNC during the course of this Chapter 11 Case pursuant to Orders entered by the Bankruptcy Court, until the Allowed Class 1 Claims are paid in full;

---

[5] The reasonable fees and expenses of the Bank's attorneys and other professionals (to the extent allowed) incurred in connection with the consummation, administration, and enforcement of the Plan shall be considered additional Class 1 Claims.

-5-

    b.  Interest on its Allowed Class 1 Claim until fully paid at the pre-petition, non-default contract rate contained in its loan documents, payable in 59 monthly installments on the 15th day of each month; and,

    c.  Payment of the unpaid balance of the Allowed Class 1 Claim due it on the fifth (5th) anniversary of the Effective Date;

  2.  Payments shall commence on the 15th day of the month following the Effective Date;

  3.  To the extent not otherwise modified by the terms of this Plan, the parties shall continue to be bound by and shall perform the terms and conditions contained in the loan documents between PNC and the Debtor; and,

  4.  Payment of the unpaid amount of the Allowed Class 1 Claim may be made in whole or in part, from time to time, without penalty or charge at the sole and exclusive option of the Debtor.

  C.  **Guaranty of Indebtedness:** The existing guaranty(s) of Ivan Djurin, to the extent of its validity, shall remain valid, enforceable and in full force, unaffected by this Plan except to the extent of the modification of the Allowed Class 1 Claims provided herein.

  D.  **Other Provisions**:

  1.  The Debtor, at its sole and exclusive option, may accelerate payments to the holder of the Allowed Class 1 Claims. All unaccrued interest shall be deemed waived and no penalty shall be chargeable to the Debtor in the event that the Debtor elects to accelerate payments.

  2.  Upon completion of the payments under the Plan to PNC on account of the Allowed Class 1 Claims, all of the liens, security interests and Claims of PNC shall be deemed released and discharged. To the extent requested by the Debtor, once the Allowed Class 1 Claims are paid in full as required by the Plan, PNC shall prepare and file any and all documents that may be reasonably necessary to effectuate the termination of such liens and security interests. Any right of any party under Section 506(c) of the Bankruptcy Code as against the holder of the Allowed Class 1 Claims or its collateral shall be preserved and shall survive Confirmation of the Plan.

  3.  This Plan shall supersede and replace the terms and conditions of the loan documents establishing the Allowed Class 1 Claims to the extent the loan documents are inconsistent with this Plan.

    4.  The holder of the Allowed Class 1 Claims shall only be entitled to the reimbursement of reasonable attorneys' and professionals' fees and costs arising after Confirmation in the event that the Debtor is in default of the payments required under the Plan on account of the Allowed Class 1 Claims (which default remains uncured after ten (10) days written notice to the Debtor and Debtor's Counsel from the holder of the Allowed Class 1 Claims as required by this Plan) and in the further event that the underlying note provides for such fees.

    5.  In the event of a default by the Debtor under the Plan with respect to the treatment of the Allowed Class 1 Claims, the holder of the Allowed Class 1 Claims shall provide written notice of such default as required by the underlying loan documents and to the Debtor by transmitting such default notice by first class mail and telefax to the Debtor at its place of business to the attention of Ivan Djurin, and in the same manner to Debtor's Counsel, David K. Welch, Crane, Heyman, Simon, Welch & Clar, 135 S. LaSalle St., Suite 3705, Chicago, Illinois 60603 ("Default Notice").

**Real Estate Tax Claims**

The holder of Allowed Class 2 Claims for accrued and unpaid pre-petition Real Estate Tax Claims is Office of the Fayette County Sheriff. Under the Plan, Allowed Class 2 Claims are unimpaired and are provided for in Article V, Section 5.1 of the Plan. Notably, either the Debtor or PNC paid the Allowed Class 2 Claims. To the extent PNC paid such Allowed Class 2 Claims, PNC, on information and belief, has added the amount thereof to the balance due to PNC on account of its Class 1 Claim. As a result, the Debtor believes that there are no Allowed Class 2 Claims.

To the extent any Allowed Class 2 Claim exists, the Plan provides that the holder of the Allowed Class 2 Claim shall receive and/or retain:

    A.  Its lien on the real property owned by the Debtor, with the same validity, enforceability, perfection and priority as it had on the Petition Date and as may have been acquired during the course of this Chapter 11 Case pursuant to Orders entered by the Bankruptcy Court, until the Allowed Class 2 Claims are paid in full; and,

      B.    Payment of the entire unpaid balance of the Allowed Class 2 Claim, including any accrued statutory interest, shall be paid on the Effective Date.[6]

## Security Deposit Claims

Tenants at Colts Run Apartments may have provided security deposits to the Debtor in conjunction with their leases with the Debtor. The Plan has a specific provision relating to these Claims for security deposits (Article V, Section 5.2 of the Plan). These Class 3 Claims are unimpaired under the Plan.

Tenants shall be paid 100% of the allowed amount of their Class 3 Claims in cash without interest as required by the terms of the lease between the Debtor and each respective Tenant.

## Other Secured Claims

Under the Plan, Other Secured Claims are in Class 4, are impaired under the Plan and are provided for in Article V, Section 5.3 of Plan. The only holder of an Allowed Class 4 Claim known to the Debtor is GMAC with a Class 4 Claim in the approximate amount of $39,000.00.

In full satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Claim in Class 4, each holder of an Allowed Class 4 Claim shall be paid in full in cash as required by the terms and conditions of the underlying contract between the Debtor and the holder of the Allowed Class 4 Claim. To the extent a monetary default exists under any such contract, such monetary default shall be cured on the Effective Date by the payment of cash by the Debtor to the holder

---

[6]The Debtor believes that there are no Allowed Class 2 Claims.

-8-

of the Allowed Class 4 Claim in the amount of such monetary default. The Debtor does not believe that any such monetary default exists.

**Unsecured Creditors**

Unsecured Creditors, are the holders of Allowed Class 5 Claims and are impaired under the Plan. The treatment of the Allowed Class 5 Claims is set forth in Article VI, Section 6.2 of the Plan. The holders of Allowed Class 5 Claims shall receive 100% of the allowed amount of their Class 5 Claims with interest at 5% per annum ("Unsecured Dividend"). The Unsecured Dividend shall be payable in equal quarterly installments as follows:

    A.    Interest on its unpaid indebtedness until fully paid at five (5%) percent per annum;

    B.    Payment of the principal balance and accrued interest shall be paid in quarterly installments over a two (2) year period, commencing 90 days after the Effective Date, and continuing each quarter thereafter until fully paid; and,

    C.    Payment of the unpaid indebtedness may be made in whole or in part, from time to time, without penalty or charge at the sole and exclusive option of the Debtor.

The payments to the holders of Allowed Class 9 Claims under the Plan shall be made in full and complete satisfaction of such Claims. The Debtor estimates that the holders of Allowed Class 9 Claims have Claims aggregating approximately $53,411.35.

**Equity Interests**

The Debtor's members are the holders of Allowed Class 6 Interests. Class 6 Interests are not impaired under the Plan. The Debtor's members are Ivan Djurin (86.75%) and The Teresa M. Baldwin Trust (14.25%). The Debtor's manager is Ivan

-9-

Djurin. Under the Plan, the Debtor's members shall retain their respective equity interests in the Debtor after Confirmation of the Plan.

## Claims Objections

Except as otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan, the Debtor shall file any and all objections to the allowance of Claims or Interests on or within one hundred and twenty (120) days of Confirmation of this Plan unless extended by Order of the Bankruptcy Court. Cause shall not be a requirement for an extension of this deadline.

## PURPOSE OF DISCLOSURE STATEMENT

This Disclosure Statement is provided to all of the known holders of Claims against and Interests in the Debtor who are entitled to vote their acceptance or rejection of the Plan. This Disclosure Statement is disseminated in connection with the solicitation of acceptances of the Plan filed by the Debtor. The purpose of this Disclosure Statement is to provide such information as would enable a hypothetical, reasonable investor, typical of the holder of Claims and Interests which are impaired under the Plan, to make an informed judgment about the Plan. The Debtor's exclusive period to solicit acceptances of the Plan under Section1121(d) expires on November 5, 2010.

The information contained in this Disclosure Statement has been submitted by the Debtor unless specifically stated to be from other sources. No representations concerning the Debtor or this Plan, other than those set forth in this Disclosure Statement, have been authorized by the Debtor. The Debtor believes that all of the

-10-

information contained in this Disclosure Statement is accurate. However, the Debtor is unable to warrant that there are no inaccuracies.

**Under the Bankruptcy Code, a Class of Claims is considered to have accepted the Plan if both a majority in number and two-thirds (2/3) of the dollar amount of those actually voting vote to accept the Plan. The Claims of those who do not vote are not counted in determining whether the requisite statutory majority in number and dollar amount have voted for acceptance. Acceptance by the statutory majority will bind the minority who dissent and those who fail to vote.**

<u>**The Plan requires that the holders of Allowed Claims in Classes 1 and 5 vote on Confirmation of the Plan.**</u>

## <u>HISTORY AND BACKGROUND</u>

The Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on April 23, 2010. The Debtor is an Illinois limited liability company that is the owner and operator of a residential apartment project located in Lexington, Kentucky, known as "Colts Run Apartments." The Debtor's principal office and "nerve center" is located in Lake Forest, Illinois. The Debtor is operating its business and managing its financial affairs as Debtor in Possession.

Colts Run Apartments was purchased by the Debtor in May 2001 for $19,000,000.00. In addition to regular maintenance, the Debtor has expended in excess of $2,700,000.00 for capital improvements to Colts Run Apartments. Colts Run Apartments are comprised of 252 residential rental apartment units located in 21 buildings spread over 13.77 acres. In addition, Colts Run Apartments has a clubhouse

and 8 garage buildings. Residential apartment units at Colts Run Apartments lease for rentals ranging from $799.00 to $1399.00 per month. The current occupancy rate (as of approximately July 15, 2010) at Colts Run Apartments is approximately 89% with leasing at 100%. Occupancy and leasing rates are increasing.

The Debtor's operational and profitability problems are principally due to the general economic problems of the country over the last several years (particularly in real estate). Beginning on November 9, 2009, and continuing through April 7, 2010, the Debtor and PNC were negotiating the terms and conditions of a loan restructuring which included new loan repayment terms and the funding of the payment of accrued and unpaid real estate taxes. These restructuring negotiations ended due to the unreasonable demands of PNC. Although, PNC never commenced a foreclosure case, the Debtor was compelled to commence this Chapter 11 case, due to the unreasonable demands and threats of PNC.

## POST-PETITION ACTIVITIES

The continued administration of this Chapter 11 Case has been primarily predicated upon the entry of a series of Cash Collateral Orders entered by the Bankruptcy Court. These Cash Collateral Orders established the framework for the continued operation of the Debtor's business and the terms under which the Debtor could use the cash and cash equivalents that serve as collateral to the various Banks. Although all of these Cash Collateral Orders were entered on a consensual basis, disputes existed between the Debtor and PNC which caused the Debtor to prepare for contested hearings on the use of cash collateral. However, in each such instance, the Debtor and PNC resolved their differences without ever having to proceed to a contested hearing on the Debtor's right to use cash collateral. Notably, under these Cash

Collateral Orders, the Debtor has been making contract interest (non-default rate) payments to PNC.

PNC filed a motion pursuant to Section 1104(a) of the Bankruptcy Code for the appointment of a Chapter 11 trustee ("Trustee Motion"). The Debtor opposes the relief sought by PNC in the Trustee Motion and believes that no grounds exist for such an appointment. The hearing on the Trustee Motion was continued to the same date as the hearing on Confirmation of the Plan.

The Debtor's focus has always been on proposing an exit strategy from this Chapter 11 Case that would provide a mechanism for all creditors to be paid in full, most with interest. The Debtor has swiftly filed such a Plan and has sought a combined hearing in the Bankruptcy Court on approval of the Disclosure Statement and Confirmation of the Plan. If successful in obtaining Confirmation of the Plan on or about the scheduled combined hearings, the Debtor will have successfully concluded this Chapter 11 Case in rapid fashion.

## OTHER ASPECTS OF THE PLAN

The Debtor shall be the disbursing agent charged with making the payments required under the Plan to the holders of Allowed Claims. Management of the Debtor will remain unchanged after Confirmation. Furthermore, North Street Properties, Inc., an entity owned and controlled by Ivan Djurin, shall continue to serve as the Debtor's agent for management and leasing of Colts Run Apartments and shall be paid by the Debtor for such services in the same manner that North Street Properties, Inc. has been historically paid by the Debtor.

PNC may be asserting Claims for reimbursement of fees and expenses paid to professionals that PNC retained in this Chapter 11 Case. To the extent that PNC is asserting a Claim(s) for reimbursement from the Debtor for professionals retained in this Chapter 11 Case which claims remain unresolved, PNC shall file such Claims with the Clerk of the Bankruptcy Court with a full and complete itemization of services rendered and expenses incurred by each such professional within forty-five (45) days of Confirmation of the Plan. The Debtor shall have the right to object to any such Claim by the deadline set forth in Article XIV, Section 14.1 of the Plan and the Bankruptcy Court expressly reserves jurisdiction to hear any matters relating thereto. In the event that PNC fails to timely file a Claim as set forth herein, such Claim shall be deemed waived, released and discharged, PNC shall be barred from asserting such Claim and PNC shall be entitled to no distribution or payment on account of such Claim.

Upon Confirmation of the Plan, the Debtor shall be revested with its assets, subject only to the terms and conditions of the Plan. The Debtor shall be entitled to continue to operate and manage its business and financial affairs without further Order of the Bankruptcy Court, except as hereinafter set forth. Payments to creditors pursuant to the Plan will be made from existing cash deposits and from funds from continued business operations. If necessary, the Debtor may borrow funds sufficient to pay the balloon payment due to PNC as required by the Plan or such earlier date as the Debtor may elect at its sole and exclusive option.

Upon Confirmation, an injunction under Section 524 of the Bankruptcy Code shall arise to prevent any party from foreclosing its lien or security interest or otherwise enforcing its Claims against the Debtor and its assets in this bankruptcy case except as authorized in the Plan. Such injunction shall not affect any secured creditor's right to foreclose upon any security interest provided in the Plan in the event of any post-

Confirmation default under the Plan. This injunction will remain in effect until all distributions under the Plan have been made.

The Plan is self-executing. The Debtor shall not be required to execute any newly created documents to effectuate the terms of the Plan. Upon payment as required by the Plan, any liens supporting such Claims shall be deemed released and discharged.

All executory contracts and unexpired leases which exist between the Debtor and any other party, whether such executory contract be in writing or oral, which has not been previously assumed, assigned, rejected or otherwise terminated by the Debtor shall be assumed upon Confirmation of the Plan pursuant to Sections 365 and 1123(b)(2) of the Bankruptcy Code. Any and all Claims asserted by any party arising from the rejection of executory contracts and unexpired leases pursuant to the Plan must be filed on or within thirty (30) days following the rejection. Further, with respect to Claims for default relating to any unexpired lease or executory contract that is assumed pursuant to the Plan, any and all such Claims must also be filed on or within thirty (30) days following Confirmation. Allowed Claims emanating from the rejection of unexpired leases and executory contracts will be treated as Class 5 Claims. Allowed Claims for default emanating from the assumption of unexpired leases and executory contracts will be treated as Administrative Claims. Any person failing to file such a Claim within the time provided in the Plan shall be forever barred from asserting such Claim and shall not receive any distribution under the Plan. The provisions for assumption, assignment and rejection shall be equally applicable to executory contracts and unexpired leases of real and personal property.

The Bankruptcy Court shall retain jurisdiction for certain specified purposes. Any distribution under the Plan that remains unclaimed sixty (60) days after the distribution is made will become property of the Debtor, and will not be recouped in subsequent

-15-

distributions. The Debtor will have the right to make any distribution to creditors earlier than required by the Plan. The Debtor shall have the right, power and authority after Confirmation of the Plan to commence any preference, fraudulent conveyance or other litigation it deems appropriate.[7] The Bankruptcy Court shall retain jurisdiction for such litigation.

The provisions of the Plan shall bind all creditors, Interest holders and parties in interest. Except as expressly provided in the Plan or the Bankruptcy Code, no interest or penalties accruing on or after April 23, 2010, shall be paid on any Claim nor shall any creditor claiming any such interest or penalty be entitled to have its Claim for interest or penalty allowed for payment. To the extent necessary, pursuant to Section 1129(b) of the Bankruptcy Code, the Debtor intends to request that the Bankruptcy Court confirm the Plan if all applicable requirements of Section 1129(a) of the Bankruptcy Code, other than Section 1129(a)(8), are met.

## LIQUIDATION ANALYSIS

Failure of the Debtor to obtain Confirmation of the Plan could result in a forced liquidation or a conversion to a case under Chapter 7 of the Bankruptcy Code and immediate termination of the Debtor's business operations. Under the Plan, all creditors are being paid 100% of the allowed amount of their Claims, most with interest. With respect to PNC, PNC is being paid the allowed amount of its Claims plus the non-default contract rate of interest provided for in its loan documents.

Notably, as of July 31, 2010, the Debtor has approximately $120,000.00 in cash. The Debtor reasonably projects that the amount of its cash will continue to increase from

---

[7] The Debtor has not completed an analysis of potential preference and fraudulent conveyance claims. The Debtor believes that no such litigation claims exist.

now through Confirmation of the Plan. This cash and further cash generated after Confirmation are to be used by the Debtor for payment of creditors' Claims under the Plan and for costs of operation of the Debtor's business after Confirmation of the Plan.

In the event of a forced liquidation, such as foreclosure by PNC on its liens and security interests, any proceeds realized from the liquidation of the Debtor's assets would first be used to pay the costs of collection, which for purposes of this discussion, the Debtor has estimated to be an amount equal to 10% of the gross collection proceeds. Once the costs of collection have been paid, Secured, Administrative and Priority Claims would be paid. Only after making the above disbursements of liquidation proceeds could any distribution be made to general unsecured creditors. Typically, in the event of a foreclosure, no creditor other than the mortgage lender (and perhaps real estate tax claimants) receive funds from the foreclosure. The Debtor asserts that such a result should be expected in a foreclosure of the Colts Run Apartments.

Clearly, the dividend being paid to unsecured creditors under the Plan represents substantially more than such unsecured creditors would ever receive in a liquidation (which according to the above analysis is nothing). The same is also true for PNC with respect to its Allowed Class 1 Claims. Furthermore, the existing trade debt to be paid according to ordinary business terms would also be included in the pool of Administrative Claims thereby substantially increasing the total dollar amount due Administrative Claimants in a liquidation and further reducing the likelihood of any funds being available for unsecured creditors. Also, the projected amount allowable for Administrative Claims, in the event of conversion, would further increase to account for the fees and costs attributable to a Chapter 7 Trustee and his administration or Secured Creditors and the liquidation of their collateral.

Clearly, upon forced liquidation, unsecured creditors would get nothing. In fact, PNC would also likely receive substantially less than that being paid under the Plan. Accordingly, the Plan offers all creditors substantially more than such creditors would receive in a liquidation.

## IMPLEMENTATION OF THE PLAN

As discussed throughout this Disclosure Statement, distributions under the Plan shall be made from cash deposits existing at the time of Confirmation and from proceeds realized from the continued operation of the Debtor's business by the Debtor. The Debtor does not intend to liquidate any of its assets in order to make the payments required under the Plan. If necessary, at the point of the balloon payment coming due to PNC as required by the Plan, the Debtor may borrow the funds sufficient to make this balloon payment.

## FEASIBILITY AND FAIRNESS OF PLAN

Attached to this Disclosure Statement as **Exhibits B and C** are balance sheets and income statements pertaining to the Debtor's business activity for the periods ending December 2009 and June 2010. The purpose of these Exhibits is to provide creditors with historical financial information concerning the Debtor's ability to make the payments required under the Plan. These balance sheets and income statements were prepared by the Debtor and Debtor's Accountant and are based upon an analysis of actual business activity.

Attached to this Disclosure Statement as **Exhibit D** are financial projections pertaining to the Debtor's projected business activity for the three (3) years following Confirmation of the Plan. The purpose of this Exhibit is to provide creditors with projected financial information concerning the Debtor's ability to make the payments

-18-

required under the Plan. These projections were prepared by Debtor's management and are based upon an analysis of past business results and projected future business activity. These projections, coupled with the Debtor's available cash, establish that the Plan is feasible.

The projections represent reasonable calculations based upon historical progressions of the Debtor's business. These projections clearly reflect the Debtor's ability to perform under the proposed Plan. Furthermore, the Debtor's achievements during the course of this reorganization case further indicate that the Plan is feasible.

The Debtor believes that the Plan represents an opportunity for the holders of Allowed Claims to receive substantially more than such claimants would receive in a forced liquidation. Given the conservative financial projections and the Debtor's past performance, the Plan is also fair.

### RECOMMENDATION

The Debtor strongly recommends that those persons entitled to vote, vote to accept the Plan.

Respectfully submitted,

COLTS RUN, L.L.C., a limited liability company, Debtor and Debtor in Possession

By: /s/David K. Welch
One of Its Attorneys

**DEBTOR'S COUNSEL**:
David K. Welch, Esq. (Atty. No. 06183621)
Arthur G. Simon, Esq. (Atty. No. 03124481)
Scott R. Clar, Esq. (Atty. No. 06183741)
Jeffrey C. Dan, Esq. (Atty. No. 06242750)
Crane, Heyman, Simon, Welch & Clar
135 South LaSalle Street, Suite 3705
Chicago, IL 60603
TEL: (312) 641-6777
FAX: (312) 641-7114
W:\GRACE\Colts\Disclosure Statement.wpd