UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
Eastern Division

| | | |
|---|---|---|
| In Re: | ) | BK No.:  10-18071 |
| Colts Run, L.L.C., | ) | |
| an Illinois Limited Liability Company, | ) | |
| | ) | Chapter: 11 |
| | ) | Honorable Pamela S. Hollis |
| | ) | |
| Debtor(s) | ) | |

### ORDER MODIFYING AND CONFIRMING
### DEBTOR'S PLAN OF REORGANIZATION

THIS MATTER COMING to be heard upon the hearing on confirmation of the Plan of Reorganization (Plan") filed by COLTS RUN, LLC, Debtor and Debtor in Possession herein; proper notice having been provided as required by Rule 2002(b) of the Federal Rules of Bankruptcy Procedure; the Debtor having filed a Report of Balloting pursuant to Local Bankruptcy Rule 3018-1; PNC Bank, National Association ("Bank"), the Debtor's primary secured creditor, having filed Objections to confirmation of the Plan ("Plan Objections"); the Bank having voted to reject the Plan; the Debtor and the Bank having settled and resolved the Plan Objections pursuant to the terms and conditions of this Order; the Debtor having proposed modifications to the Plan as set forth in this Order that are predicated upon the settlement of the Plan Objections; this Court having determined that the modifications to the Plan set forth in this Order do not require further notice to creditors and other parties in interest; the Bank having agreed to withdraw its rejection of the Plan and to accept the Plan as modified under this Order; this Court having heard and considered the statements of Debtor's Counsel and Bank's Counsel with respect to confirmation of the Plan and all related matters; this Court having heard, considered and accepted the Debtor's Offer of Proof with respect to confirmation of the Plan; the value of Debtor's equity interests is de minimis in light of the Debtor's substantial time-sensitive repayment obligations to creditors under the Plan, and, therefore Angelina Djurin's retention of Debtor's equity interest, subject to the Bank's lien, does not violate Section 1129(b)(2)(B) (ii) of the Bankruptcy Code; subject to the entry of this Order, the Bank has agreed to withdraw the Plan Objections and consent to confirmation of the Plan as modified herein; this Court finding that the requirements of Section 1129(a) of the Bankruptcy Code with respect to confirmation of the Plan, as modified herein, have been satisfied; and this Court being fully advised in the premises:

NOW, THEREFORE, IT IS HEREBY ORDERED as follows:

A) The Plan Objections are withdrawn;

B) The Bank's votes to reject the Plan are amended to votes to accept the Plan;

C) The Plan is modified as follows:

1) Article VI, Section 6.1 of the Plan is deleted from the Plan;

2) The post-confirmation loan documents attached to this Order as Group Exhibit A ("Post-Confirmation Documents")shall constitute the treatment of any and all claims of the Bank under the Plan and such Post-Confirmation Documents are incorporated into the Plan by this reference;

3) The Debtor is authorized to execute the Post-Confirmation Documents and to perform all of the Debtor's obligations thereunder;

4) To the extent of any inconsistency between the provisions of this Order and the Plan, the provisions of this Order shall control; and

5) Article VII, Section 7.8 of the Plan is deleted.

D) The recording of the "Deed" (as defined in that certain Deed in Lieu of Escrow Agreement attached as part of Group Exhibit A to this Order) in accordance with the terms and provisions of such Escrow Agreement is hereby approved and shall constitute, and shall be deemed to constitute, an absolute conveyance and transfer of all of Debtor's right, title and interest in the Property (as defined in the Escrow Agreement), in fact as well as in form, and neither the Escrow Agreement nor the recording of the Deed in accordance with the terms of the Escrow Agreement shall constitute, and shall not be deemed to constitute, a mortgage, equitable mortgage, trust, conveyance, deed of trust, or security instrument of any kind whatsoever and shall not be prohibited by any state or local law that may be to the contrary.

E) Any transfer of the Property (as defined in the Escrow Agreement) in accordance with the terms and provisions of the Escrow Agreement shall be, and shall be deemed to be, free and clear of, and not subject to, any law imposing any stamp or other tax pursuant to Section 1146(c) of the Bankruptcy Code.

F) The Budget attached to this Order as Exhibit B is approved by the Bank, is included as part of the Plan, as modified by this Order, and shall be deemed amended and approved to account for any payments required under the Plan and any fees and expenses allowed by this Court to professionals retained by the Debtor;

G) The Plan, a copy of which is attached to this Order as Exhibit C, as modified by this Order, is confirmed; and

H) This case is set for a post-confirmation status hearing on _April 26_, )ych 2012, at _10:30_ a.m.

Enter:

_Pam Hollis_

Honorable Pamela S. Hollis
United States Bankruptcy Judge

Dated: MAR 20 2012

**Prepared by counsel of Movant:**

DEBTOR'S COUNSEL:
David K. Welch, Esq.(Atty. No. 06183621)
Scott R. Clar, Esq.(Atty. No. 06183741)
Eugene Crane, Esq.(Atty. No. 0537039)
CRANE, HEYMAN, SIMON, WELCH & CLAR
135 S. LaSalle St., Suite 3705
Chicago, IL 60603

Rev: 20101008_bko

# Exhibit A

# SENIOR NOTE
## (DAILY LIBOR)



$17,500,000.00                                                    March 20, 2012

     **FOR VALUE RECEIVED, COLTS RUN, L.L.C.,** an Illinois limited liability company (the **"Borrower"**), with an address at 1 Conway Park, 100 North Field Drive, Lake Forest, Illinois 60045 promises to pay to the order of **PNC BANK, NATIONAL ASSOCIATION,** successor to **NATIONAL CITY BANK,** a national banking association (the **"Bank"**), in lawful money of the United States of America in immediately available funds at its offices located at 1 North Franklin Street, Suite 2150, Chicago, Illinois 60606, or at such other location as the Bank may designate from time to time, the principal sum of SEVENTEEN MILLION FIVE HUNDRED THOUSAND AND NO/100THS DOLLARS ($17,500,000.00), together with interest accruing on the outstanding principal balance from the date hereof, all as provided below.

     This Senior Note (this **"Note"**) is the Senior Note evidencing the Senior Loan referred to in and is issued pursuant to that certain Consolidated, Amended and Restated Loan Agreement of even date herewith by and between Borrower and the Bank (the **"Loan Agreement"**), and is entitled to the benefits of and is subject to the provisions of the Loan Agreement. The Loan Agreement, among other things, contains provisions for acceleration of the maturity of this Note upon the happening of certain stated events and also for prepayments on account of the principal hereof prior to the maturity hereof upon the terms and conditions specified in the Loan Agreement and the Loan Documents, which provisions are hereby made a part of this Note and are deemed incorporated herein in full. All capitalized terms used herein, unless otherwise specifically defined in this Note, shall have the meanings ascribed to them in the Loan Agreement.

     This Note, together with the Junior Note, consolidates, amends and restates in their entirety the Second A&R Fixed Rate Note and the Fourth A & R Adjustable Rate Note. This Note evidences the Senior Loan and the Junior Note evidences the Junior Loan, which together comprise the Loan under the Loan Agreement. This Note is senior in priority over the Junior Note as to payment of principal and interest.

     1.    **Rate of Interest.** Amounts outstanding under this Note will bear interest at a rate per annum which is at all times equal to (A) the Daily LIBOR Rate <u>plus</u> (B) five hundred thirty-five (535) basis points (5.35%). Interest hereunder will be calculated based on the actual number of days that principal is outstanding over a year of 360 days. In no event will the rate of interest hereunder exceed the maximum rate allowed by law.

     If the Bank determines (which determination shall be final and conclusive) that, by reason of circumstances affecting the eurodollar market generally, deposits in dollars (in the applicable amounts) are not being offered to banks in the eurodollar market for the selected term, or adequate means do not exist for ascertaining the Daily LIBOR Rate, then

the Bank shall give notice thereof to the Borrower. Thereafter, until the Bank notifies the Borrower that the circumstances giving rise to such suspension no longer exist, the interest rate for all amounts outstanding under this Note shall be equal to (A) the Base Rate plus (B) two hundred seventy five (275) basis points (2.75%) (the "**Alternate Rate**").

In addition, if, after the date of this Note, the Bank shall determine (which determination shall be final and conclusive) that any enactment, promulgation or adoption of or any change in any applicable law, rule or regulation, or any change in the interpretation or administration thereof by a governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by the Bank with any guideline, request or directive (whether or not having the force of law) of any such authority, central bank or comparable agency shall make it unlawful or impossible for the Bank to make or maintain or fund loans based on the Daily LIBOR Rate, the Bank shall notify the Borrower. Upon receipt of such notice, until the Bank notifies the Borrower that the circumstances giving rise to such determination no longer apply, the interest rate on all amounts outstanding under this Note shall be the Alternate Rate.

For purposes hereof, the following terms shall have the following meanings:

"**Base Rate**" shall mean the higher of (A) the Prime Rate, and (B) the sum of the Federal Funds Open Rate plus fifty (50) basis points (0.50%). If and when the Base Rate (or any component thereof) changes, the rate of interest with respect to any amounts hereunder to which the Base Rate applies will change automatically without notice to the Borrower, effective on the date of any such change.

"**Business Day**" shall mean any day other than a Saturday or Sunday or a legal holiday on which commercial banks are authorized or required by law to be closed for business in Chicago, Illinois.

"**Daily LIBOR Rate**" shall mean, for any day, the rate per annum determined by the Bank by dividing (A) the Published Rate by (B) a number equal to 1.00 minus the percentage prescribed by the Federal Reserve for determining the maximum reserve requirements with respect to any eurocurrency fundings by banks on such day. The rate of interest will be adjusted automatically as of each Business Day based on changes in the Daily LIBOR Rate without notice to the Borrower.

"**Federal Funds Open Rate**" shall mean, for any day, the rate per annum (based on a year of 360 days and actual days elapsed) which is the daily federal funds open rate as quoted by ICAP North America, Inc. (or any successor) as set forth on the Bloomberg Screen BTMM for that day opposite the caption "OPEN" (or on such other substitute Bloomberg Screen that displays such rate), or as set forth on such other recognized electronic source used for the purpose of displaying such rate as selected by the Bank (an "**Alternate Source**") (or if such rate for such day does not appear on the Bloomberg Screen BTMM (or any substitute screen) or on any Alternate Source, or if there shall at any time, for any reason, no longer exist a Bloomberg Screen BTMM (or any substitute screen) or any Alternate Source, a comparable replacement rate determined by the Bank at such time (which

determination shall be conclusive absent manifest error); provided however, that if such day is not a Business Day, the Federal Funds Open Rate for such day shall be the "open" rate on the immediately preceding Business Day. The rate of interest charged shall be adjusted as of each Business Day based on changes in the Federal Funds Open Rate without notice to the Borrower.

**"Prime Rate"** shall mean the rate publicly announced by the Bank from time to time as its prime rate. The Prime Rate is determined from time to time by the Bank as a means of pricing some loans to its borrowers. The Prime Rate is not tied to any external rate of interest or index, and does not necessarily reflect the lowest rate of interest actually charged by the Bank to any particular class or category of customers.

**"Published Rate"** shall mean the rate of interest published each Business Day in the Wall Street Journal "Money Rates" listing under the caption "London Interbank Offered Rates" for a one month period (or, if no such rate is published therein for any reason, then the Published Rate shall be the eurodollar rate for a one month period as published in another publication selected by the Bank).

2. **Payment Terms.** Interest shall be due and payable monthly, provided however, absent an Event of Default, the first payment of interest hereunder will be due commencing on May 1, 2012, and then continuing on the first day of each month thereafter until December 31, 2013, on which date all outstanding principal and accrued interest shall be due and payable in full. In addition, Borrower shall make principal payments with respect to the Senior Loan in such amounts and at the times as are specified in Sections 7.4 and 9 of the Loan Agreement. If any payment under this Note shall become due on a Saturday, Sunday or public holiday under the laws of the State where the Bank's office indicated above is located, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in computing interest in connection with such payment. The Borrower hereby authorizes the Bank to charge the Borrower's deposit account at the Bank for any payment when due. If the Borrower revokes this authorization for any reason whatsoever or fails to maintain a deposit account with the Bank which may be charged, the Bank may, at its option, upon thirty (30) days notice to the Borrower, increase the interest rate payable by the Borrower under this Note by twenty-five (25) basis points (0.25%). Payments received will be applied to charges, fees and expenses (including attorneys' fees), accrued interest and principal in any order the Bank may choose, in its sole discretion.

3. **Late Payments; Default Rate.** If the Borrower fails to make any payment of principal, interest or other amount coming due pursuant to the provisions of this Note within ten (10) calendar days of the date due and payable, the Borrower also shall pay to the Bank a late charge equal to five percent (5%) of the amount of such payment (the **"Late Charge"**). Such ten (10) day period shall not be construed in any way to extend the due date of any such payment. Upon maturity, whether by acceleration, demand or otherwise, and at the Bank's option upon the occurrence of any Event of Default (as hereinafter defined) and during the continuance thereof, amounts outstanding under this Note shall bear interest at a rate per annum (based on the actual number of days that principal is

-3-

outstanding over a year of 360 days) which shall be five percentage points (5%) in excess of the interest rate in effect from time to time under this Note but not more than the maximum rate allowed by law (the **"Default Rate"**). The Default Rate shall continue to apply whether or not judgment shall be entered on this Note. Both the Late Charge and the Default Rate are imposed as liquidated damages for the purpose of defraying the Bank's expenses incident to the handling of delinquent payments, but are in addition to, and not in lieu of, the Bank's exercise of any rights and remedies hereunder, under the other Loan Documents or under applicable law, and any fees and expenses of any agents or attorneys which the Bank may employ. In addition, the Default Rate reflects the increased credit risk to the Bank of carrying a loan that is in default. The Borrower agrees that the Late Charge and Default Rate are reasonable forecasts of just compensation for anticipated and actual harm incurred by the Bank, and that the actual harm incurred by the Bank cannot be estimated with certainty and without difficulty.

4.      **Prepayment.** The indebtedness evidenced by this Note may be prepaid in whole or in part at any time without penalty.

5.      **Other Loan Documents.** This Note is issued in connection with the Loan Agreement and the other Loan Documents and is secured by the property described in the Loan Documents and by such other collateral as previously may have been or may in the future be granted to the Bank to secure this Note.

6.      **Events of Default.** The occurrence of any of the following events will be deemed to be an **"Event of Default"** under this Note:  (i) the nonpayment of any principal, interest or other indebtedness under this Note when due; (ii) the occurrence of any event of default or any default and the lapse of any notice or cure period, or any Obligor's failure to observe or perform any covenant or other agreement, under or contained in any Loan Document or any other document now or in the future evidencing or securing any debt, liability or obligation of any Obligor to the Bank; (iii) the filing by or against any Obligor of any proceeding in bankruptcy, receivership, insolvency, reorganization, liquidation, conservatorship or similar proceeding (and, in the case of any such proceeding instituted against any Obligor, such proceeding is not dismissed or stayed within 30 days of the commencement thereof, provided that the Bank shall not be obligated to advance additional funds hereunder during such period); (iv) any assignment by any Obligor for the benefit of creditors, or any levy, garnishment, attachment or similar proceeding is instituted against any property of any Obligor held by or deposited with the Bank; (v) a default with respect to any other indebtedness of any Obligor for borrowed money, if the effect of such default is to cause or permit the acceleration of such debt; (vi) the commencement of any foreclosure or forfeiture proceeding, execution or attachment against any collateral securing the obligations of any Obligor to the Bank; (vii) the entry of a final judgment in excess of $25,000 (individually or in aggregate with any other outstanding judgments) against any Obligor and the failure of such Obligor to discharge the judgment within ten (10) days of the entry thereof; (viii) any material adverse change in any Obligor's business, assets, operations, financial condition or results of operations; (ix) any Obligor ceases doing business as a going concern; (x) any representation or warranty made by any Obligor to the Bank in any Loan

-4-

Document or any other documents now or in the future evidencing or securing the obligations of any Obligor to the Bank, is false, erroneous or misleading in any material respect; (xi) (intentionally omitted); (xii) the revocation or attempted revocation, in whole or in part, of any guarantee by any Obligor; or (xiii) the death, incarceration, indictment or legal incompetency of any individual Obligor or, if any Obligor is a partnership or limited liability company, the death, incarceration, indictment or legal incompetency of any individual general partner or member. As used herein, the term **"Obligor"** means any Borrower and any guarantor of, or any pledgor, mortgagor or other person or entity providing collateral support for, the Borrower's obligations to the Bank existing on the date of this Note or arising in the future.

Upon the occurrence of an Event of Default: (a) the Bank shall be under no further obligation to make advances hereunder; (b) if an Event of Default specified in clause (iii) or (iv) above shall occur, the outstanding principal balance and accrued interest hereunder together with any additional amounts payable hereunder shall be immediately due and payable without demand or notice of any kind; (c) if any other Event of Default shall occur, the outstanding principal balance and accrued interest hereunder together with any additional amounts payable hereunder, at the Bank's option and without demand or notice of any kind, may be accelerated and become immediately due and payable; (d) at the Bank's option, this Note will bear interest at the Default Rate from the date of the occurrence of the Event of Default; and (e) the Bank may exercise from time to time any of the rights and remedies available under the Loan Documents or under applicable law.

7.     **Right of Setoff.**  In addition to all liens upon and rights of setoff against the Borrower's money, securities or other property given to the Bank by law, the Bank shall have, with respect to the Borrower's obligations to the Bank under this Note and to the extent permitted by law, a contractual possessory security interest in and a contractual right of setoff against, and the Borrower hereby grants the Bank a security interest in, and hereby assigns, conveys, delivers, pledges and transfers to the Bank, all of the Borrower's right, title and interest in and to, all of the Borrower's deposits, moneys, securities and other property now or hereafter in the possession of or on deposit with, or in transit to, the Bank or any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., whether held in a general or special account or deposit, whether held jointly with someone else, or whether held for safekeeping or otherwise, excluding, however, all IRA, Keogh, and trust accounts. Every such security interest and right of setoff may be exercised without demand upon or notice to the Borrower. Every such right of setoff shall be deemed to have been exercised immediately upon the occurrence of an Event of Default hereunder without any action of the Bank, although the Bank may enter such setoff on its books and records at a later time.

8.     **Indemnity.**  To the maximum extent not prohibited by applicable law, the Borrower agrees to indemnify each of the Bank, each legal entity, if any, who controls, is controlled by or is under common control with the Bank, and each of their respective directors, officers and employees (the **"Indemnified Parties"**), and to defend and hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities

and expenses (including all fees and charges of internal or external counsel with whom any Indemnified Party may consult and all expenses of litigation and preparation therefor) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority (including any person or entity claiming derivatively on behalf of the Borrower), in connection with or arising out of or relating to the matters referred to in this Note or in the other Loan Documents or the use of any advance hereunder, whether (a) arising from or incurred in connection with any breach of a representation, warranty or covenant by the Borrower, or (b) arising out of or resulting from any suit, action, claim, proceeding or governmental investigation, pending or threatened, whether based on statute, regulation or order, or tort, or contract or otherwise, before any court or governmental authority; provided, however, that the foregoing indemnity agreement shall not apply to any claims, damages, losses, liabilities and expenses attributable to an Indemnified Party's gross negligence or willful misconduct. The indemnity agreement contained in this Section shall survive the termination of this Note, payment of any advance hereunder and the assignment of any rights hereunder. The Borrower may participate at its expense in the defense of any such action or claim.

9.    **Miscellaneous.**    All notices, demands, requests, consents, approvals and other communications required or permitted hereunder (**"Notices"**) must be in writing (except as may be agreed otherwise above with respect to borrowing requests) and will be effective upon receipt. Notices may be given in any manner to which the parties may separately agree, including electronic mail. Without limiting the foregoing, first-class mail, facsimile transmission and commercial courier service are hereby agreed to as acceptable methods for giving Notices. Regardless of the manner in which provided, Notices may be sent to a party's address as set forth above or to such other address as any party may give to the other for such purpose in accordance with this paragraph. No delay or omission on the Bank's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will the Bank's action or inaction impair any such right or power. The Bank's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which the Bank may have under other agreements, at law or in equity. No modification, amendment or waiver of, or consent to any departure by the Borrower from, any provision of this Note will be effective unless made in a writing signed by the Bank, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. The Borrower agrees to pay on demand, to the extent permitted by law, all costs and expenses incurred by the Bank in the enforcement of its rights in this Note and in any security therefor, including without limitation reasonable fees and expenses of the Bank's counsel. If any provision of this Note is found to be invalid, illegal or unenforceable in any respect by a court, all the other provisions of this Note will remain in full force and effect. The Borrower and all other makers and indorsers of this Note hereby forever waive presentment, protest, notice of dishonor and notice of non-payment. The Borrower also waives all defenses based on suretyship or impairment of collateral. If this Note is executed by more than one Borrower, the obligations of such persons or entities hereunder will be joint and several. This Note shall bind the Borrower and its heirs, executors, administrators, successors and assigns, and the benefits hereof shall inure to the benefit of the Bank and its successors and assigns;

provided, however, that the Borrower may not assign this Note in whole or in part without the Bank's written consent and the Bank at any time may assign this Note in whole or in part.

This Note has been delivered to and accepted by the Bank and will be deemed to be made in the State where the Bank's office indicated above is located. **THIS NOTE WILL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE BANK AND THE BORROWER DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE WHERE THE BANK'S OFFICE INDICATED ABOVE IS LOCATED, EXCLUDING ITS CONFLICT OF LAWS RULES.** The Borrower hereby irrevocably consents to the exclusive jurisdiction of any state or federal court in the county or judicial district where the Bank's office indicated above is located; provided that nothing contained in this Note will prevent the Bank from bringing any action, enforcing any award or judgment or exercising any rights against the Borrower individually, against any security or against any property of the Borrower within any other county, state or other foreign or domestic jurisdiction.  The Borrower acknowledges and agrees that the venue provided above is the most convenient forum for both the Bank and the Borrower.  The Borrower waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Note.

10.    **Commercial Purpose.**  The Borrower represents that the indebtedness evidenced by this Note is being incurred by the Borrower solely for the purpose of acquiring or carrying on a business, professional or commercial activity, and not for personal, family or household purposes.

11.    WAIVER OF JURY TRIAL.  The Borrower irrevocably waives any and all rights the Borrower may have to a trial by jury in any action, proceeding or claim of any nature relating to this Note, any documents executed in connection with this Note or any transaction contemplated in any of such documents.  The Borrower acknowledges that the foregoing waiver is knowing and voluntary.

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

The Borrower acknowledges that it has read and understood all the provisions of this Note, including the waiver of jury trial, and has been advised by counsel as necessary or appropriate.

WITNESS the due execution hereof as a document under seal, as of the date first written above, with the intent to be legally bound hereby.

**COLTS RUN, L.L.C.**, an Illinois limited liability company

By:_____
Name: Angelina Djurin
Its: Manager

Signature Page to Senior Note

# JUNIOR NOTE



$5,470,920.53                                                   March 20, 2012

**FOR VALUE RECEIVED, COLTS RUN, L.L.C.**, an Illinois limited liability company (the **"Borrower"**), with an address at 1 Conway Park, 100 North Field Drive, Lake Forest, Illinois 60045 promises to pay to the order of **PNC BANK, NATIONAL ASSOCIATION**, successor to **NATIONAL CITY BANK**, a national banking association (the **"Bank"**), in lawful money of the United States of America in immediately available funds at its offices located at 1 North Franklin Street, Suite 2150, Chicago, Illinois 60606, or at such other location as the Bank may designate from time to time, the principal sum of FIVE MILLION FOUR HUNDRED SEVENTY THOUSAND NINE HUNDRED TWENTY AND 53/100 ($5,470,920.53), together with interest accruing on the outstanding principal balance from the date hereof, all as provided below.

This Junior Note (this **"Note"**) is the Junior Note evidencing the Junior Loan referred to in and is issued pursuant to that certain Consolidated, Amended and Restated Loan Agreement of even date herewith by and between Borrower and the Bank (the **"Loan Agreement"**), and is entitled to the benefits of and is subject to the provisions of the Loan Agreement. The Loan Agreement, among other things, contains provisions for acceleration of the maturity of this Note upon the happening of certain stated events and also for prepayments on account of the principal hereof prior to the maturity hereof upon the terms and conditions specified in the Loan Agreement and the Loan Documents, which provisions are hereby made a part of this Note and are deemed incorporated herein in full. All capitalized terms used herein, unless otherwise specifically defined in this Note, shall have the meanings ascribed to them in the Loan Agreement.

This Note, together with the Senior Note, consolidates, amends and restates in their entirety the Second A&R Fixed Rate Note and the Fourth A & R Adjustable Rate Note. This Note evidences the Junior Loan and the Senior Note evidences the Senior Loan, which together comprise the Loan under the Loan Agreement. This Note is junior in priority to the Senior Note as to payment of principal and interest.

1.      **Rate of Interest.** Amounts outstanding under this Note will bear interest at a rate per annum which is at all times equal to one percent (1.00%). Interest hereunder will be calculated based on the actual number of days that principal is outstanding over a year of 360 days. In no event will the rate of interest hereunder exceed the maximum rate allowed by law.

For purposes hereof, the term **"Business Day"** shall mean any day other than a Saturday or Sunday or a legal holiday on which commercial banks are authorized or required by law to be closed for business in Chicago, Illinois.

2.    **Payment Terms.**  Interest shall accrue at the rate aforesaid.  Until the Maturity Date, Borrower shall pay principal and interest on the unpaid principal balance of the Junior Loan from time to time in such amounts and at such times as are specified in Sections 7.4 and 9 of the Loan Agreement.  If not paid prior thereto, all accrued interest hereunder, together with the outstanding principal balance hereof, shall be due and payable on the Maturity Date or any earlier date on which the Loan comes due as a result of acceleration of the Loan or otherwise.  "**Maturity Date**" shall mean the first to occur of (i) December 31, 2013 or (ii) the date on which the Obligations becomes due and payable pursuant to the provisions of the Loan Documents (whether by acceleration or otherwise).  If any payment under this Note shall become due on a Saturday, Sunday or public holiday under the laws of the State where the Bank's office indicated above is located, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in computing interest in connection with such payment.  The Borrower hereby authorizes the Bank to charge the Borrower's deposit account at the Bank for any payment when due.  If the Borrower revokes this authorization for any reason whatsoever or fails to maintain a deposit account with the Bank which may be charged, the Bank may, at its option, upon thirty (30) days notice to the Borrower, increase the interest rate payable by the Borrower under this Note by twenty-five (25) basis points (0.25%).  Payments received will be applied to charges, fees and expenses (including attorneys' fees), accrued interest and principal in any order the Bank may choose, in its sole discretion.

3.    **Late Payments; Default Rate.**  If the Borrower fails to make any payment of principal, interest or other amount coming due pursuant to the provisions of this Note within ten (10) calendar days of the date due and payable, the Borrower also shall pay to the Bank a late charge equal to five percent (5%) of the amount of such payment (the "**Late Charge**").  Such ten (10) day period shall not be construed in any way to extend the due date of any such payment.  Upon maturity, whether by acceleration, demand or otherwise, and at the Bank's option upon the occurrence of any Event of Default (as hereinafter defined) and during the continuance thereof, amounts outstanding under this Note shall bear interest at a rate per annum (based on the actual number of days that principal is outstanding over a year of 360 days) which shall be five percentage points (5%) in excess of the interest rate in effect from time to time under this Note but not more than the maximum rate allowed by law (the "**Default Rate**").  The Default Rate shall continue to apply whether or not judgment shall be entered on this Note.  Both the Late Charge and the Default Rate are imposed as liquidated damages for the purpose of defraying the Bank's expenses incident to the handling of delinquent payments, but are in addition to, and not in lieu of, the Bank's exercise of any rights and remedies hereunder, under the other Loan Documents or under applicable law, and any fees and expenses of any agents or attorneys which the Bank may employ.  In addition, the Default Rate reflects the increased credit risk to the Bank of carrying a loan that is in default.  The Borrower agrees that the Late Charge and Default Rate are reasonable forecasts of just compensation for anticipated and actual harm incurred by the Bank, and that the actual harm incurred by the Bank cannot be estimated with certainty and without difficulty.

4.    **Prepayment.** The indebtedness evidenced by this Note may be prepaid in whole or in part at any time without penalty.

5.    **Other Loan Documents.** This Note is issued in connection with the Loan Agreement and the other agreements and documents executed and/or delivered in connection therewith or referred to therein, the terms of which are incorporated herein by reference (as amended, modified or renewed from time to time, collectively the **"Loan Documents"**), and is secured by the property described in the Loan Documents and by such other collateral as previously may have been or may in the future be granted to the Bank to secure this Note.

6.    **Events of Default.** The occurrence of any of the following events will be deemed to be an **"Event of Default"** under this Note:  (i) the nonpayment of any principal, interest or other indebtedness under this Note when due; (ii) the occurrence of any event of default or any default and the lapse of any notice or cure period, or any Obligor's failure to observe or perform any covenant or other agreement, under or contained in any Loan Document or any other document now or in the future evidencing or securing any debt, liability or obligation of any Obligor to the Bank; (iii) the filing by or against any Obligor of any proceeding in bankruptcy, receivership, insolvency, reorganization, liquidation, conservatorship or similar proceeding (and, in the case of any such proceeding instituted against any Obligor, such proceeding is not dismissed or stayed within 30 days of the commencement thereof, provided that the Bank shall not be obligated to advance additional funds hereunder during such period); (iv) any assignment by any Obligor for the benefit of creditors, or any levy, garnishment, attachment or similar proceeding is instituted against any property of any Obligor held by or deposited with the Bank; (v) a default with respect to any other indebtedness of any Obligor for borrowed money, if the effect of such default is to cause or permit the acceleration of such debt; (vi) the commencement of any foreclosure or forfeiture proceeding, execution or attachment against any collateral securing the obligations of any Obligor to the Bank; (vii) the entry of a final judgment in excess of $25,000 (individually or in the aggregate with any other then outstanding judgments) against any Obligor and the failure of such Obligor to discharge the judgment within ten (10) days of the entry thereof; (viii) any material adverse change in any Obligor's business, assets, operations, financial condition or results of operations; (ix) any Obligor ceases doing business as a going concern; (x) any representation or warranty made by any Obligor to the Bank in any Loan Document or any other documents now or in the future evidencing or securing the obligations of any Obligor to the Bank, is false, erroneous or misleading in any material respect; (xi) (intentionally deleted); (xii) the revocation or attempted revocation, in whole or in part, of any guarantee by any Obligor; or (xiii) the death, incarceration, indictment or legal incompetency of any individual Obligor or, if any Obligor is a partnership or limited liability company, the death, incarceration, indictment or legal incompetency of any individual general partner or member.  As used herein, the term **"Obligor"** means any Borrower and any guarantor of, or any pledgor, mortgagor or other person or entity providing collateral support for, the Borrower's obligations to the Bank existing on the date of this Note or arising in the future.

-3-

Upon the occurrence of an Event of Default: (a) the Bank shall be under no further obligation to make advances hereunder; (b) if an Event of Default specified in clause (iii) or (iv) above shall occur, the outstanding principal balance and accrued interest hereunder together with any additional amounts payable hereunder shall be immediately due and payable without demand or notice of any kind; (c) if any other Event of Default shall occur, the outstanding principal balance and accrued interest hereunder together with any additional amounts payable hereunder, at the Bank's option and without demand or notice of any kind, may be accelerated and become immediately due and payable; (d) at the Bank's option, this Note will bear interest at the Default Rate from the date of the occurrence of the Event of Default; and (e) the Bank may exercise from time to time any of the rights and remedies available under the Loan Documents or under applicable law.

7.     **Right of Setoff.**  In addition to all liens upon and rights of setoff against the Borrower's money, securities or other property given to the Bank by law, the Bank shall have, with respect to the Borrower's obligations to the Bank under this Note and to the extent permitted by law, a contractual possessory security interest in and a contractual right of setoff against, and the Borrower hereby grants the Bank a security interest in, and hereby assigns, conveys, delivers, pledges and transfers to the Bank, all of the Borrower's right, title and interest in and to, all of the Borrower's deposits, moneys, securities and other property now or hereafter in the possession of or on deposit with, or in transit to, the Bank or any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., whether held in a general or special account or deposit, whether held jointly with someone else, or whether held for safekeeping or otherwise, excluding, however, all IRA, Keogh, and trust accounts.  Every such security interest and right of setoff may be exercised without demand upon or notice to the Borrower.  Every such right of setoff shall be deemed to have been exercised immediately upon the occurrence of an Event of Default hereunder without any action of the Bank, although the Bank may enter such setoff on its books and records at a later time.

8.     **Indemnity.**  To the maximum extent not prohibited by applicable law, the Borrower agrees to indemnify each of the Bank, each legal entity, if any, who controls, is controlled by or is under common control with the Bank, and each of their respective directors, officers and employees (the **"Indemnified Parties"**), and to defend and hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all fees and charges of internal or external counsel with whom any Indemnified Party may consult and all expenses of litigation and preparation therefor) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority (including any person or entity claiming derivatively on behalf of the Borrower), in connection with or arising out of or relating to the matters referred to in this Note or in the other Loan Documents or the use of any advance hereunder, whether (a) arising from or incurred in connection with any breach of a representation, warranty or covenant by the Borrower, or (b) arising out of or resulting from any suit, action, claim, proceeding or governmental investigation, pending or threatened, whether based on statute, regulation or order, or tort, or contract or otherwise, before any court or governmental authority; <u>provided</u>, <u>however</u>, that the foregoing indemnity agreement

-4-

shall not apply to any claims, damages, losses, liabilities and expenses attributable to an Indemnified Party's gross negligence or willful misconduct.   The indemnity agreement contained in this Section shall survive the termination of this Note, payment of any advance hereunder and the assignment of any rights hereunder.  The Borrower may participate at its expense in the defense of any such action or claim.

        9.    **Miscellaneous.**  All notices, demands, requests, consents, approvals and other communications required or permitted hereunder (**"Notices"**) must be in writing (except as may be agreed otherwise above with respect to borrowing requests) and will be effective upon receipt. Notices may be given in any manner to which the parties may separately agree, including electronic mail.  Without limiting the foregoing, first-class mail, facsimile transmission and commercial courier service are hereby agreed to as acceptable methods for giving Notices.  Regardless of the manner in which provided, Notices may be sent to a party's address as set forth above or to such other address as any party may give to the other for such purpose in accordance with this paragraph.  No delay or omission on the Bank's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will the Bank's action or inaction impair any such right or power.  The Bank's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which the Bank may have under other agreements, at law or in equity.  No modification, amendment or waiver of, or consent to any departure by the Borrower from, any provision of this Note will be effective unless made in a writing signed by the Bank, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  The Borrower agrees to pay on demand, to the extent permitted by law, all costs and expenses incurred by the Bank in the enforcement of its rights in this Note and in any security therefor, including without limitation reasonable fees and expenses of the Bank's counsel.  If any provision of this Note is found to be invalid, illegal or unenforceable in any respect by a court, all the other provisions of this Note will remain in full force and effect.  The Borrower and all other makers and indorsers of this Note hereby forever waive presentment, protest, notice of dishonor and notice of non-payment.   The Borrower also waives all defenses based on suretyship or impairment of collateral.  If this Note is executed by more than one Borrower, the obligations of such persons or entities hereunder will be joint and several.  This Note shall bind the Borrower and its heirs, executors, administrators, successors and assigns, and the benefits hereof shall inure to the benefit of the Bank and its successors and assigns; provided, however, that the Borrower may not assign this Note in whole or in part without the Bank's written consent and the Bank at any time may assign this Note in whole or in part.

      This Note has been delivered to and accepted by the Bank and will be deemed to be made in the State where the Bank's office indicated above is located. THIS NOTE WILL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE BANK AND THE BORROWER DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE WHERE THE BANK'S OFFICE INDICATED ABOVE IS LOCATED, EXCLUDING ITS CONFLICT OF LAWS RULES. The Borrower hereby irrevocably consents to the exclusive jurisdiction of any state or federal court in the county or judicial district where the Bank's office indicated above is located; provided that nothing contained in this Note will prevent the Bank from bringing any action, enforcing any

award or judgment or exercising any rights against the Borrower individually, against any security or against any property of the Borrower within any other county, state or other foreign or domestic jurisdiction.  The Borrower acknowledges and agrees that the venue provided above is the most convenient forum for both the Bank and the Borrower.  The Borrower waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Note.

10.   **Commercial Purpose.**  The Borrower represents that the indebtedness evidenced by this Note is being incurred by the Borrower solely for the purpose of acquiring or carrying on a business, professional or commercial activity, and not for personal, family or household purposes.

11.   <u>WAIVER OF JURY TRIAL</u>.  The Borrower irrevocably waives any and all rights the Borrower may have to a trial by jury in any action, proceeding or claim of any nature relating to this Note, any documents executed in connection with this Note or any transaction contemplated in any of such documents.  The Borrower acknowledges that the foregoing waiver is knowing and voluntary.

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

The Borrower acknowledges that it has read and understood all the provisions of this Note, including the waiver of jury trial, and has been advised by counsel as necessary or appropriate.

**WITNESS** the due execution hereof as a document under seal, as of the date first written above, with the intent to be legally bound hereby.

**COLTS RUN, L.L.C.**, an Illinois limited liability company

By:_____
Name: Angelina Djurin
Its: Manager

Signature Page to Term Note

**PNCBANK**

## CONSOLIDATED, AMENDED AND RESTATED LOAN AGREEMENT

**THIS CONSOLIDATED, AMENDED AND RESTATED LOAN AGREEMENT** (the "**Agreement**"), is entered into as of March 20, 2012, between **COLTS RUN, L.L.C.**, an Illinois limited liability company (the "**Borrower**"), with an address at 1 Conway Park, 100 North Field Drive, Lake Forest, Illinois   60045, and **PNC BANK, NATIONAL ASSOCIATION** successor to **NATIONAL CITY BANK**, a national banking association (the "**Bank**"), with an address at 1 North Franklin Street, Suite 2150, Chicago, Illinois 60606.

## RECITALS

A.     Borrower is the owner of certain property improved with a 252-unit apartment complex known as Colts Run Apartments located at 3170 Mapleleaf Drive, Lexington, Kentucky (the "**Property**"), which premises is more particularly described in Exhibit A attached hereto.

B.     On or about July 19, 2001, National City Bank (the "**Original Lender**") made a loan to Borrower in the original principal sum of FIFTEEN MILLION TWO HUNDRED THOUSAND AND NO/100 DOLLARS ($15,200,000.00) ("**Original Loan**").

C.     The Original Loan was evidenced by a Note dated July 19, 2001 in the original principal amount of FIFTEEN MILLION TWO HUNDRED THOUSAND SEVEN HUNDRED ELEVEN AND NO/100 DOLLARS ($15,200,000.00) ("**Original Note**").

D.     The Original Note was secured, in part, by a Real Estate Mortgage, Security Agreement and Assignment of Leases executed by Borrower dated July 19, 2001, and recorded on July 24, 2001, as Document Number 200107240162 in the office of the Fayette County Clerk encumbering the Property ("**Original Mortgage**"), which Original Mortgage was amended by that certain First Amendment to Mortgage and Assignment of Leases and Rents, dated as of June 16, 2003 and recorded July 17, 2003, as Document Number 200307170312 in the office of the Fayette County Clerk ("**First Amendment**"), and by that certain Real Estate Mortgage, Security Agreement and Assignment of Leases from Borrower to Original Lender, dated June 16, 2003, recorded in Mortgage Book 4434, page 523 of the office of the Clerk of Fayette County, Kentucky, as further amended by the Second Amendment to Mortgage and Assignment of Leases and Rents, dated as of March 1, 2005 and recorded March 3, 2005, as Document Number 200503030290, in the office of the Fayette County Clerk ("**Second Amendment**"), as further amended by the Real Estate Mortgage, Security Agreement and Assignment of Leases dated as of July 14, 2006 and recorded July 20, 2006, as Document Number 200607200212 in the Office of the Fayette County Clerk ("**Third Amendment**"), as further amended by the Real Estate Mortgage, Security Agreement and Assignment of Leases dated December 3, 2007, recorded in Mortgage Book 6254, page 189 of the office of the Clerk of Fayette County, Kentucky ("**Fourth Amendment**") (the Original Mortgage, as so amended, the "**Existing Borrower Mortgage**").

E.     In connection with a transfer of an undivided 15% interest in the Property, the transferee thereof (the "**Baldwin Trust**") granted a Real Estate Mortgage, Security Agreement and Assignment of Leases from The Teresa M. Baldwin Trust dated April 8, 1994, to Original Lender, dated March 1, 2005, recorded in Mortgage Book 5217, page 360 of the office of the Clerk of Fayette County, Kentucky to secure the Original Note, as it had then been modified (the "**Original**

Trust Mortgage"), which was amended by that certain Real Estate Mortgage, Security Agreement and Assignment of Leases from the Baldwin Trust to Original Lender, dated July 14, 2006, recorded in Mortgage Book 5784, page 622 of the office of the Clerk of Fayette County, Kentucky, and by that certain Real Estate Mortgage, Security Agreement and Assignment of Leases Mortgage from the Baldwin Trust to Original Lender, dated December 3, 2007, recorded in Mortgage Book 6254, page 199 of the office of the Clerk of Fayette County, Kentucky (the Original Trust Mortgage, as so amended, the **"Existing Trust Mortgage"**).

F.     The Baldwin Trust subsequently transferred its interest in the Property back to the Borrower.

G.     Pursuant to the First Amendment, Borrower borrowed from Original Lender an additional TWO MILLION EIGHT HUNDRED THOUSAND SEVEN HUNDRED ELEVEN AND NO/100 DOLLARS ($2,800,711.00), thus increasing the outstanding principal balance of the Original Loan as of June 16, 2003 to SEVENTEEN MILLION EIGHT HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($17,850,000.00).

H.     Pursuant to the First Amendment and in connection with the foregoing increase in the principal balance of the Original Loan, the Original Note was replaced by two (2) separate notes, both dated as of June 16, 2003: (i) an Amended and Restated Adjustable Rate Note in the original principal amount of NINE MILLION TWO HUNDRED FIFTY-TWO THOUSAND NINE HUNDRED NINETY-SEVEN AND 78/100 DOLLARS ($9,252,997.78) (**"A & R Adjustable Rate Note"**); and (ii) an Amended and Restated Fixed Rate Note in the original principal amount of EIGHT MILLION FIVE HUNDRED NINETY-SEVEN THOUSAND TWO AND 22/100 DOLLARS ($8,597,002.22) (**"A & R Fixed Rate Note"**).

I.     Pursuant to the Second Amendment, Borrower borrowed from Original Lender an additional ONE MILLION SIX HUNDRED FIFTEEN THOUSAND SIX HUNDRED SIX AND 78/100 DOLLARS ($1,615,606.78), thus increasing the outstanding principal balance of the Original Loan as of March 1, 2005 to NINETEEN MILLION DOLLARS ($19,000,000.00).

J.     Pursuant to the Second Amendment and in connection with the foregoing additional increase in the principal balance of the Original Loan, the A & R Adjustable Rate Note was replaced by a Second Amended and Restated Adjustable Rate Note dated March 1, 2005 in the original principal amount of TEN MILLION SIX HUNDRED TWENTY-THREE THOUSAND FOUR HUNDRED FOUR AND 56/100 DOLLARS ($10,623,404.56) (**"Second A & R Adjustable Rate Note"**).

K.     Pursuant to the Third Amendment, Borrower borrowed from Original Lender an additional TWO MILLION SEVEN HUNDRED EIGHT THOUSAND SIX HUNDRED NINETY-EIGHT AND 10/100 DOLLARS ($2,708,698.10), thus increasing the outstanding principal balance of the Original Loan as of July 14, 2006 to TWENTY-ONE MILLION THREE HUNDRED THOUSAND DOLLARS ($21,300,000.00).

L.     Pursuant to the Third Amendment and in connection with the foregoing additional increase in the principal balance of the Original Loan, the Second A & R Adjustable Rate Note was replaced by a Third Amended and Restated Adjustable Rate Note dated July 14, 2006 in

the original principal amount of THIRTEEN MILLION ONE HUNDRED TWENTY-EIGHT
THOUSAND TWO HUNDRED TWO AND 66/100 DOLLARS ($13,128,202.66) ("Third A & R
Adjustable Rate Note").

M.     Pursuant to the Fourth Amendment, (i) Borrower borrowed from Original
Lender an additional THREE MILLION ONE HUNDRED EIGHTY-SEVEN THOUSAND NINE
HUNDRED NINE DOLLARS ($3,187,909.00), thus increasing the outstanding principal balance of
the Original Loan as of December 3, 2007 to TWENTY-FOUR MILLION DOLLARS
($24,000,000.00) and (ii) the Maturity Date of the Original Loan was extended to August 25, 2011.

N.     Pursuant to the Fourth Amendment and in connection with the foregoing
further increase in the principal balance of the Original Loan and extension of the Maturity Date of
the Original Loan, (i) the Third A&R Adjustable Rate Note was replaced by a Fourth Amended and
Restated Adjustable Rate Note dated as of December 3, 2007 in the original principal amount of
SIXTEEN MILLION THIRTY-THREE THOUSAND TWO HUNDRED THIRTEEN DOLLARS
($16,033,213) ("**Fourth A & R Adjustable Rate Note**") and (ii) the A & R Fixed Rate Note was
replaced by a Second Amended and Restated Fixed Rate Note dated as of December 3, 2007 in the
original principal amount of SEVEN MILLION NINE HUNDRED SIXTY-SIX THOUSAND
SEVEN HUNDRED EIGHTY-SEVEN DOLLARS ($7,966,787) ("**Second A & R Fixed Rate
Note**")(The Second A & R Fixed Rate Note and Fourth A & R Adjustable Rate Note are collectively
referred to as the "**A & R Notes**").

O.     The A & R Notes are further secured, in part, by a Guaranty executed by Ivan
Djurin ("**Guarantor**") dated July 19, 2001, as amended by that certain Reaffirmation of Guaranty,
dated as of June 16, 2003, to and for the benefit of Original Lender (as so amended, the "**Original
Guaranty**").

P.     The Original Guaranty was amended and replaced by the Amended and
Restated Guaranty dated September 22, 2004 executed by Guarantor to and for the benefit of
Original Lender, which was amended and replaced by the Second Amended and Restated Guaranty
dated as of March 1, 2005 executed by Guarantor to and for the benefit of Original Lender, which
was amended and replaced by the Third Amended and Restated Guaranty dated as of July 14, 2006
executed by Guarantor to and for the benefit of Original Lender, which was amended and replaced
by the Fourth Amended and Restated Guaranty dated as of December 3, 2007 executed by
Guarantor to and for the benefit of Original Lender (the Original Guaranty, as so amended and
replaced, the "**Existing Guaranty**").

Q.     The Bank is the successor in interest to the Original Lender.

R.     Various "Defaults" as defined in the A & R Notes occurred, including those
described in Exhibit B attached hereto (the "**Existing Defaults**"). Among the Existing Defaults was
that Borrower filed for federal bankruptcy protection.

S.     The Bank has agreed to forebear taking action as a result of the Existing
Defaults, subject to the terms of this Agreement and the other Loan Documents (as defined below).
In connection therewith, the parties have agreed to amend the terms of the Original Loan as

provided in this Agreement and the other Loan Documents, including the extension of the maturity date of such loan.

T.    In order to effectuate the aforesaid amendment, the A & R Notes are being consolidated, amended and restated pursuant to this Agreement and the other Loan Documents, and the Existing Borrower Mortgage and the Existing Trust Mortgage are also being consolidated, amended and restated by that certain Consolidated, Amended and Restated Open-End Real Estate Mortgage, Security Agreement and Assignment of Leases dated as of the date hereof (the "**Mortgage**").

U.    Reference is further made to those certain loans (the "**Original Mt. Zions Loans**") made by Original Lender and its processors in interest to Mt. Zion Limited Partnership, a Kentucky limited partnership ("**Mt. Zion**") pursuant to various notes and other loan documents, including those described on Exhibit C attached hereto (as amended to date, the "**Original Mt. Zion Loan Documents**").

V.    There exist various "Events of Default" under the Original Mt. Zion Loan Documents, including the fact that Mt. Zion filed for federal bankruptcy protection. The Bank has agreed to forebear taking action as a result of such existing events of default and to amend the terms of the Original Mt. Zion Loans pursuant to various loan documents being entered into concurrently herewith pertaining to such other loans (the Original Mt. Zion Loan Documents, as amended thereby, being referred to as the "**Mt. Zion Amended Loan Documents**" and the Original Mt. Zion Loans, as amended thereby, being referred to as the "**Amended Mt. Zion Loans**").

W.    The ultimate ownership of the Borrower and of Mt. Zion was held by Guarantor. Pursuant to the Colts Run Plan (and the Mt. Zion Plan in the Mt. Zion Bankruptcy Case), the ultimate ownership of Borrower and of Mt. Zion is being transferred to Angelina Djurin, not personally, but solely as Trust of the Angelina Djurin Self Declaration of Trust Dated April 2, 2001 (the "**Djurin Pledgor**").

X.    As a condition for the Bank to agree to the forbearance and amendments of the Original Loan and the Original Mt. Zion Loans, the Bank has required that all such loans, as amended by this Agreement, the other Loan Documents and the Mt. Zion Amended Loan Documents, respectively, be cross-defaulted and cross-collateralized; and Borrower, Mt. Zion, Guarantor, Djurin Pledgor and Baldwin Pledgor have agreed thereto.

Y.    This Agreement and the other Loan Documents are being entered pursuant to that certain Debtor's Second Amended Plan of Reorganization filed by Borrower in the Colts Run Bankruptcy Case on March 29, 2011 (Docket No. 208), as amended and otherwise modified pursuant that certain Debtor's Plan of Reorganization filed by Borrower in the Colts Run Bankruptcy Case on August 3, 2010 (Docket No. 55), as amended and otherwise modified pursuant to that certain Order Modifying and Confirming Debtor's Plan of Reorganization, entered in the Bankruptcy Case on [__], 2012 (Docket No. [__]) (the "**Colts Run Plan**").   "**Colts Run Bankruptcy Case**" shall be defined as that certain bankruptcy case voluntarily commenced by Borrower under chapter 11 of the United States Bankruptcy Code on or about April 23, 2010 in the United States Bankruptcy Court for the Northern District of Illinois (Eastern Division), Case No. 10-18071.

Z.    The Mt. Zion Amended Loan Documents are being entered into concurrently herewith pursuant to that certain Debtor's Second Amended Plan of Reorganization filed by Mt. Zion in the Mt. Zion Bankruptcy Case on March 29, 2011 (Docket No. 208), as amended and otherwise modified pursuant to that certain Order Modifying and Confirming Debtor's Second Amended Plan of Reorganization, entered in the Mt. Zion Bankruptcy Case on [__], 2012 (Docket No. [__]) (the "**Mt. Zion Plan**"). "**Mt. Zion Bankruptcy Case**" shall be defined as that certain that certain bankruptcy case voluntarily commenced by Mt. Zion under chapter 11 of the United States Bankruptcy Code on or about April 23, 2010 in the United States Bankruptcy Court for the Northern District of Illinois (Eastern Division), Case No. 10-18075.

NOW, THEREFORE, in consideration of the covenants and agreements contained herein and in the other Loan Documents and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Bank and Borrower hereby covenant and agree as follows:

1.    **Incorporation of Recitals**.  The Recitals above are hereby incorporated into this Agreement.

2.    **Consolidation, Amendment and Restatement**.  This Agreement, together with the other Loan Documents being executed and delivered in connection herewith, consolidates, amends and restates the terms of the Loan and the Existing Loan Documents in their entirety.

3.    **Acknowledgment of Obligations and Consolidation of Debt**.  Borrower hereby acknowledges, confirms and agrees that as of the day prior to the date hereof, Borrower was indebted to the Bank with respect to the Second A & R Fixed Rate Note and the Fourth A & R Adjustable Rate Note for an aggregate indebtedness as of that date of $22,970,920.53, plus certain additional amounts as set forth in the following paragraph.  Borrower hereby acknowledges, confirms and agrees that all such amounts, together with interest accrued and accruing thereon, and all fees, costs, expenses and other charges now or hereafter payable by Borrower to the Bank, are unconditionally owing by Borrower to the Bank, without offset, defense or counterclaim of any kind, nature or description whatsoever.  From and after the Effective Date, the Second A & R Fixed Rate Note and the Fourth A & R Adjustable Rate Note are hereby consolidated, amended and restated into two replacement notes: (i) that certain Senior Note dated as of the date hereof made by Borrower in favor of the Bank in the principal amount of $17,500,000.00 (together with any Amendments thereto, the "**Senior Note**"), and (ii) by that certain Junior Note dated as of the date hereof by Borrower in favor of the Bank in the principal amount of $5,470,920.53 (together with any Amendments thereto, the "**Junior Note**").  The portion of the Debt evidenced by the Junior Note (the "**Junior Loan**") is subordinate in right to payment to the portion of the Debt evidenced by the Senior Note (the "**Senior Loan**").  The Original Loan is, as of the Effective Date, amended as provided in this Agreement and the other Loan Documents (as so amended, the "**Loan**").  Although the Loan is governed by this Agreement and the other Loan Documents, the Senior Loan and the Junior Loan may be treated as separate loans made by the Bank, at its election.

In addition to the amounts set forth in the previous paragraph, Borrower hereby acknowledges, confirms and agrees that as of the date hereof, Borrower is also indebted to the Bank in the following amounts: (i) $115,392.84 representing accrued but unpaid interest accruing prior to and following the bankruptcy filing of Borrower (the "**Accrued Interest**"), and (ii) accrued legal

fees and other charges for appraisals, etc., in the aggregate amount of $397,464.63 (the "**Accrued Charges**"), which amount excludes any legal fees and charges being paid by Borrower in connection with the execution and delivery of the Loan Documents (including title company fees and charges and $4,000.00 in reimbursement of Bank's appraisal fees).

        4.    **Acknowledgment of Security Interests**.  Borrower hereby acknowledges, confirms and agrees that the Bank has and shall continue to have valid, enforceable and perfected first-priority liens upon and security interests in the collateral heretofore granted to the Bank pursuant to the A & R Notes, the Existing Borrower Mortgage, the Existing Trust Mortgage, the Existing Security Agreement, the Existing Assignment and the Existing Guaranty (collectively, the "**Existing Loan Documents**") or otherwise granted to or held by the Bank.  Borrower hereby further acknowledges that the security for repayment of the Loan includes but is not limited to the collateral, guaranties and other documents heretofore, contemporaneously or hereafter executed and delivered to the Bank (the "**Security Documents**"), which shall secure repayment of the Loan, the Senior Note, the Junior Note, the Amended Mt. Zion Loans and all other loans, advances, debts, liabilities, obligations, covenants and duties owing by the Borrower or Mt. Zion to the Bank or to any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., of any kind or nature, present or future (including any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, whether or not (i) evidenced by any note, guaranty or other instrument, (ii) arising under any agreement, instrument or document, (iii) for the payment of money, (iv) arising by reason of an extension of credit, opening of a letter of credit, loan, equipment lease or guarantee, (v) under any interest or currency swap, future, option or other interest rate protection or similar agreement, (vi) under or by reason of any foreign currency transaction, forward, option or other similar transaction providing for the purchase of one currency in exchange for the sale of another currency, or in any other manner, or (vii) arising out of overdrafts on deposit or other accounts or out of electronic funds transfers (whether by wire transfer or through automated clearing houses or otherwise) or out of the return unpaid of, or other failure of the Bank to receive final payment for, any check, item, instrument, payment order or other deposit or credit to a deposit or other account, or out of the Bank's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository or other similar arrangements; and any amendments, extensions, renewals and increases of or to any of the foregoing, and all costs and expenses of the Bank incurred in the documentation, negotiation, modification, enforcement, collection and otherwise in connection with any of the foregoing, including reasonable attorneys' fees and expenses (hereinafter referred to collectively as the "**Obligations**").  Unless expressly provided to the contrary in documentation for any other loan or loans, it is the express intent of the Bank and the Borrower that all Obligations including those included in the Loan be cross-collateralized and cross-defaulted, such that collateral securing any of the Obligations shall secure repayment of all Obligations and a default under any Obligation shall be a default under all Obligations.

        This Agreement, the Senior Note, the Junior Note, the Security Documents and all other agreements and documents executed and/or delivered pursuant hereto, as each may be amended, modified, extended or renewed from time to time, are collectively referred to as the

**"Loan Documents."** Capitalized terms not defined herein shall have the meanings ascribed to them in the Loan Documents.

5. **Term of Loan**. On the Maturity Date, the Obligations, if not sooner paid or payable, shall become due and payable in full. **"Maturity Date"** means the first to occur of (i) December 31, 2013, or (ii) the date on which the Obligations become due and payable pursuant to the provisions of the Loan Documents (whether by acceleration or otherwise).

6. **Disbursement and Prepayment**.

6.1. **No Additional Loan Funding**. Borrower acknowledges, confirms and agrees that the Bank has fully disbursed the Loan and no further advances thereof are required to be made by the Bank.

6.2. **Voluntary Prepayment**. The Obligations may be prepaid in whole or in part, at any time as set forth in the Notes and this Agreement.

7. **Mandatory Principal Payments; Lockbox Account; Operating Account; Budgets; Security Deposits**.

7.1. As of the date hereof, Borrower has established with the Bank or its servicer a deposit account (the **"Lockbox Account"**) into which Borrower shall (or shall cause Borrower's property manager to) deposit upon receipt rental payments and all other payments made by tenants of the Property whether pursuant to their leases or otherwise, as well as all other proceeds of the Property (including without limitation, casualty, rent loss, business interruption insurance proceeds or other insurance proceeds and proceeds of any condemnation (temporary or permanent) with respect to the Property). Upon the occurrence of an Event of Default, the Bank or its servicer may establish a post office address (the **"Lockbox"**) as described in the Deposit Account Control Agreement pertaining to the Lockbox Account. All collected proceeds of the Lockbox shall be deposited into the Lockbox Account in accordance with the terms of said Deposit Account Control Agreement and the Cash Management Agreement. Borrower has also established a cash management deposit account with the Bank (the **"Operating Account"**), which shall also be subject to the terms of a Deposit Account Control Agreement. Borrower hereby grants a security interest in the Lockbox, Lockbox Account and the Operating Account and all funds therein to the Bank, and the Lockbox, Lockbox Account and the Operating Account and all funds therein shall constitute collateral securing the Obligations. Upon the occurrence of an Event of Default, all deposits and amounts in the Lockbox, Lockbox Account and Operating Account may be applied by Bank to cure such Event of Default or to the Obligations in such order as the Bank may determine in its sole discretion.

7.2. Upon the occurrence of an Event of Default, at Bank's election, Borrower warrants and covenants that Borrower will deliver letters to all tenants of the Property directing them to deposit all rental and other payments made pursuant to their leases at the Property directly into the Lockbox. Whether prior to or after an Event of Default, Borrower will (and will cause its property manager to) immediately deposit any and all receipts from tenants, of any nature whatsoever, into the Lockbox Account. Any amounts so received by the Borrower shall be deemed

-7-

to be collateral and shall be held in trust by it for the benefit, and as of property of, the Bank and shall not be commingled with any other funds or property of Borrower.

       7.3.    Borrower and the Bank acknowledge that the budget attached hereto as Exhibit D (the **"Initial Budget"**) shall include an estimate of all Expenses (as hereinafter defined) for the Property for the period beginning on or before March 20, 2012 through December 31, 2012. Beginning on December 15, 2012, on each March 15, June 15, September 15 and December 15 (each, a **"Budget Due Date"**) thereafter, Borrower shall submit to the Bank a proposed quarterly budget (each, a **"Quarterly Budget"**; together with the Initial Budget, each a **"Budget"**) with respect to the Expenses for the Property for the following calendar quarter. The Bank shall have five (5) days after its receipt of a Quarterly Budget to either approve it or request changes thereto. If the Bank does not request changes thereto within said five (5) day period, such Quarterly Budget shall be deemed approved by the Bank. Borrower shall promptly revise any Quarterly Budget not approved by the Bank and resubmit it to the Bank so that a Quarterly Budget approved by the Bank is in place on or before the twentieth (20th) day of the calendar month in which the Budget Due Date falls. If Borrower and the Bank are unable to timely agree upon a Quarterly Budget in good faith, the last Quarterly Budget Borrower submitted, with the changes requested by the Bank, shall constitute the Bank approved Quarterly Budget for that quarter. **"Expenses"** means, for a given quarter, the expenses to be incurred and paid by Borrower in owning, operating, leasing and maintaining the Property, including such capital expenditures as Bank may approve in its discretion, provided that Expenses shall not include payments of principal and interest due under the Loan Documents or payments to satisfy real estate taxes made with funds from the Real Estate Tax Reserve Account. Each Budget shall be broken down into consecutive one-month periods to allow for disbursements pursuant to Section 7.4 below. On or before the fifteenth (15th) day of each calendar month, Borrower shall submit to the Bank an Operating Account reconciliation (each, a **"Reconciliation"**), including a list of all outstanding checks written against the Operating Account and the amounts thereof (individually and in aggregate).

       7.4.    On or before the date that this Agreement is executed, Borrower shall deposit with the Bank a sum of money to be deposited into the Operating Account which will be sufficient to pay all Expenses from the date of execution of this Agreement (the **"Execution Date"**) through the twentieth (20th) day of the first calendar month following the Execution Date. On the twenty first (21st) day of each calendar month (provided, for the month of April, 2012 only, on April 5, 2012), to the extent available, the Bank shall disburse funds in the Lockbox Account in the order and manner as follows: (i) first, to the Bank to pay the expenses and fees of maintaining the Lockbox Account, the Lockbox (if applicable) and the Operating Account, (ii) second to accrued and unpaid interest on the principal balance of the Senior Note (provided the first scheduled payment of interest shall not, absent an Event of Default, be due under the Senior Note prior to May 1, 2012); (iii) third, to the Real Estate Tax Reserve Account (as hereinafter defined) in the amount set forth in Section 8 below; (iv) fourth, to the Operating Account in an amount sufficient so that the Operating Account has in it an amount (determined by the Bank) equal to the sum of (x) the aggregate amount of outstanding checks written against the Operating Account to pay Expenses for prior periods pursuant to the Reconciliation, plus (y) 105% of the estimated Expenses for such month as set forth in a Budget approved by the Bank; and (v) fifth, at the Bank's sole discretion, to payment of all then unpaid Obligations. Borrower shall timely make payments for all Expenses from the Operating Account. Borrower shall not make any disbursements from the Operating Account other than to pay Expenses (not to exceed 105% of the Expenses set forth in a Bank

approved Budget for any month) or to pay the Bank. In all events, Borrower shall be responsible for timely payments of all costs and expenses of ownership, operation, management and leasing of the Property, without regard to availability of funds from the Lockbox Account. Any funds remaining in the Lockbox Account after the aforesaid disbursement to the Operating Account shall be disbursed to the Bank and applied in accordance with Section 9 below.

7.5.   On or before the date that this Agreement is executed, Borrower shall deposit with the Bank a sum of money equal to the amount of all security deposits held by Borrower pursuant to leases of the Property. Within two (2) Business Days after Borrower (or its property manager) receives any security deposit pursuant to a lease of the Property, Borrower shall (or shall cause its property manager to) deposit such security deposit with the Bank. All such security deposits deposited with the Bank hereunder shall be maintained in a segregated account and otherwise in accordance with Applicable Law. Subject to Applicable Law and tenants' rights to the return of their respective security deposits, Borrower hereby grants to Bank a security interest in such segregated account and all funds therein to secure payment of all of the Obligations and such account and funds constitute collateral. The Bank shall make such funds available to Borrower (or its property manager) to return to tenants in accordance with their respective leases of the Property and in accordance with Applicable Laws; provided, the Bank reserves the right to pay such amounts directly to the tenant to whom such amounts are due. Funds held in such account that are entitled to be paid to Borrower pursuant to a tenant's lease of the Property and Applicable Law shall, upon reasonable notice and evidence thereof being submitted to the Bank, be deposited into the Lockbox Account and dealt with as provided with the foregoing provisions of this Section 7.

8.   **Real Estate Tax Reserve**.   For the period beginning on the Execution Date through April 30, 2012, the Bank shall not make any monthly disbursements from the Lockbox Account into the Real Estate Tax Reserve Account (as hereinafter defined) for Real Estate Taxes (as hereinafter defined) relating to the Property. For the period beginning on May 1, 2012 through October 1, 2012, in accordance with Section 7.4, the Bank shall, to the extent available, disburse monthly from the Lockbox Account into a deposit account with the Bank (the **"Real Estate Tax Reserve Account"**) a sum of money equal to one sixth (1/6th) of the annual charges for real estate taxes, assessments, franchise taxes and charges, impositions and other similar charges and obligations relating to the Property (the **"Real Estate Taxes"**). For the period beginning on November 1, 2012 until the Obligations are paid in full, in accordance with Section 7.4, the Bank shall, to the extent available, disburse monthly from the Lockbox Account into a the Real Estate Tax Reserve Account a sum of money equal to one twelfth (1/12th) of the annual charges for the Real Estate Taxes. Deposits shall be made on the basis of the Bank's estimate from time to time of the charges for the current year (after giving effect to any reassessment or, at the Bank's election, on the basis of the charges for the prior year, with adjustments when the charges are fixed for the then current year), so that the Real Estate Taxes are in all events paid on or before October 31st each year to take full advantage of all discounts for "early" payment.. If the funds in the Lockbox Account for any month prior to the Maturity Date are insufficient to make such deposits into the Real Estate Tax Reserve Account, Borrower shall deposit any deficiency with the Bank immediately upon demand. Borrower hereby grants the Bank a security interest in the Real Estate Tax Reserve Account and all funds therein to secure payment of all of the Obligations and such account and funds constitute collateral. Absent an Event of Default having occurred and be continuing, the Bank shall make funds in the Real Estate Tax Reserve Account available to Borrower to pay all real estate taxes assessed against the Property, which shall be paid on time (and "early" so as to receive the benefit of

all discounts for early payment). However, lack of adequate funds in such reserve shall not excuse Borrower from its obligation to timely pay all such taxes. Upon the occurrence of an Event of Default, the Bank may use or apply the Real Estate Tax Reserve or any other reserves or monies deposited by Borrower with the Bank to cure such Event of Default or to apply as a payment of the Obligations in such order as Bank may determine in its sole direction.

9.    **Application of Payments**. Prior to the occurrence of an Event of Default, all payments and prepayments on account of the Loan shall be applied as follows: (i) first, to fees, expenses, costs and other similar amounts then due and payable to the Bank, including without limitation, any late charges; (ii) second, to accrued and unpaid interest on the principal balance of the Senior Note; (iii) third, to the payment of any escrows, impounds or other amounts which may then be due and payable under the Loan Documents; (iv) fourth, to any other amount then due the Bank hereunder or under any of the Loan Documents with respect to the Loan (other than amounts described in clauses (v) through (vii) of this Section 9); (v) fifth, to the unpaid principal balance of the Senior Note; (vi) sixth, to the interest accrued and unpaid on the principal balance of the Junior Note; (vii) seventh, to the unpaid principal balance of the Junior Note; (viii) eighth, to payment of all then unpaid Pre-Bankruptcy Interest; (ix) ninth, to payment of all then unpaid Accrued Charges, and (x) tenth, to payment of all then unpaid Obligations. Any prepayment shall not extend or postpone the due date or reduce the amount of any subsequent payment of principal or interest due hereunder. After an Event of Default has occurred and is continuing, payments may be applied to amounts owed hereunder and under the Notes and other Loan Documents and the other Obligations in such order as the Bank shall determine, in its sole discretion; provided, accrued interest and the unpaid principal balance of the Senior Loan shall be paid in full before any payments with respect to interest or principal with respect to the Junior Loan are paid.

10.    **Representations and Warranties**. The Borrower hereby makes the following representations and warranties, which shall be continuing in nature and remain in full force and effect until the Obligations are paid in full, and which shall be true and correct:

10.1.    **Existence, Power and Authority**. The Borrower is duly organized, validly existing and in good standing under the laws of the State of its incorporation or organization and has the power and authority to own and operate its assets and to conduct its business as now or proposed to be carried on, and is duly qualified, licensed and in good standing to do business in all jurisdictions where its ownership of property or the nature of its business requires such qualification or licensing. The Borrower is duly authorized to execute and deliver the Loan Documents, all necessary action to authorize the execution and delivery of the Loan Documents has been properly taken, and the Borrower is and will continue to be duly authorized to borrow under this Agreement and to perform all of the other terms and provisions of the Loan Documents.

10.2.    **Financial Statements**. Borrower has delivered or caused to be delivered to the Bank its most recent balance sheet, income statement and statement of cash flows, (the "**Historical Financial Statements**"). The Historical Financial Statements are true, complete and accurate in all material respects and fairly present the financial condition, assets and liabilities, whether accrued, absolute, contingent or otherwise and the results of the Borrower's operations for the period specified therein. The Historical Financial Statements have been prepared in accordance with generally accepted accounting principles ("**GAAP**") consistently applied from period to period,

-10-

subject in the case of interim statements to normal year-end adjustments and to any comments and notes acceptable to the Bank in its sole discretion.

10.3. **No Material Adverse Change**. Since the date of the most recent Financial Statements (as hereinafter defined), the Borrower has not suffered any damage, destruction or loss, and no event or condition has occurred or exists, which has resulted or could result in a material adverse change in its business, assets, operations, condition (financial or otherwise) or results of operation (a **"Material Adverse Change"**).

10.4. **Binding Obligations**. The Borrower has full power and authority to enter into the transactions provided for in this Agreement and has been duly authorized to do so by appropriate action of its general partners and the Loan Documents, when executed and delivered by the Borrower, will constitute the legal, valid and binding obligations of the Borrower enforceable in accordance with their terms.

10.5. **No Defaults or Violations**. Other than the Existing Defaults, there does not exist any Event of Default under this Agreement or any default or violation by the Borrower of or under any of the terms, conditions or obligations of: (i) its partnership agreement; (ii) any indenture, mortgage, deed of trust, franchise, permit, contract, agreement, or other instrument to which it is a party or by which it is bound; or (iii) any law, ordinance, regulation, ruling, order, injunction, decree, condition or other requirement applicable to or imposed upon it by any law, the action of any court or any governmental authority or agency; and the consummation of this Agreement and the transactions set forth herein will not result in any such default or violation or Event of Default.

10.6. **Title to Assets**. The Borrower has good and marketable title to the assets reflected on the most recent Financial Statements, free and clear of all liens and encumbrances, except for (i) current taxes and assessments not yet due and payable, (ii) assets disposed of by the Borrower in the ordinary course of business since the date of the most recent Financial Statements, and (iii) liens and encumbrances in favor of the Bank.

10.7. **Litigation**. There are no actions, suits, proceedings or governmental investigations pending of which Borrower has been served or as to which Borrower has otherwise received notice thereof or, to the knowledge of the Borrower, threatened against the Borrower, which could result in a material adverse change in its business, assets, operations, condition (financial or otherwise) or results of operations and there is no basis known to the Borrower for any action, suit, proceeding or investigation which could result in such a material adverse change.

10.8. **Tax Returns**. The Borrower has filed all returns and reports that are required to be filed by it in connection with any federal, state or local tax, duty or charge levied, assessed or imposed upon it or its property or withheld by it, including income, unemployment, social security and similar taxes, and all of such taxes have been either paid or adequate reserve or other provision has been made therefor.

10.9. **Employee Benefit Plans**. Each employee benefit plan as to which the Borrower may have any liability complies in all material respects with all applicable provisions of the Employee Retirement Income Security Act of 1974 (as amended from time to time, **"ERISA"**),

including minimum funding requirements, and (i) no Prohibited Transaction (as defined under ERISA) has occurred with respect to any such plan, (ii) no Reportable Event (as defined under Section 4043 of ERISA) has occurred with respect to any such plan which would cause the Pension Benefit Guaranty Corporation to institute proceedings under Section 4042 of ERISA, (iii) the Borrower has not withdrawn from any such plan or initiated steps to do so, and (iv) no steps have been taken to terminate any such plan.

10.10. **Environmental Matters**.  To the best of Borrower's knowledge, the Borrower is in compliance, in all material respects, with all Environmental Laws (as hereinafter defined), including, without limitation, all Environmental Laws in jurisdictions in which the Borrower owns or operates, or has owned or operated, a facility or site, stores Collateral, arranges or has arranged for disposal or treatment of hazardous substances, solid waste or other waste, accepts or has accepted for transport any hazardous substances, solid waste or other wastes or holds or has held any interest in real property or otherwise.  No litigation or proceeding arising under, relating to or in connection with any Environmental Law is pending or, to the best of the Borrower's knowledge, threatened against the Borrower, any real property which the Borrower holds or has held an interest or any past or present operation of the Borrower.  No release, threatened release or disposal of hazardous waste, solid waste or other wastes is occurring, or to the best of the Borrower's knowledge has occurred, on, under or to any real property in which the Borrower holds or has held any interest or performs or has performed any of its operations, in violation of any Environmental Law.  As used in this Section, **"litigation or proceeding"** means any demand, claim notice, suit, suit in equity, action, administrative action, investigation or inquiry whether brought by a governmental authority or other person, and **"Environmental Laws"** means all provisions of laws, statutes, ordinances, rules, regulations, permits, licenses, judgments, writs, injunctions, decrees, orders, awards and standards promulgated by any governmental authority concerning health, safety and protection of, or regulation of the discharge of substances into, the environment.

10.11. **Intellectual Property**.  The Borrower owns or is licensed to use all patents, patent rights, trademarks, trade names, service marks, copyrights, intellectual property, technology, know-how and processes necessary for the conduct of its business as currently conducted that are material to the condition (financial or otherwise), business or operations of the Borrower.

10.12. **Regulatory Matters**.  No part of the proceeds of the Loan will be used for "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U of the Board of Governors of the Federal Reserve System as now and from time to time in effect or for any purpose which violates the provisions of the Regulations of such Board of Governors.

10.13. **Solvency**.  As of the date hereof and after giving effect to the transactions contemplated by the Loan Documents, (i) the aggregate value of the Borrower's assets will exceed its liabilities (including contingent, subordinated, unmatured and unliquidated liabilities), (ii) the Borrower will have sufficient cash flow to enable it to pay its debts as they become due, and (iii) the Borrower will not have unreasonably small capital for the business in which it is engaged.

10.14. **Disclosure**.  None of the Loan Documents contains or will contain any untrue statement of material fact or omits or will omit to state a material fact necessary in order to make the statements contained in this Agreement or the Loan Documents not misleading.  There is no fact known to the Borrower which materially adversely affects or, so far as the Borrower can now foresee, might materially adversely affect the business, assets, operations, condition (financial or otherwise) or results of operation of the Borrower and which has not otherwise been fully set forth in this Agreement or in the Loan Documents.

11.    **Affirmative Covenants**.  The Borrower agrees that from the date of execution of this Agreement until all Obligations have been paid in full and any commitments of the Bank to the Borrower have been terminated, the Borrower will:

11.1.  **Books and Records**.  Maintain books and records in accordance with GAAP and give representatives of the Bank access thereto at all reasonable times, including permission to examine, copy and make abstracts from any of such books and records and such other information as the Bank may from time to time reasonably request, and the Borrower will make available to the Bank for examination copies of any reports, statements and returns which the Borrower may make to or file with any federal, state or local governmental department, bureau or agency.

11.2.  **Financial Reports**.  Deliver or cause to be delivered to the Bank each of the following:

(i)    **Annual Reports**.  Within forty-five (45) days of the close of each fiscal quarter of Borrower, and within ninety (90) days of the close of each fiscal year of Borrower, certified copies of the internally prepared financial statements for such fiscal year of Borrower, prepared in accordance with generally accepted accounting principles consistently applied, including a statement of operations (profit and loss), a statement of cash flows, a calculation of net operating income, a balance sheet and such other information as is reasonably required by the Bank.  Each balance sheet furnished under this paragraph shall be accompanied by a schedule categorizing the assets and liabilities set forth in each such balance sheet as either current assets or liabilities or long-term assets or liabilities, as the case may be.

(ii)    **Guarantor's and Djurin Pledgor's Financials**.  On or before April 30th of each year during the term of the Loan, personal financial statements for Guarantor and Djurin Pledgor in forms reasonably acceptable to the Bank.

(iii)    **Tax Returns**.  Within thirty (30) days after the due date thereof as it may be extended, copies of all tax returns filed with respect to each Loan Party (as hereinafter defined).

(iv)    **Rent Roll**.  Within ten (10) days following the end of each calendar month, a certified copy of the updated rent roll for the Property in a form reasonably acceptable to the Bank.

(v) **Operating Statement**. Within ten (10) days following the end of each calendar month, a certified copy of the operating statement of the Property detailing the total revenues received and total expenses incurred in a form reasonably acceptable to the Bank.

(vi) **Global Cash Flow**. Within thirty (30) days following the end of each calendar year and as the Bank shall otherwise reasonably request, a complete global cash flow report for Borrower and Guarantor by property, in a form reasonably acceptable to the Bank.

11.3. **Other Information**. Within thirty (30) days after request, such further detailed information covering the Property and the financial affairs of any Loan Party, as may be reasonably requested by the Bank.

11.4. **Payment of Taxes and Other Charges**. Pay and discharge when due all indebtedness and all taxes, assessments, charges, levies and other liabilities imposed upon the Borrower, its income, profits, property or business, except those which currently are being contested in good faith by appropriate proceedings and for which the Borrower shall have set aside adequate reserves or made other adequate provision with respect thereto acceptable to the Bank in its sole discretion.

11.5. **Maintenance of Existence, Operation and Assets**. Do all things necessary to (i) maintain, renew and keep in full force and effect its organizational existence and all rights, permits and franchises necessary to enable it to continue its business as currently conducted; (ii) continue in operation in substantially the same manner as at present; (iii) keep its properties in good operating condition and repair; and (iv) make all necessary and proper repairs, renewals, replacements, additions and improvements thereto.

11.6. **Insurance**.

(a) Policies. Borrower, at its sole cost and expense, shall insure and keep insured the Property against such perils and hazards, and in such amounts and with such limits, and pursuant to such policies issued by such insurers, as Bank may from time to time reasonably require (collectively, "**Policies**"), and, in any event, including:

(i) All Risk. Insurance against loss to the Property which during construction shall be on an "All Risk" perils "Builders' Risk", non-reporting "Completed Value" form covering insurance risks no less broad than those covered under a Standard Multi Peril (SMP) policy form, which contains a Commercial ISO "Causes of Loss - Special Form", including theft, and insurance against such other risks as Bank may reasonably require, including, but not limited to, insurance covering the cost of demolition of undamaged portions of any portion of the Property when required by Applicable Law and the increased cost of reconstruction to conform with current code or ordinance requirements and the cost of debris removal. In addition, such Policies shall cover the following: real estate property taxes; architect, engineering, and consulting fees; legal and accounting fees; advertising and promotion expenses; interest on money borrowed; and any and all other expenses which may be incurred as a result of any property loss or destruction by an insured. Such Policies shall be in amounts equal to the full replacement cost of the Property on an As

Built Basis, including all fixtures, equipment, construction materials and Personal Property on and off-site, but in no event less than the aggregate amount of the Loan (assuming full disbursement thereof). Such Policies shall also contain a one hundred percent (100%) co-insurance clause with an agreed amount endorsement (with such amount to include the replacement cost of any foundation and any underground pipes), a permission to occupy endorsement (if such endorsement is applicable because such coverage would otherwise be excluded) and deductibles which are in amounts reasonably acceptable to Bank.

(ii) <u>Workers' Compensation</u>. During the construction of any improvements to the Property (i) insurance covering claims based on the owner's or employer's contingent liability not covered by the insurance provided in **Section 11.6(a)(i)** and (ii) workers' compensation insurance covering all Persons engaged in such alterations or improvements.

(iii) <u>Flood</u>. Insurance against loss or damage by flood or mud slide in compliance with the Flood Disaster Protection Act of 1973, as amended from time to time, if the Property is now, or at any time while the Loan remains outstanding shall be, situated in any area which an appropriate Governmental Authority designates as a special flood hazard area, Zone A or Zone V, in amounts equal to the full replacement value of all above grade structures on the Property.

(iv) <u>Earthquake</u>. Insurance against loss or damage by earthquake, if the Property is now, or at any time while the Loan remains outstanding shall be, situated in any area which is classified as a Major Damage Zone, Zones 3 and 4, by the International Conference of Building Officials in an amount equal to the probable maximum loss for said Property, fixtures and equipment, plus the cost of debris removal.

(v) <u>Public Liability</u>. Comprehensive liability insurance against death, bodily injury and property damage arising in connection with the Property. Such Policy shall be written on a Standard ISO occurrence basis form or equivalent form, shall list Borrower as the named insured, shall designate thereon the location of the Property and have such limits as Bank may reasonably require, but in no event less than TWO MILLION DOLLARS ($2,000,000.00) per occurrence. Borrower shall also obtain excess umbrella liability insurance with such limits as Bank may reasonably require, but in no event less than TEN MILLION DOLLARS ($10,000,000.00).

(vi) <u>Business Interruption</u>. Business Interruption and loss of rental value insurance in an amount reasonably acceptable to Bank.

(vii) <u>Other Insurance</u>. Such other insurance relating to the Property as Bank may, from time to time, reasonably require.

(b) <u>Contractor's Insurance</u>. Borrower shall furnish to Bank certificates from the insurance carrier for each Contractor Party evidencing workers' compensation, employers' liability, commercial auto liability, excess umbrella liability coverage and commercial general liability insurance (including contractual liability and completed operations coverage) written on a standard "ISO" occurrence basis form or its equivalent, with general liability insurance limits as Bank may reasonably require. Bank shall be named as an additional insured under such liability Policies.

Borrower shall cause each subcontractor to maintain commercial general liability, commercial automobile liability, workers' compensation, employers' liability, and excess umbrella liability coverage in form and amount satisfactory to Bank.

      (c)    <u>Policy Requirements</u>.

          (i)    All insurance required to be obtained by Borrower shall: (i) be carried by companies with a Best's rating of A/X or better, or otherwise reasonably acceptable to Bank; (ii) be in form and content acceptable to Bank; (iii) provide for thirty (30) days' advance written notice to Bank before any cancellation, adverse material modification or notice of non-renewal; and (iv) to the extent not otherwise specified herein, contain deductibles and limits which are in amounts acceptable to Bank. All physical damage Policies and renewals shall contain (i) standard mortgage and waiver of subrogation clauses in favor of Bank, and (ii) a loss payable clause in favor of Bank for personal property, contents, inventory and equipment. All liability Policies and renewals shall name Bank as an additional insured. All Policies shall have "pollution exclusions" deleted by endorsement. No Person (other than Bank) shall appear in the mortgagee or loss payable clause without Bank's prior written consent. In the event of the foreclosure of the Mortgage or any other transfer of title to the Property in full or partial satisfaction of the Loan, all right, title and interest of Borrower in and to all insurance Policies and renewals thereof then in force shall pass to the purchaser or grantee.

      (d)    <u>Delivery of Policies</u>. The insurance shall be evidenced by the original Policy or a true and certified copy of the original Policy. Borrower shall (i) deliver to Bank a binder (accompanied by an insurance certificate) or originals or certified copies of all Policies and renewals marked "paid" or other evidence satisfactory to Bank of the continuing coverage at least fifteen (15) days before the expiration of existing Policies and (ii) in any event deliver originals or certified copies of such Policies to Bank no later than thirty (30) days after the expiration of existing Policies. If Bank has not received the items specified in (i) and (ii) of the immediately preceding sentence within the time frames therein specified (even if advised orally or in writing that such Policies have been renewed or otherwise obtained), Bank shall have the right, but not the obligation, to purchase such insurance at Borrower's expense to protect Bank's interests in the Collateral. Any amounts so disbursed by Bank in so doing shall be deemed to be Protective Advances, but nothing contained in this Section shall require Bank to incur any expense or take any action hereunder, and inaction by Bank shall never be considered a waiver of any right accruing to Bank on account of this Section. Insurance purchased hereunder by Bank may, but need not, protect Borrower's interest. The coverage that Bank purchases may not pay any claim that Borrower may make or any claim that is made against Borrower in connection with the Property. Borrower may later cancel any insurance purchased by Bank, but only after providing Bank with evidence that Borrower has obtained insurance as required by this Agreement. If Bank purchases insurance for the Property, Borrower will be responsible for the costs of such insurance, including interest and any other charges that may be imposed in connection with the placement of such insurance, until the effective date of the cancellation or expiration of such insurance. Without limitation of any other provision of this Agreement, the cost of such insurance shall be added to the indebtedness secured hereby. The cost of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

(e)    <u>Separate Insurance</u>.  Borrower shall not carry (and shall not allow or permit any other Loan Party to carry) any separate insurance on the Property concurrent in kind or form with any insurance required hereunder or contributing in the event of loss without Bank's prior written consent, and any such Policy shall have attached a standard non- contributing mortgagee clause, with loss payable to Bank, and shall otherwise meet all other requirements set forth herein.

(f)    <u>Event of Default</u>.  Any default, breach or violation of this **Section 11.6** shall be an automatic Event of Default (without any notice, grace or cure period).

11.7.    **Compliance with Laws**.  Comply with all laws applicable to the Borrower and to the operation of its business (including without limitation any statute, ordinance, rule or regulation relating to employment practices, pension benefits or environmental, occupational and health standards and controls).

11.8.    **Additional Reports**.  Provide prompt written notice to the Bank of the occurrence of any of the following (together with a description of the action which the Borrower proposes to take with respect thereto): (i) any Event of Default or any event, act or condition which, with the passage of time or the giving of notice, or both, would constitute an Event of Default (a **"Default"**), (ii) any litigation filed by or against the Borrower, (iii) any Reportable Event or Prohibited Transaction with respect to any Employee Benefit Plan(s) (as defined in ERISA) or (iv) any event which might result in a material adverse change in the business, assets, operations, condition (financial or otherwise) or results of operation of the Borrower.

12.    **Negative Covenants**.  The Borrower covenants and agrees that from the date of this Agreement until all Obligations have been paid in full and any commitments of the Bank to the Borrower have been terminated, the Borrower will not, without the Bank's prior written consent:

12.1.    **Indebtedness**.    Create, incur, assume or suffer to exist any indebtedness for borrowed money other than: (i) the Loan and any subsequent indebtedness to the Bank; and (ii) open account trade debt incurred in the ordinary course of business and not past due.

12.2.    **Liens and Encumbrances**.  Create, assume, incur or permit to exist any mortgage, pledge, encumbrance, security interest, lien or charge of any kind upon any of its property, now owned or hereafter acquired, or acquire or agree to acquire any kind of property subject to any conditional sales or other title retention agreement.

12.3.    **Guarantees**.  Guarantee, endorse or become contingently liable for the obligations of any person, firm, corporation or other entity (a **"Person"**), except in connection with the endorsement and deposit of checks in the ordinary course of business for collection.

12.4.    **Loans or Advances**.  Purchase or hold beneficially any stock, other securities or evidences of indebtedness of, or make or have outstanding, any loans or advances to, or otherwise extend credit to, or make any investment or acquire any interest whatsoever in, any other Person, except investments disclosed on the Borrower's Historical Financial Statements or acceptable to the Bank in its sole discretion.

12.5.    **Merger or Transfer of Assets**.  Liquidate or dissolve, or merge or consolidate with or into any Person or sell, lease (other than leases of individual apartments at the

Property on forms approved by Bank and for market terms and periods not to exceed 14 months), transfer or otherwise dispose of all or any substantial part of its property, assets, operations or business, whether now owned or hereafter acquired (a "**Prohibited Transfer**").

12.6.   **Change in Business, Management or Ownership**.  Make or permit any change in its form of organization, the nature of its business as carried on as of the date hereof, or in the direct or indirect ownership control or management of Borrower or the managing member of Borrower (a "**Prohibited Change of Control**").

12.7.   **Dividends**.  Declare or pay any dividends on or make any distribution with respect to any class of its equity or ownership interest, or purchase, redeem, retire or otherwise acquire any of its equity.  Any violation of this Section 12.7 shall be an automatic Event of Default (without any notice, grace or cure period).

12.8.   **Acquisitions**.   Make acquisitions of all or substantially all of the property or assets of any Person.

13.    **Events of Default**.  The occurrence of any of the following will be deemed to be an Event of Default:

(i) Borrower shall fail to make any payment to the Bank under the Loan Documents when due and payable, and Borrower's failure to make such payment shall continue for ten (10) days (inclusive of the first day such payment was due), except that no grace or cure period shall apply to payment of any principal or interest due under the Senior Note or the Junior Note or any amounts due on the Maturity Date, or (ii) Borrower shall fail to pay the entire unpaid Obligations on the Maturity Date;

(b)    Any failure of Borrower for a period of thirty (30) days (except as to Events of Default specified elsewhere in this Section 13 or where a longer or shorter period is specified herein or in the other Loan Documents for a particular default) after written notice from the Bank to Borrower to observe or perform any of the covenants of Borrower under the terms of this Agreement or any other of the Loan Document except payment of the Notes; provided, if such failure is not susceptible of cure within said period, as reasonably determined by the Bank, and provided Borrower is in good faith attempting to cure the same, Borrower shall have such additional time as is necessary not to exceed sixty (60) days;

(c)    If any representation or warranty of any Loan Party (as hereinafter defined) in any Loan Document or in any certificate, report, financial statement or other instrument or document furnished to the Bank by or on behalf of any Loan Party shall have been false or misleading in any material respect when made (or deemed remade in accordance with this Agreement);

(d)    The occurrence of a Prohibited Transfer or a Prohibited Change of Control;

(e)    The existence of any collusion, fraud, dishonesty or bad faith by or with the acquiescence of any Loan Party which in any way relates to or affects the Loan or the Property;

(f)     If all or a substantial part of the assets of any Loan Party is attached, seized, subjected to a writ or distress warrant, or is levied upon, unless such attachment, seizure, writ, warranty or levy is vacated within thirty (30) days;

(g)     If any Loan Party is enjoined, restrained or in any way prevented by court order from performing any of obligations hereunder or under the other Loan Documents or conducting all or a substantial part of his or its business affairs; or if a proceeding seeking such relief is not dismissed within thirty (30) days of being filed or commenced;

(h)     If a notice of lien, levy or assessment is filed of record with respect to all or any part of the property of any Loan Party by the United States, or any other governmental authority not released within twenty (20) days;

(i)     If there occurs a Material Adverse Change in the financial condition of any Loan Party;

(j)     Default in the payment when due (subject to any applicable cure period), whether by acceleration or otherwise, of any other indebtedness for borrowed money of, or guaranteed by, any Loan Party or default in the performance or observance of any obligation or condition with respect to any such other indebtedness if the effect of such default is to accelerate the maturity of any such indebtedness, or to permit the holder or holders thereof, or any trustee or agent for such holders, to cause such indebtedness to become due and payable prior to its expressed maturity date;

(k)     If any of Borrower, Djurin Pledgor, or Baldwin Pledgor (as hereinafter defined):

(i)     Shall file a voluntary petition in bankruptcy or for arrangement, reorganization or other relief under any chapter of the Federal Bankruptcy Code or any similar law, state or federal, now or hereafter in effect;

(ii)     Shall file an answer or other pleading in any proceedings admitting insolvency, bankruptcy, or inability to pay his or its debts as they mature;

(iii)     Shall have any involuntarily proceeding under the Federal Bankruptcy Act or similar law, state or federal, now or hereafter in effect, filed against any one of them, and such proceedings shall not have been vacated within thirty (30) days after the filing thereof;

(iv)     Shall have an order appointing a receiver, trustee or liquidator entered against any of them or for all or a major part of his or its property or the Property and the same shall not have been vacated within thirty (30) days following entry thereof;

(v)     Shall be adjudicated a bankruptcy;

(vi)     Shall make an assignment for the benefit of creditors or shall admit in writing his or its inability to pay his or its debts generally as they become due or shall

consent to the appointment of a receiver or trustee or liquidator of all or the major part of his or its property, or the Property;

(vii)    Is a firm, partnership, limited liability company or corporation and said firm, partnership, limited liability company or corporation is dissolved, terminated or merged; or

(viii)    Is an individual and said individual shall die or be adjudicated incompetent;

(l)    If an event occurs under the terms of this Loan Agreement or any other Loan Document, which by such terms constitutes or is stated to be a "Default" or an "Event of Default" or an automatic "Default" or "Event of Default"; or

(m)    Any default occurs under any of the Mt. Zion Amended Loan Documents which default continues uncured beyond any applicable notice and cure period thereunder, or the Amended Mt. Zion Loans are not paid when due at maturity thereof or any earlier date upon which such loans come due;

it being understood and agreed that if any event or circumstance occurs or exists which is an Event of Default under any one subsection of subsections (a) through (m) (inclusive) of this Section 12, then an "Event of Default" under the Loan Documents shall automatically exist (and shall be deemed continuing) regardless of whether any other term or provision of any Loan Document provides for any, or for any different, notice, grace and/or cure period, in which case such other notice, grace or cure period shall be void and of no force or effect.

Upon the occurrence of an Event of Default, at the Bank's election (or as to an Event of Default described in subsection (k) of this Section 13, automatically), the Loan and the other Obligations (including without limitation, all accrued interest with respect thereto) shall become immediately due and payable. The aforesaid acceleration of the Loan and the other Obligations is in addition to, and not in limitation of, all other rights and remedies of the Bank under this Agreement and the other Loan Documents as a result of the occurrence of an Event of Default.

14.    **Expenses**. The Borrower agrees to pay the Bank, upon the execution of this Agreement, and otherwise on demand, all costs and expenses incurred by the Bank in connection with the preparation, negotiation and delivery of this Agreement and the other Loan Documents, and any modifications thereto, and the collection of all of the Obligations, including but not limited to enforcement actions, relating to the Loan, whether through judicial proceedings or otherwise, or in defending or prosecuting any actions or proceedings arising out of or relating to this Agreement, including reasonable fees and expenses of counsel (which may include costs of in-house counsel), expenses for auditors, appraisers and environmental consultants, lien searches, recording and filing fees and taxes.

15.    **Increased Costs**. On written demand, together with written evidence of the justification therefor, the Borrower agrees to pay the Bank all direct costs incurred and any losses suffered or payments made by the Bank as a consequence of making the Loan by reason of any change in law or regulation, or the interpretation thereof, imposing any reserve, deposit, allocation of capital or similar requirement (including without limitation, Regulation D of the Board of

Governors of the Federal Reserve System) on the Bank, its holding company or any of their respective assets.

16.   **Waiver of Suretyship Defenses**.   Each of Borrower, Djurin Pledgor, the Teresa M. Baldwin Trust Dated April 8, 1994 n/k/a Teresa Flanagan Matre Restatement of Trust Dated February 7, 2007 (the **"Baldwin Pledgor"**) and/or Guarantor (each, a **"Loan Party"**) acknowledges that the liens and security interests created or granted in this Agreement and by the other Loan Documents secure, in addition to obligations of Borrower, obligations of Persons other than Borrower, including Mt. Zion (referred to herein as **"Third Party Obligors"**).   With full recognition of such fact, each Loan Party acknowledges and agrees as follows:

16.1.   It is understood and agreed that the Bank is entering into this Agreement and entering into or accepting the other Loan Documents in connection herewith solely as an accommodation to Borrower and Third Party Obligors at their request.   To induce the Bank to do so, and in consideration thereof, Borrower hereby agrees to indemnify and hold the Bank harmless from and against any and all liabilities, expenses, losses, damages and/or claims of damage or injury asserted against the Bank by Borrower, Third Party Obligors or by any other Person arising from or incurred by reason of the Bank handling of the Loan or the Amended Mt. Zion Loans or reliance by the Bank on any requests or instructions from Borrower or Third Party Obligors, or any other action taken by the Bank in good faith with respect to this Agreement or the other Loan Documents or the Mt. Zion Amended Loan Documents, other than any of the foregoing relating to the Bank's gross negligence or willful misconduct.

16.2.   Each Loan Party hereby consents and agrees that the Bank may, at any time and from time to time, without notice or demand, and without affecting the enforceability or security hereof or of any other Loan Document or the Mt. Zion Amended Loan Documents:

(i)   supplement, modify, amend, extend, renew, accelerate, or otherwise change the time for payment or the terms of the Obligations of Third Party Obligors or any part thereof included as Obligations, including any increase or decrease of the rate(s) of interest thereon;

(ii)   supplement, modify, amend or waive, or enter into or give any agreement, approval or consent with respect to, the Obligations of Third Party Obligors or any part thereof or any of the Loan Documents or the Mt. Zion Amended Loan Documents or any additional security or guaranties, or any condition, covenant, default, remedy, right, representation or term thereof or thereunder;

(iii)   accept new or additional instruments, documents or agreements in exchange for or relative to any of the Loan Documents or the Mt. Zion Amended Loan Documents or the Obligations of Third Party Obligors or any part thereof;

(iv)   accept partial payments on the Obligations of Third Party Obligors;

(v)   receive and hold additional security or guaranties for the Obligations of Third Party Obligors or any part thereof;

(vi)    release, reconvey, terminate, waive, abandon, subordinate, exchange, substitute, transfer and enforce any security or guaranties, and apply any security and direct the order or manner of sale thereof as The Bank in its sole and absolute discretion may determine;

(vii)    release any Person or any guarantor from any personal liability with respect to the Obligations of Third Party Obligors or any part thereof;

(viii)    settle, release, liquidate or enforce any Obligations of Third Party Obligors and any security or guaranty therefor on terms satisfactory to the Bank or by operation of Applicable Laws (as hereinafter defined) or otherwise in any manner, consent to the transfer of any security and bid and purchase at any sale; and

(ix)    consent to the merger, change or any other restructuring or termination of the existence of Third Party Obligors or any other Person, and correspondingly restructure the Obligations of Third Party Obligors, and any such merger, change, restructuring or termination shall not affect the liability of Borrower or any Loan Party or the continuing existence of any lien or security interest hereunder, under any other Loan Document to which Borrower or a Loan Party is a party or under any Mt. Zion Amended Loan Documents or the enforceability hereof or thereof with respect to all or any part of the Obligations of Third Party Obligors or Borrower or any Loan Party.

16.3.    Upon the occurrence of and during the continuance of any Event of Default, the Bank may enforce this Agreement and/or any other Loan Document independently of any other remedy or security the Bank at any time may have or hold in connection with the Obligations of Third Party Obligors or any Loan Party, and it shall not be necessary for the Bank to marshal assets in favor of Third Party Obligors or any Loan Party or any other Person or to proceed upon or against and/or exhaust any other security or remedy before proceeding to enforce this Agreement and/or any other Loan Document or the Mt. Zion Amended Loan Documents.  Each Loan Party expressly waives any right to require the Bank to marshal assets in favor of any Loan Party or Third Party Obligors or any other Person or to proceed against any other Person or any property provided by any other Person, and agrees that the Bank may proceed against any Persons and/or property in such order as it shall determine in its sole and absolute discretion.  The Bank may file a separate action or actions against any Loan Party or Third Party Obligors, whether action is brought or prosecuted with respect to any other security or against any other Person, or whether any other Person is joined in any such action or actions.  Each Loan Party agrees that the Bank and Third Party Obligors and any other Person may deal with each other in connection with the Obligations of Third Party Obligors or otherwise, or alter any contracts or agreements now or hereafter existing between any of them, in any manner whatsoever, all without in any way altering or affecting the security of this Agreement and/or any other Loan Document.  The rights of the Bank under the Loan Documents shall be reinstated and revived, and the enforceability of this Agreement and the other Loan Documents shall continue, with respect to any amount at any time paid on account of the Obligations of Third Party Obligors or any Loan Party which thereafter shall be required to be restored or returned by the Bank upon bankruptcy, insolvency or reorganization of Third Party Obligors or any Loan Party or any other Person, or otherwise, all as though such amount had not been paid.  The enforceability of this Agreement and the other Loan Documents at all times shall remain effective even though the Obligations of Borrower or Third Party Obligors, including

any part thereof or any other security or guaranty therefor, may be or hereafter may become invalid or otherwise unenforceable as against Third Party Obligors, Borrower, or any other Person and whether or not Third Party Obligors, Borrower, or any other Person shall have any personal liability with respect thereto. Each Loan Party expressly waives any and all defenses now or hereafter arising or asserted by reason of (i) any disability or other defense of Third Party Obligors or any other Person with respect to the Obligations of Third Party Obligors, (ii) the unenforceability or invalidity of any security or guaranty for the Obligations of Third Party Obligors or the lack of perfection or continuing perfection or failure of priority of any security for the obligations of Third Party Obligors, (iii) the cessation for any cause whatsoever of the liability of Third Party Obligors or any other Person (other than by reason of the full payment and performance of all Obligations of Third Party Obligors), (iv) any failure of the Bank to marshal assets in favor of Third Party Obligors or any other Person, (v) any failure of the Bank to give notice of sale or other disposition to Third Party Obligors or any other Person or any defect in any notice that may be given in connection with any sale or disposition, (vi) any failure of the Bank to comply in any nonmaterial respect with Applicable Laws in connection with the sale or other disposition of any property or other security for any Obligation of Third Party Obligors, (vii) any act or omission of the Bank or others that directly or indirectly results in or aids the discharge or release of Third Party Obligors or any other Person or the obligations of Third Party Obligors or any other security or guaranty therefor by operation of law or otherwise, (viii) any Applicable Laws which provide that the obligation of a surety or guarantor must neither be larger in amount nor in other respects more burdensome than that of the principal or which reduces a surety's or guarantor's obligation in proportion to the principal obligation, (ix) any failure of the Bank to file or enforce a claim in any bankruptcy or other proceeding with respect to any Person, (x) the election by the Bank, in any bankruptcy proceeding of any Person, of the application or non application of Section 1111(b)(2) of the United States Bankruptcy Code, (xi) any extension of credit or the grant of any lien under Section 364 of the United States Bankruptcy Code, (xii) any use of cash collateral under Section 363 of the United States Bankruptcy Code, (xiii) any agreement or stipulation with respect to the provision of adequate protection in any bankruptcy proceeding of any Person, (xiv) the avoidance of any lien or security interest in favor of the Bank for any reason, or (xv) any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, liquidation or dissolution proceeding commenced by or against any Person, including any discharge of, or bar or stay against collecting, all or any of the Obligations of Third Party Obligors (or any interest thereon) in or as a result of any such proceeding. Without in any way limiting the foregoing and to the extent not prohibited by Applicable Laws, with respect to the Loan Documents and all obligations secured thereby, each Loan Party: (A) waives all rights and defenses arising out of an election of remedies by the Bank, even though that election of remedies, such as non-judicial foreclosure with respect to security for the Obligations of Third Party Obligors, may affect a Loan Party's rights of subrogation and reimbursement against Third Party Obligors or any other Person; and (B) waives any right to a fair value hearing or similar proceeding following a nonjudicial foreclosure.

16.4.    Each Loan Party represents and warrants to the Bank that such Loan Party has established adequate means of obtaining from Third Party Obligors, on a continuing basis, financial and other information pertaining to the businesses, operations and condition (financial and otherwise) of such Third Party Obligor and its properties, and such Loan Party now is and hereafter will be completely familiar with the businesses, operations and condition (financial and otherwise) of each Third Party Obligor and its properties. Each Loan Party hereby expressly waives and

relinquishes any duty on the part of the Bank to disclose to such Loan Party any matter, fact or thing related to the businesses, operations or condition (financial or otherwise) of Third Party Obligors or Third Party Obligors' properties, whether now known or hereafter known by the Bank during the term of this Agreement.   With respect to any of the Obligations of Third Party Obligors or Borrower, the Bank need not inquire into the powers of Third Party Obligors or Borrower, or of the partners, members, officers or employees of Third Party Obligors or Borrower acting or purporting to act on its behalf.

     16.5.   Without limiting the foregoing, or anything else contained in this Agreement, each Loan Party waives all rights and defenses that it may have because the Obligations secured by this Agreement are secured by real property.  This means, among other things:

     (i)   the Bank may collect on the Obligations secured by this Agreement by enforcing this Agreement and/or any of the other Loan Documents without first foreclosing on any real or personal property collateral pledged by Borrower or Third Party Obligors or otherwise proceeding against Borrower or Third Party Obligors; and

     (ii)   If the Bank forecloses on any real property collateral pledged by Borrower or Third Party Obligors: (A) the amount of the Obligations secured by this Agreement and/or any of the other Loan Documents may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and (B) the Bank may enforce this Agreement and/or any of the other Loan Documents even if the Bank, by foreclosing on any other real property collateral, has destroyed any right that a Loan Party may have to collect from Borrower or Third Party Obligors.

     16.6.   Notwithstanding anything to the contrary elsewhere contained herein or in any other Loan Document or Mt. Zion Amended Loan Document to which Third Party Obligors or a Loan Party is a party, until the Obligations secured by this Agreement and/or any of the other Loan Documents are paid in full, each Loan Party hereby waives any and all rights at law or in equity to subrogation, to reimbursement, to exoneration, to contribution, to setoff, and to any other rights that could accrue to a surety against a principal, to a guarantor against a maker or obligor, to an accommodation party against the party accommodated, or to a holder or transferee against a maker and which a Loan Party may have or hereafter acquire against Borrower or Third Party Obligors or any other party in connection with or as a result of a Loan Party's or Third Party Obligors' execution, delivery and/or performance of this Agreement or any other Loan Document or any Mt. Zion Amended Loan Documents to which Third Party Obligors or a Loan Party is a party. Each Loan Party agrees that it shall not have or assert any such rights against Third Party Obligors or Third Party Obligors' successors and assigns or any other Person (including any surety), either directly or as an attempted setoff to any action commenced against such Loan Party by Third Party Obligors (in any capacity) or any other Person until the obligations secured by this Agreement and/or any of the other Loan Documents and/or any Mt. Zion Amended Loan Documents are paid in full.  Each Loan Party hereby acknowledges and agrees that this waiver is intended to benefit the Bank and shall not limit or otherwise affect any of Borrower's or any other Loan Party's liability hereunder or under any other Loan Document to which Borrower or such other Loan Party is a party, or the enforceability hereof or thereof.

16.7.   Each Loan Party warrants and agrees that each of the waivers and consents set forth herein is made with full knowledge of its significance and consequences, with the understanding that events giving rise to any defense waived may diminish, destroy or otherwise adversely affect rights which such Loan Party may have against Third Party Obligors, Borrower, the Bank, or others, or against any property.  If any of the waivers or consents herein are determined to be contrary to any Applicable Laws or public policy, such waivers and consents shall be effective to the maximum extent permitted by Applicable Laws.  **"Applicable Law"** means (i) all existing and future governmental statutes, laws, rules, orders, regulations, ordinances, judgment decrees and injunctions of any governmental authority affecting either the Bank, any Loan Party, the Property, any collateral, or any part thereof (whether now or hereafter enacted and in force), including those relating to zoning, occupancy, building codes, health, fire and safety; (ii) all permits, licenses and authorizations and regulations relating thereto, including the building permit and certificates of occupancy; and (iii) all covenants, conditions and restrictions contained in any agreements, instruments or other documents at any time in force (whether or not involving any governmental authority) affecting the Property or any part thereof.

17.   **Miscellaneous**.

17.1.   **Notices:  All notices, demands, requests, consents, approvals and other communications required or permitted hereunder ("Notices") must be in writing and will be effective upon receipt**.  Notices may be given in any manner to which the parties may separately agree, including electronic mail.  Without limiting the foregoing, first-class mail, facsimile transmission and commercial courier service are hereby agreed to as acceptable methods for giving Notices.  Regardless of the manner in which provided, Notices may be sent to a party's address as set forth above or to such other address as any party may give to the other for such purpose in accordance with this section.

17.2.   **Preservation of Rights**.  No delay or omission on the Bank's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will the Banks action or inaction impair any such right or power.  The Bank's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which the Bank may have under other agreements, at law or in equity.

17.3.   **Illegality**.  If any provision contained in this Agreement should be invalid, illegal or unenforceable in any respect, it shall not affect or impair the validity, legality and enforceability of the remaining provisions of this Agreement.

17.4.   **Changes in Writing**.  No modification, amendment or waiver of, or consent to any departure by the Borrower from, any provision of this Agreement will be effective unless made in a writing signed by the party to be charged, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice to or demand on the Borrower will entitle the Borrower to any other or further notice or demand in the same, similar or other circumstance.

17.5.   **Entire Agreement**.  This Agreement (including the documents and instruments referred to herein), together with the other Loan Documents and the Colts Run Plan,

constitute the entire agreement and supersedes all other prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof and thereof.

17.6.  **Counterparts**.  This Agreement may be signed in any number of counterpart copies and by the parties hereto on separate counterparts, but all such copies shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart.  Any party so executing this Agreement by facsimile transmission shall promptly deliver a manually executed counterpart, provided that any failure to do so shall not affect the validity of the counterpart executed by facsimile transmission.

17.7.  **Successors and Assigns**.  This Agreement will be binding upon and inure to the benefit of the Borrower and the Bank and their respective heirs, executors, administrators, successors and assigns; provided, however, that the Borrower may not assign this Agreement in whole or in part without the Bank's prior written consent and the Bank at any time may assign this Agreement in whole or in part.

17.8.  **Interpretation**.  In this Agreement, unless the Bank and the Borrower otherwise agree in writing, the singular includes the plural and the plural the singular; words importing any gender include the other genders; references to statutes are to be construed as including all statutory provisions consolidating, amending or replacing the statute referred to; the word "or" shall be deemed to include "and/or", the words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; references to articles, sections (or subdivisions of sections) or exhibits are to those of this Agreement; and references to agreements and other contractual instruments shall be deemed to include all subsequent amendments and other modifications to such instruments, but only to the extent such amendments and other modifications are not prohibited by the terms of this Agreement. Section headings in this Agreement are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. Unless otherwise specified in this Agreement, all accounting terms shall be interpreted and all accounting determinations shall be made in accordance with GAAP.  If this Agreement is executed by more than one party as Borrower, the obligations of such persons or entities will be joint and several.

17.9.  **No Consequential Damages, Etc**.  The Bank will not be responsible for any damages, consequential, incidental, special, punitive or otherwise, that may be incurred or alleged by any person or entity, including the Borrower and any Guarantor, as a result of this Agreement, the other Loan Documents, the transactions contemplated hereby or thereby, or the use of the proceeds of the Loan.

17.10.  **Assignments and Participations**.  At any time, without any notice to the Borrower, the Bank may sell, assign, transfer, negotiate, grant participations in, or otherwise dispose of all or any part of the Bank's interest in the Loan.  The Borrower hereby authorizes the Bank to provide, without any notice to the Borrower, any information concerning the Borrower, including information pertaining to the Borrower's financial condition, business operations or general creditworthiness, to any person or entity which may succeed to or participate in all or any part of the Bank's interest in the Loan.

17.11. **Governing Law and Jurisdiction**.    This Agreement has been delivered to and accepted by the Bank and will be deemed to be made in the State where the Bank's office indicated above is located.  This Agreement will be interpreted and the rights and liabilities of the parties hereto determined in accordance with the laws of the State where the Bank's office indicated above is located, excluding its conflict of laws rules.  The Borrower hereby irrevocably consents to the exclusive jurisdiction of any state or federal court in the county or judicial district where the Bank's office indicated above is located; provided that nothing contained in this Agreement will prevent the Bank from bringing any action, enforcing any award or judgment or exercising any rights against the Borrower individually, against any security or against any property of the Borrower within any other county, state or other foreign or domestic jurisdiction.  The Bank and the Borrower agree that the venue provided above is the most convenient forum for both the Bank and the Borrower.  The Borrower waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Agreement.

17.12. **WAIVER OF JURY TRIAL**.    EACH OF THE BORROWER AND THE BANK IRREVOCABLY WAIVES ANY AND ALL RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS AGREEMENT, ANY DOCUMENTS EXECUTED IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS.    THE BORROWER AND THE BANK ACKNOWLEDGE THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.

17.13. **Release**.

(a)    In consideration of the agreements of the Bank contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower and each other Loan Party, on behalf of itself and its successors and assigns, and its present and former partners, members, shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents, legal representatives and other representatives (Borrower, each other Loan Party and all such other Persons being hereinafter referred to collectively as the "Releasing Parties" and individually as a "**Releasing Party**"), hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges the Bank, and its successors and assigns, and its present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents, legal representatives and other representatives (the Bank and all such other Persons being hereinafter referred to collectively as the "**Releasees**" and individually as a "**Releasee**"), of and from all demands, actions, causes of action, suits, damages and any and all other claims, counterclaims, defenses, rights of set off, demands and liabilities whatsoever (individually, a "**Claim**" and collectively, "**Claims**") of every kind and nature, known or unknown, suspected or unsuspected, at law or in equity, which any Releasing Party may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any circumstance, action, cause or thing whatsoever which arises at any time on or prior to the Effective Date for or on account of, or in relation to, or in any way in connection with this Agreement, any of the Loan Documents or any of the transactions hereunder or thereunder or any actions or omissions arising on or prior to the Effective Date with respect to the Original Senior Loan or the Original Mezzanine Loan.

-27-

(b)    Borrower and each other Loan Party understands, acknowledges and agrees that the release set forth above may be pleaded as a full and complete defense to any Claim and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.

(c)    Borrower and each other Loan Party agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final, absolute and unconditional nature of the release set forth above.

17.14.  **Covenant Not to Sue**.    Each of the Releasing Parties hereby absolutely, unconditionally and irrevocably, covenants and agrees with and in favor of each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Claim released, remised and discharged by any Releasing Party pursuant to Section 17.13 above.  If any Releasing Party violates the foregoing covenant, Borrower, for itself and its successors and assigns, and its present and former members, shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents, legal representatives and other representatives, agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

17.15.  **Waiver**.  In reliance on the representations and warranties set forth in this Agreement and the satisfaction of the conditions to effectiveness set forth in this Agreement, the Bank hereby: (i) waives the Existing Defaults and (ii) forgives and waives payment of the portion of all interest payments that has accrued as of the date hereof in excess of the otherwise applicable rates by reason of the Existing Defaults.  The Bank's agreement to waive the Existing Defaults (x) in no way shall be deemed an agreement by the Bank to waive any other existing or hereafter arising defaults or Events of Default, and (y) shall not limit or impair the Bank's right to demand strict performance at all times of all covenants and agreements set forth in this Agreement and Loan Documents.

17.16.  **Partial Release**.    The Bank shall permit a release (a "**Release**") of either the Property or the Mt. Zion Property (the parcel being released shall be referred to as the "**Release Parcel**") from the lien of the applicable security instrument in favor of Bank upon prepayment in full of the Loan (if the Release is with respect to the Property) or the Amended Mt. Zion Loans (if the Release is with respect to the Mt. Zion Property), as applicable, subject to the following conditions: (i) no Event of Default shall have occurred and be continuing under the Loan Documents or the Mt. Zion Amended Loan Documents, (ii) Borrower shall have provided the Bank at least thirty (30) days prior to the proposed date for such Release with a written request for such Release and with such information and documentation as the Bank may reasonably require to permit the Bank to determine the satisfaction of the other conditions stated herein, (iii) the property to be released from the security instrument is sold to a third party not affiliated with any Loan Party and in connection therewith Bank shall receive payment (the "**Release Payment**", which shall be applied by the Bank first to the outstanding principal balance of the Loan (if the Release is with respect to the Property) or first to the Amended Mt. Zion Loan (if the Release is with respect to the Mt. Zion Property), as applicable, with the remaining proceeds applied to the other Obligations) equal the net sales proceeds from the sale of such Release Parcel and which in no event shall be less

-28-

than 95% of the gross sales price for such Release Parcel, (iv) the Bank shall have obtained at Borrower's expense such endorsements to the Bank's title insurance policy as the Bank may require, confirming that the security instrument not being released remains a valid first in priority lien on the remaining Property or Mt. Zion Property, as applicable, following such Release and no intervening liens or encumbrances appear on the Bank's updated title policy, and (x) Borrower shall have paid all costs and expenses, including reasonable attorneys fees and title costs, incurred by the Bank in connection with the requested Release. Notwithstanding the foregoing, if either the Loan or the Amended Mt. Zion Loans have been repaid in full prior to the sale of the Release Parcel, the Bank shall release the remaining parcel upon payment in full of the outstanding principal balance of the Loan and the other Obligations with respect to the Loan (if the Release is with respect to the Property) or of the outstanding principal balance of the Amended Mt. Zion Loans and the other Obligations with respect to the Amended Mt. Zion Loans (if the Release is with respect to the Mt. Zion Property). For purposes of this Section 17.16, "net sales proceeds" shall mean all normal real estate sale closing costs, prorations and credits including, but not limited to, real estate tax credits, prepaid rent, security deposits, brokerage commissions not to exceed 5%, title insurance premiums, escrow fees, transfer taxes and similar costs and expenses (but excluding attorneys fees and expenses).

### 17.17. **Affiliate Agreements**.

(a)    Except as specifically permitted herein or otherwise disclosed to and consented to by the Bank, no Loan Party shall pay, or permit the payment of, development fees, management fees, sales brokerage fees or commissions or any other compensation of any form whatsoever to any Affiliate (as hereinafter defined), or request disbursement of funds from the Bank for such purpose, without the prior written consent of the Bank. The payment of any such fees, commissions or other compensation without the prior written consent of the Bank shall constitute an automatic Event of Default (with no notice, cure or grace period). Any contracts or agreements, including the agreements to pay the amounts set forth below, relating to the Property in any manner between or among any Affiliate ("**Affiliate Agreements**") shall be made on an arm's-length basis and shall be subject to the prior written approval of the Bank, which approval shall not be unreasonably withheld. Once the Bank has approved an Affiliate Agreement, such Affiliate Agreement shall not be amended, modified or extended without the prior written consent of the Bank. The parties to each Affiliate Agreement shall acknowledge and agree that such agreement is terminable upon notice, without penalty, premium or liability for future or accrued liabilities or obligations, if an Event of Default shall have occurred under the Loan Documents. Following an Event of Default under the Loan Documents, if requested by the Bank in writing, Borrower shall, or shall cause the applicable Loan Party to, terminate any Affiliate Agreement specified by the Bank within five (5) days after delivery of the Bank's request without payment of any penalty, premium or termination fee. If such Affiliate Agreement is not terminated in accordance with the immediately preceding sentence, the Bank shall have the right, and Borrower hereby irrevocably authorizes the Bank and irrevocably appoints the Bank as Borrower's attorney-in-fact coupled with an interest, at the Bank's sole option, to terminate such Affiliate Agreement on behalf of and in the name of Borrower or the applicable Loan Party, and Borrower hereby releases and waives any claims against the Bank arising out of the Bank's exercise of such authority. Without limiting the foregoing, under no circumstances shall the fees paid by Borrower to any Affiliate for managing, leasing and operating the Property exceed, in aggregate, four percent (4%) of rent received by Borrower (computed on a cash basis) for any applicable period. An "**Affiliate**" of any specified Person means

any other Person controlling, controlled by or under common control with such specified Person. In addition, each Loan Party or other Person holding any ownership interest in the Property shall be deemed an Affiliate of (i) each other Loan Party or other Person holding any ownership interest in the Property and (ii) each other Person controlling, controlled by or under common control with such other Loan Party or other Person holding any ownership interest in the Property. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise; and "controlling" and "controlled" have meanings correlative to the foregoing.

(b)    Any default, breach or violation of this Section 17.17 shall be an automatic Event of Default (without any notice, grace or cure period).

### 17.18. **Bank Assignment: Securitization.**

(a)    Assignment.  Borrower acknowledges and agrees that Bank shall have the absolute and unconditional right in its sole and absolute discretion at any time after the date hereof and at any time during the term of the Loan without requiring any consent or approval from Borrower, any other Loan Party or any other Person to sell, assign, pledge, hypothecate or otherwise transfer Bank's interest in the Loan, in whole or in part, or to place one or more participation interests therein, or to effect a syndication or securitization of the Loan, in one or more separate transactions, in each case to or with such Persons (including domestic or foreign banks, insurance companies, pension funds, trusts, other institutional Banks or investors, natural persons, grantor trusts, owner trusts, special purpose corporations, real estate investment trusts, opportunity funds and other similar or comparable investment vehicles) (each a **"Bank Transferee"**) and on such terms and conditions as Bank shall deem to be appropriate in the exercise of its sole and absolute discretion (in each case, a **"Bank Transfer"**).  Without limiting in any manner the rights of any Bank Transferee at law or in equity, any Bank Transferee shall take its interest in the Loan free and clear of all offsets, counterclaims or defenses which are unrelated to the Loan.  In addition, to the extent that a Bank Transferee assumes in writing Bank's obligations under the Loan Documents (an **"Assuming Bank Transferee"**), Bank shall be relieved of such obligations so transferred.

(b)    Disclosure.  In connection with any Bank Transfer, Bank shall have the absolute and unconditional right without giving notice to or obtaining the consent or approval of Borrower or any other Loan Party or any other Person to disclose, deliver and to share with any prospective Bank Transferee, or with any prospective rating agency, or their respective counsel or representatives, such information (financial or otherwise), documents and instruments pertaining to the Loan or any Loan Party or any other Person associated or connected with the Loan or the Collateral or the Property as Bank shall deem to be necessary or appropriate in the exercise of its sole and absolute discretion.

(c)    Cooperation.  Borrower shall cooperate, and shall cause each other Loan Party to cooperate, in all reasonable respects with Bank in connection with any Bank Transfer.  Borrower shall execute and deliver, and shall cause each other Loan Party (and to the extent possible using only commercially reasonable efforts, each other Person associated with the Loan, the Collateral or the Property) to execute and deliver, such documents and instruments as may be reasonably necessary to (i) split the Loan into two or more loans evidenced by and pursuant to separate sets of

notes and other related loan documents, or (ii) modify the terms and provisions of the Loan Documents, in each case to the full extent required by Bank to facilitate any Bank Transfer, it being agreed that (A) any such splitting or modification of the Loan will not materially adversely affect or diminish the rights of any Loan Party as presently set forth in the Loan Documents and will not increase the monetary obligations and liabilities or materially increase the non-monetary obligations of any Loan Party under the Loan Documents, and (B) if the Loan is split, the retained interest of Bank, if any, in the Loan shall be allocated to or among one or more of such separate loans in a manner specified by Bank in its sole and absolute discretion.

(d)    Notice of Bank Transfer. Bank shall endeavor to provide notice to Borrower of any Bank Transfer in a reasonably timely manner after any such Bank Transfer, but any failure by Bank to provide notice to Borrower shall not give rise to any claim or defense on the part of any of the Loan Parties, or limit the rights of Bank under this **Section 17.18** or the Loan Documents. Until otherwise directed in writing by Bank following a Bank Transfer, Borrower shall continue to make all payments and deposits as required prior to such occurrence.

17.19. **Brokers and Financial Advisors**. Borrower hereby represents to Bank that no Loan Party or any Affiliate thereof has dealt with brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement. Borrower agrees to indemnify and hold the Bank harmless from and against any and all claims, liabilities, costs and expenses of any kind in any way (including reasonable attorneys' fees) relating to or arising from a claim by any Person that such Person acted on behalf of any Loan Party or any Affiliate thereof in connection with the transactions contemplated herein. The provisions of this Section shall survive the expiration and termination of this Agreement and the repayment of the Debt.

17.20. **Counterclaims**. Borrower hereby waives the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Bank arising out of or in any way connected with the Loan or the Loan Documents.

17.21. **Loan Expenses**. Borrower covenants and agrees to immediately pay Bank on demand all costs and expenses ("**Loan Expenses**") including reasonable attorneys' fees, incurred by Bank in connection with or relating to the Loan, including: (i) Bank's Closing Expenses; (ii) the Loan Parties' ongoing performance of and compliance with their respective agreements and covenants contained in the Loan Documents on their part to be performed or complied with after the Effective Date, including confirming compliance with environmental and insurance requirements; (iii) any request made to Bank for consent or approval of any matter; (iv) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers, extensions or other modifications to the Loan Documents or any other document or matter requested by any Loan Party, by Bank; (v) all federal, state, county and local taxes, filing, registration or recording fees and all other taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of any of Loan Documents; (vi) title insurance premiums and escrow charges; and (vii) reasonable attorneys' fees incurred by Bank in connection with any of the foregoing, including in connection with any bankruptcy or similar proceeding affect the Property, the Collateral or any Loan Party. All Loan Expenses incurred by Bank shall be due and payable within ten (10) days of demand, and (without limiting any other right or remedy of Bank) if not paid within such 10-day period shall bear interest at the Default Rate from the date of such demand until the date paid.

-31-

**17.22. Loan Taxes**.  If any Applicable Law is enacted or adopted or amended after the date of this Loan Agreement which deducts the Debt from the value of the Collateral for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Bank's interest in the Collateral, Borrower will pay the tax, with interest and penalties thereon, if any.  If at any time any Governmental Authority shall require revenue or other stamps to be affixed to the Note or any other of the Loan Documents or impose any tax or charge on the same, except for any tax or imposition imposed solely on the income of Bank, Borrower will pay for the same, with interest and penalties thereon, if any.  If such Applicable Law prevents or prohibits Borrower from so paying or reimbursing Bank, the enaction, adoption or amendment of such Applicable Law shall, at the option of Bank, constitute an Event of Default.

**17.23. Rescission of Payments**.  If at any time all or any part of any payment made by Borrower or any other Loan Party in connection with this Agreement or any other Loan Document is rescinded, returned or Bank is otherwise required to hold such payment in trust for or otherwise return the payment to another Person, for any reason whatsoever (including the insolvency, bankruptcy or reorganization of any Loan Party or any other Person), then the Obligations of Borrower or such other Loan Party shall, to the extent of the payment rescinded or returned, be deemed to have continued in existence notwithstanding such previous payment, and the Obligations of Borrower or such Loan Party under the Loan Documents shall continue to be effective or be reinstated, as the case may be, as to such payment, all as though such previous payment had never been made.

**17.24. WAIVER OF STATUTORY RIGHTS**.    BORROWER SHALL NOT APPLY FOR OR AVAIL ITSELF OF ANY APPRAISEMENT, VALUATION, STAY, EXTENSION OR EXEMPTION LAWS, OR ANY SIMILAR LAWS NOW EXISTING OR HEREAFTER ENACTED, IN ORDER TO PREVENT OR HINDER THE ENFORCEMENT OF THE LOAN DOCUMENTS, BUT HEREBY WAIVES THE BENEFIT OF SUCH LAWS TO THE FULL EXTENT THAT IT MAY DO SO UNDER APPLICABLE LAW.  BORROWER HEREBY WAIVES ANY AND ALL RIGHT TO HAVE THE PROPERTY AND ESTATES COMPRISING THE COLLATERAL MARSHALED AND AGREES THAT ANY COURT HAVING JURISDICTION OVER ANY EXERCISE OF BANK'S REMEDIES MAY ORDER THE COLLATERAL SOLD AS AN ENTIRETY OR IN SEPARATE PARTS.  BORROWER HEREBY WAIVES, TO THE FULL EXTENT IT MAY DO SO OR NOT PROHIBITED UNDER APPLICABLE LAW, ANY AND ALL RIGHTS OF REDEMPTION FROM SALE UNDER ANY ORDER OR DECREE OF FORECLOSURE, UCC AUCTION OR UNDER ANY PUBLIC OR PRIVATE SALE PERMITTED UNDER ANY APPLICABLE LAW NOW EXISTING OR HEREAFTER ENACTED.

**17.25. USURY LAWS**.

(a)    BORROWER ACKNOWLEDGES AND AGREES THAT ALL AMOUNTS PAYABLE UNDER THE LOAN DOCUMENTS FORM AN INTEGRAL COMPONENT OF THE DEBT AND PAYMENT OF THE SAME IS A MATERIAL INDUCEMENT TO BANK TO MAKE THE LOAN AND ENTER INTO THE LOAN DOCUMENTS, AND THAT BANK WOULD NOT BE WILLING TO MAKE THE LOAN AND ENTER INTO THE LOAN DOCUMENTS BUT FOR BORROWER'S AGREEMENT TO PAY THE ENTIRE DEBT PURSUANT TO THE TERMS OF THE LOAN DOCUMENTS.  BORROWER FURTHER