ACKNOWLEDGES AND AGREES THAT THE PAYMENT OF THE ENTIRE DEBT IS FAIR AND REASONABLE IN LIGHT OF THE SIZE OF THE RISK TAKEN BY BANK AND THAT PAYMENT OF THE ENTIRE DEBT OR ANY COMPONENT THEREOF WILL NOT VIOLATE APPLICABLE USURY LAWS.    WITHOUT LIMITING THE FOREGOING, BORROWER HEREBY WAIVES ANY RIGHT OR DEFENSE IT MAY HAVE TO THE PAYMENT OF TOE DEBT OR ANY PORTION THEREOF BASED ON ANY USURY, PENALTY OR OTHER SIMILAR LAWS OR EQUITABLE PRINCIPLES.

(b)    BORROWER ACKNOWLEDGES AND AGREES, WITHOUT LIMITING THE ABOVE, THIS AGREEMENT AND EACH OF THE OTHER LOAN DOCUMENTS IS SUBJECT TO THE EXPRESS CONDITION THAT AT NO TIME SHALL BORROWER OR ANY OTHER LOAN PARTY BE OBLIGATED OR REQUIRED TO PAY ANY AMOUNT UNDER THE LOAN DOCUMENTS INCLUDING ANY INTEREST ON THE PRINCIPAL BALANCE OF THE LOAN AT A RATE IN EXCESS OF THE MAXIMUM INTEREST RATE WHICH BORROWER OR SUCH LOAN PARTY IS PERMITTED BY APPLICABLE LAW TO CONTRACT OR AGREE TO PAY.  IN DETERMINING WHETHER OR NOT THE INTEREST OR ANY OTHER AMOUNT PAID OR PAYABLE UNDER THE LOAN DOCUMENTS EXCEEDS    THE    MAXIMUM    RATE    PERMITTED    UNDER    APPLICABLE    LAW (A) BORROWER OR SUCH LOAN PARTY AND BANK SHALL TO THE EXTENT PERMITTED UNDER APPLICABLE LAW CHARACTERIZE ANY NON-PRINCIPAL PAYMENT, AS A FEE, PREMIUM OR EXPENSE RATHER THAN INTEREST, AND (B) ALL SUMS PAID OR AGREED TO BE PAID TO BANK FOR THE USE, FORBEARANCE, OR DETENTION OF THE DEBT, SHALL, TO THE EXTENT PERMITTED BY APPLICABLE LAW, BE AMORTIZED, PRORATED, ALLOCATED, AND SPREAD THROUGHOUT THE FULL STATED TERM OF THE LOAN UNTIL PAYMENT IN FULL SO THAT THE RATE OR AMOUNT OF INTEREST ON ACCOUNT OF THE DEBT DOES NOT EXCEED THE MAXIMUM LAWFUL RATE OF INTEREST.    IF BY THE TERMS OF THE LOAN DOCUMENTS, BORROWER OR SUCH LOAN PARTY ARE AT ANY TIME REQUIRED OR OBLIGATED TO PAY ANY AMOUNT UNDER THE LOAN DOCUMENTS INCLUDING INTEREST ON THE PRINCIPAL BALANCE DUE UNDER THE LOAN AT A RATE IN EXCESS OF SUCH MAXIMUM RATE, SUCH INTEREST SHALL BE DEEMED TO BE IMMEDIATELY REDUCED TO SUCH MAXIMUM RATE AND ALL PREVIOUS PAYMENTS IN EXCESS OF THE MAXIMUM RATE SHALL BE DEEMED TO HAVE BEEN PARTIAL PREPAYMENTS (WHETHER OR NOT PERMITTED OR PROHIBITED UNDER THE LOAN DOCUMENTS) IN REDUCTION OF PRINCIPAL AND NOT ON ACCOUNT OF THE INTEREST DUE.

The Borrower acknowledges that it has read and understood all the provisions of this Agreement, including the waiver of jury trial, and has been advised by counsel as necessary or appropriate.

**WITNESS** the due execution hereof as a document under seal, as of the date first written above.

**BORROWER:**

**COLTS RUN, L.L.C.**, an Illinois limited liability company

By: _____
Print Name: Angelina Djurin
Its: Manager

**PNC BANK, NATIONAL ASSOCIATION, successor to NATIONAL CITY BANK,**
a national banking association

By: _____
Print Name: Jason A. Rockwell
Its: Vice President

The undersigned Loan Parties hereby consent to the foregoing Agreement and agree to be bound thereby as it pertains to each of them, including Sections 11.2, 13, 16, 17.13, and 17.14.

_____
Ivan Djurin

_____
Angelina Djurin, not personally, but solely as the Trustee of the Angelina Djurin Self Declaration of Trust Dated April 2, 2001

_____
Teresa M. Baldwin, Trustee of the Teresa M. Baldwin Trust Dated April 8, 1994 n/k/a Teresa Flanagan Matre Restatement of Trust Dated February 7, 2007

Signature Page to Loan Agreement (Colts Run)

## ACKNOWLEDGEMENT

Reference is made to (i) that certain Property Management Agreement dated as of _____, 2012 (the "Management Agreement") by and between Borrower and North Street Properties, Inc., an Illinois corporation ("Manager") with respect to the operation, management and leasing of the Property. Capitalized terms used and not otherwise defined herein shall have the meanings ascribed thereto in the Consolidated, Amended and Restated Loan Agreement to which this Acknowledgement is attached.

Manager hereby acknowledges and agrees (a) that the Management Agreement is terminable upon notice, without penalty, premium or liability for future or accrued liabilities or obligations, if an Event of Default shall have occurred under the Loan Documents, (b) that following an Event of Default under the Loan Documents, if requested by the Bank in writing, Borrower shall terminate the Management Agreement within five (5) days after delivery of the Bank's request without payment of any penalty, premium or termination fee, (c) if the Management Agreement is not terminated in accordance with the foregoing clause (b), the Bank shall have the right, and Borrower irrevocably authorizes the Bank and irrevocably appoints the Bank as Borrower's attorney in fact coupled with an interest, at the Bank's sole option, to terminate the Management Agreement on behalf of and in the name of the Borrower, (d) any termination pursuant to the foregoing clause (b) or clause (c) shall take effect immediately upon Manager's receipt of a notice of termination from Borrower or the Bank, as applicable, and (e) Manager hereby waives any lien it may have on any of the Collateral for fees, expenses and other amounts due Manager under the Management Agreement. Borrower releases and waives any claims against the Bank arising out of the Bank's exercise of authority set forth in the foregoing clause (c).

Manager further acknowledges and agrees that it is executing this Acknowledgement and delivering it to the Bank to induce the Bank to enter into the Consolidated, Amended and Restated Loan Agreement with Borrower, to which this Acknowledgment is attached.

Dated: _____, 2012

NORTH STREET PROPERTIES, INC., an Illinois corporation

By: _____

Name: _____

Its: _____

# EXHIBIT A

## LEGAL DESCRIPTION OF THE PROPERTY

Being all of Lot 1, Unit 3, Mapleleaf Subdivision, Fayette County, Kentucky, as shown on the plat thereof of record in Plat Cabinet K, Slide 570, Fayette County Clerk's Office, to which plat reference is hereby made for a more particular description of said property; the improvements thereon being known and designated as 3170 Maple Leaf Drive.

Being apart of the same property conveyed to Colts Run Development LLC, an Ohio limited liability company, by deed dated December 31, 1997, of record in Deed Book 1955, page 91, in the Fayette County Clerk's office.

Common address:      3170 Maple Leaf Drive, Lexington, Kentucky 40509

Exhibit A

# EXHIBIT B

## EXISTING DEFAULTS

1. The Original Loan matured and was not paid upon maturity.
2. Borrower filed for federal bankruptcy protection.

## EXHIBIT C

### MT. ZION LOAN DOCUMENTS

1.  Loan Agreement dated as of January 29, 2008, between Original Lender and Mt. Zion.

2.  Open-End Real Estate Mortgage, Security Agreement and Assignment of Leases dated as of January 29, 2008, made by Mt. Zion in favor of Original Lender, recorded January 30, 2008 at 3:32:34 P.M. in Mortgage Book 3201, Page 719, in the Office of the Clerk of Boone County, Kentucky (the **"Boone Recorder"**), as amended by that certain Loan and Mortgage Modification Agreement dated as of. June 29, 2009, recorded September 23, 2009 at 11:31:32 A.M. in Miscellaneous Book 1135, Page 956, in the Office of the Boone Recorder.

3.  Note Made By Mortgagor In Favor Of Original Lender Dated As Of January 29, 2008, In The Original Principal Amount Of $25,250,000.00

4.  Loan Agreement dated as of January 29, 2008, between Original Lender and Mt. Zion.

5.  Assignment of Leases and Rents dated as of January 29, 2008 made by Mt. Zion in favor of Original Lender recorded January 30, 2008 at 3:33:09 P.M. in Miscellaneous Book 1095, Page 682 in the Office of the Boone Recorder.

6.  Mezzanine Loan Agreement date as of January 29, 2008 between Original Lender and Mt. Zion.

7.  Second Open-End Real Estate Mortgage, Security Agreement and Assignment of Leases dated as of January 29, 2008 made by Mt. Zion in favor of Original Lender, recorded _____, _____ at _____ P.M. in Mortgage Book _____, Page _____, in the Office of the Boone Recorder, as amended by that certain Loan and Second Mortgage Modification Agreement dated as of June 1, 2009, recorded _____, _____ at _____ in Miscellaneous Book _____, Page _____, in the Office of the Boone Recorder.

8.  Junior Assignment of Leases and Rents dated as of January 29, 2008 made by Mt. Zion in favor of Original Lender recorded January 30, 2008 at 3:35:07 P.M. in Miscellaneous Book 1095, Page 691 in the Office of the Boone Recorder.

9.  Guaranty of Payment dated as of January 29, 2008 made by Guarantor in favor of Original Lender.

10. Unconditional and Continuing Guaranty dated as of January 29, 2008 made by Guarantor in favor of Original Lender.

11. Security Agreement and Pledge of Partnership Interest dated as of January 29, 2008 between Woodspring Apartments, LLC, an Illinois limited liability company, and Original Lender.

12. Security Agreement and Pledge of Partnership Interest dated as of January 29, 2008 between Guarantor and Original Lender.

Exhibit C

13. Environmental Indemnity Agreement dated as of January 29, 2008 by Mt. Zion and Guarantor in favor of Original Lender.

Exhibit C

# EXHIBIT D

# INITIAL BUDGET

This instrument was prepared by
the undersigned under the supervision
of an attorney licensed in the State of
Kentucky, and after recording return to:


_____ (signature)
Abigail M. Flanagan, Esq.
GOLDBERG KOHN LTD.
55 East Monroe Street, Suite 3300
Chicago, Illinois  60603
(312) 201-4000

## CONSOLIDATED, AMENDED AND RESTATED OPEN-END REAL ESTATE MORTGAGE, SECURITY AGREEMENT AND ASSIGNMENT OF LEASES

THIS CONSOLIDATED, AMENDED AND RESTATED OPEN-END REAL ESTATE MORTGAGE, SECURITY AGREEMENT AND ASSIGNMENT OF LEASES ("**Mortgage**"), is executed on the date indicated on the notarial certificate affixed hereto, but is made and delivered effective as of March 20, 2012, by **COLTS RUN, L.L.C.**, an Illinois limited liability company having a mailing address of 1 Conway Park, 100 North Field Drive, Lake Forest, Illinois  60045 (hereinafter referred to as "**Mortgagor**") in favor of **PNC BANK, NATIONAL ASSOCIATION**, successor to **NATIONAL CITY BANK**, a national banking association (the "**Mortgagee**"), having its chief executive office and principal place of business at One PNC Plaza, 249 Fifth Avenue, Pittsburgh, Pennsylvania 15222-2707, its principal place of business as designated in its current filing with the Office of the Comptroller of the Currency at 222 Delaware Avenue, Wilmington, Delaware 19899 and having an office at 1 N. Franklin, Suite 2150, Chicago, IL  60606 (the immediately preceding address is hereafter referred to as the "**Notice Address**").

## RECITALS

A.    On or about July 19, 2001, National City Bank (the "**Original Lender**") made a loan to Mortgagor in the original principal sum of FIFTEEN MILLION

TWO HUNDRED THOUSAND AND NO/100 DOLLARS ($15,200,000.00) ("**Original Loan**").

      B.     The Original Loan was evidenced by a Note dated July 19, 2001 in the original principal amount of FIFTEEN MILLION TWO HUNDRED THOUSAND SEVEN HUNDRED ELEVEN AND NO/100 DOLLARS ($15,200,000.00) ("**Original Note**").

      C.     The Original Note was secured, in part, by a Real Estate Mortgage, Security Agreement and Assignment of Leases executed by Mortgagor dated July 19, 2001, and recorded on July 24, 2001, as Document Number 200107240162 in the office of the Fayette County Clerk encumbering the Property ("**Original Mortgage**"), which Original Mortgage was amended by that certain First Amendment to Mortgage and Assignment of Leases and Rents, dated as of June 16, 2003 and recorded July 17, 2003, as Document Number 200307170312 in the office of the Fayette County Clerk ("**First Amendment**"), and by that certain Real Estate Mortgage, Security Agreement and Assignment of Leases from Mortgagor to Lender, dated June 16, 2003, recorded in Mortgage Book 4434, page 523 of the office of the Clerk of Fayette County, Kentucky, as further amended by the Second Amendment to Mortgage and Assignment of Leases and Rents, dated as of March 1, 2005 and recorded March 3, 2005, as Document Number 200503030290, in the office of the Fayette County Clerk ("**Second Amendment**"), as further amended by the Real Estate Mortgage, Security Agreement and Assignment of Leases dated as of July 14, 2006 and recorded July 20, 2006, as Document Number 200607200212 in the Office of the Fayette County Clerk ("**Third Amendment**"), as further amended by the Real Estate Mortgage, Security Agreement and Assignment of Leases dated December 3, 2007, recorded in Mortgage Book 6254, page 189 of the office of the Clerk of Fayette County, Kentucky ("**Fourth Amendment**") (the Original Mortgage, as so amended, the "**Existing Borrower Mortgage**").

      D.     In connection with a transfer of an undivided 15% interest in the Property, the transferee thereof (the "**Baldwin Trust**") granted a Real Estate Mortgage, Security Agreement and Assignment of Leases from The Teresa M. Baldwin Trust dated April 8, 1994, to Lender, dated March 1, 2005, recorded in Mortgage Book 5217, page 360 of the office of the Clerk of Fayette County, Kentucky to secure the Original Note, as it had then been modified (the "**Original Trust Mortgage**"), which was amended by that certain Real Estate Mortgage, Security Agreement and Assignment of Leases from the Baldwin Trust to Lender, dated July 14, 2006, recorded in Mortgage Book 5784, page 622 of the office of the Clerk of Fayette County, Kentucky, and by that certain Real Estate Mortgage, Security Agreement and Assignment of Leases Mortgage from the Baldwin Trust to Lender, dated December 3, 2007, recorded in Mortgage Book 6254, page 199 of the office of the Clerk of Fayette County, Kentucky (the Original Trust Mortgage, as so amended, the "**Existing Trust Mortgage**").

      E.     The Baldwin Trust subsequently transferred its interest in the Property back to the Mortgagor.

F.      Pursuant to the First Amendment, Mortgagor borrowed from Lender an additional TWO MILLION EIGHT HUNDRED THOUSAND SEVEN HUNDRED ELEVEN AND NO/100 DOLLARS ($2,800,711.00), thus increasing the outstanding principal balance of the Original Loan as of June 16, 2003 to SEVENTEEN MILLION EIGHT HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($17,850,000.00).

G.      Pursuant to the First Amendment and in connection with the foregoing increase in the principal balance of the Original Loan, the Original Note was replaced by two (2) separate notes, both dated as of June 16, 2003: (i) an Amended and Restated Adjustable Rate Note in the original principal amount of NINE MILLION TWO HUNDRED FIFTY-TWO THOUSAND NINE HUNDRED NINETY-SEVEN AND 78/100 DOLLARS ($9,252,997.78) ("**A & R Adjustable Rate Note**"); and (ii) an Amended and Restated Fixed Rate Note in the original principal amount of EIGHT MILLION FIVE HUNDRED NINETY-SEVEN THOUSAND TWO AND 22/100 DOLLARS ($8,597,002.22) ("**A & R Fixed Rate Note**").

H.      Pursuant to the Second Amendment, Mortgagor borrowed from Lender an additional ONE MILLION SIX HUNDRED FIFTEEN THOUSAND SIX HUNDRED SIX AND 78/100 DOLLARS ($1,615,606.78), thus increasing the outstanding principal balance of the Original Loan as of March 1, 2005 to NINETEEN MILLION DOLLARS ($19,000,000.00).

I.      Pursuant to the Second Amendment and in connection with the foregoing additional increase in the principal balance of the Original Loan, the A & R Adjustable Rate Note was replaced by a Second Amended and Restated Adjustable Rate Note dated March 1, 2005 in the original principal amount of TEN MILLION SIX HUNDRED TWENTY-THREE THOUSAND FOUR HUNDRED FOUR AND 56/100 DOLLARS ($10,623,404.56) ("**Second A & R Adjustable Rate Note**").

J.      Pursuant to the Third Amendment, Mortgagor borrowed from Lender an additional TWO MILLION SEVEN HUNDRED EIGHT THOUSAND SIX HUNDRED NINETY-EIGHT AND 10/100 DOLLARS ($2,708,698.10), thus increasing the outstanding principal balance of the Original Loan as of July 14, 2006 to TWENTY-ONE MILLION THREE HUNDRED THOUSAND DOLLARS ($21,300,000.00).

K.      Pursuant to the Third Amendment and in connection with the foregoing additional increase in the principal balance of the Original Loan, the Second A & R Adjustable Rate Note was replaced by a Third Amended and Restated Adjustable Rate Note dated July 14, 2006 in the original principal amount of THIRTEEN MILLION ONE HUNDRED TWENTY-EIGHT THOUSAND TWO HUNDRED TWO AND 66/100 DOLLARS ($13,128,202.66) ("Third A & R Adjustable Rate Note ").

L.      Pursuant to the Fourth Amendment, (i) Mortgagor borrowed from Lender an additional THREE MILLION ONE HUNDRED EIGHTY-SEVEN THOUSAND NINE HUNDRED NINE DOLLARS ($3,187,909.00), thus increasing the outstanding principal balance of the Original Loan as of December 3, 2007 to TWENTY-FOUR

MILLION DOLLARS ($24,000,000.00) and (ii) the Maturity Date of the Original Loan was extended to August 25, 2011.

M.   Pursuant to the Fourth Amendment and in connection with the foregoing further increase in the principal balance of the Original Loan and extension of the Maturity Date of the Original Loan, (i) the Third A & R Adjustable Rate Note was replaced by a Fourth Amended and Restated Adjustable Rate Note dated as of December 3, 2007 in the original principal amount of SIXTEEN MILLION THIRTY-THREE THOUSAND TWO HUNDRED THIRTEEN DOLLARS ($16,033,213) ("**Fourth A & R Adjustable Rate Note**") and (ii) the A & R Fixed Rate Note was replaced by a Second Amended and Restated Fixed Rate Note dated as of December 3, 2007 in the original principal amount of SEVEN MILLION NINE HUNDRED SIXTY-SIX THOUSAND SEVEN HUNDRED EIGHTY-SEVEN DOLLARS ($7,966,787) ("**Second A & R Fixed Rate Note**")(The Second A & R Fixed Rate Note and Fourth A & R Adjustable Rate Note are collectively referred to as the "**A & R Notes**").

N.   The A & R Notes are further secured, in part, by a Guaranty executed by Ivan Djurin ("**Guarantor**") dated July 19, 2001, as amended by that certain Reaffirmation of Guaranty, dated as of June 16, 2003, to and for the benefit of Lender (as so amended, the "**Original Guaranty**").

O.   The Original Guaranty was amended and replaced by the Amended and Restated Guaranty dated September 22, 2004 executed by Guarantor to and for the benefit of Lender, which was amended and replaced by the Second Amended and Restated Guaranty dated as of March 1, 2005 executed by Guarantor to and for the benefit of Lender, which was amended and replaced by the Third Amended and Restated Guaranty dated as of July 14, 2006 executed by Guarantor to and for the benefit of Lender, which was amended and replaced by the Fourth Amended and Restated Guaranty dated as of December 3, 2007 executed by Guarantor to and for the benefit of Lender (the Original Guaranty, as so amended and replaced, the "**Existing Guaranty**").

P.   Lender is the successor in interest to the Original Lender.

Q.   Concurrently herewith, as provided in that certain Consolidated, Amended and Restated Loan Agreement dated as of the date hereof by and between the Mortgagor and Assignee (said Consolidated, Amended and Restated Loan Agreement, together with all amendments, supplements, renewals, modifications, restatements and replacements thereof, being hereinafter referred to as the "**Loan Agreement**"), the A & R Notes are being consolidated, amended and restated into two replacement notes: (i) that certain Senior Note dated as of the date hereof made by Mortgagor in favor of the Lender in the principal amount of $17,500,000.00 (together with any Amendments thereto, the "**Senior Note**"), and (ii) by that certain Junior Note dated as of the date hereof by Mortgagor in favor of Lender in the principal amount of $5,470,920.53 (together with any Amendments thereto, the "**Junior Note**"). The Original Loan is, as of the Effective Date, amended as provided in the Loan Agreement and the other Loan Documents (as so amended, the "**Loan**"). The Loan is evidenced by that certain Senior Note and that certain Junior Note (the Senior Note and the

Junior Note, together will all amendments, renewals, supplements, modifications, restatements and replacements thereof, collectively, the **"Notes"**), which renew, amend, restate, supersede and replace the A & R Notes. All capitalized terms used but not defined herein shall have the meanings assigned to them in the Loan Agreement. This Agreement together with the Loan Agreement, the Notes and all and other documents and instruments now or hereafter executed and delivered in connection with the Loan, and any and all amendments, renewals, extensions, modifications, restatements and replacements hereof and thereof, are hereafter collectively referred to herein as the **"Loan Documents."**

R.    Reference is further made to those certain loans (the **"Original Mt. Zion Loans"**) made by Original Lender and its processors in interest to Mt. Zion Limited Partnership, a Kentucky limited partnership (**"Mt. Zion"**) pursuant to various notes and other loan documents, including the **"Original Mt. Zion Loan Documents"** (as defined in the Loan Agreement).

S.    The Original Mt. Zion Loans are being amended pursuant to various loan documents being entered into concurrently herewith pertaining to such other loans (the Original Mt. Zion Loan Documents, as amended thereby, and as each may be further amended, restated, supplemented, reviewed, modified or replaced hereafter, being referred to as the **"Mt. Zion Amended Loan Documents"** and the Original Mt. Zion Loans, as amended thereby, being referred to as the **"Amended Mt. Zion Loans"**).

T.    The final Maturity Date of the Loan and of the Amended Mt. Zion Loan is December 31,2013. Both the Loan and the Amended Mt. Zion Loan bear interest at variable interest rates.

U.    Mortgagor and Mortgagee desire hereby to: (i) cross-collateralize and cross default the Amended Mt. Zion Loans and the Loan; and (ii) consolidate, amend and restate the Existing Borrower Mortgage together with the Existing Trust Mortgage into one single consolidated security document and mortgage lien encumbering the Mortgaged Property as security for the Loan and the other obligations described herein.

**NOW, THEREFORE,** for the purpose of securing the payment and performance of:

(A)    The following obligations (collectively called the **"Colts Run Obligations"**):

(1)    The Amended Colts Run Loans, the Colts Run Amended Notes and all other loans, advances, debts, liabilities, obligations, covenants and duties owing by the Colts Run to the Mortgagee arising under or with respect to the Colts Run Amended Loan Documents or otherwise, or to any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., of any kind or nature, present or future (including any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency,

reorganization or like proceeding relating to Colts Run, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, whether or not (i) evidenced by any note, guaranty or other instrument, (ii) arising under any agreement, instrument or document, (iii) for the payment of money, (iv) arising by reason of an extension of credit, opening of a letter of credit, loan, equipment lease or guarantee, (v) under any interest or currency swap, future, option or other interest rate protection or similar agreement, (vi) under or by reason of any foreign currency transaction, forward, option or other similar transaction providing for the purchase of one currency in exchange for the sale of another currency, or in any other manner, or (vii) arising out of overdrafts on deposit or other accounts or out of electronic funds transfers (whether by wire transfer or through automated clearing houses or otherwise) or out of the return unpaid of, or other failure of the Mortgagee to receive final payment for, any check, item, instrument, payment order or other deposit or credit to a deposit or other account, or out of the Mortgagee's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository or other similar arrangements; and any amendments, extensions, renewals and increases of or to any of the foregoing, and all costs and expenses of the Mortgagee incurred in the documentation, negotiation, modification, enforcement, collection and otherwise in connection with any of the foregoing, including reasonable attorneys' fees and expenses; and

(2)    Any sums advanced by the Mortgagee or which may otherwise become due pursuant to the provisions of the Colts Run Amended Notes or the Colts Run Amended Mortgage or pursuant to any of the other Colts Run Amended Loan Documents.

(B)    The following obligations (collectively called the **"Mt. Zion Obligations"**):

(1)    The Loan, the Notes and all other loans, advances, debts, liabilities, obligations, covenants and duties owing by the Mortgagor to the Mortgagee arising under or with respect to the Loan Documents or otherwise, or to any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., of any kind or nature, present or future (including any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to the Mortgagor, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint

6

or several, due or to become due, now existing or hereafter arising, whether or not (i) evidenced by any note, guaranty or other instrument, (ii) arising under any agreement, instrument or document, (iii) for the payment of money, (iv) arising by reason of an extension of credit, opening of a letter of credit, loan, equipment lease or guarantee, (v) under any interest or currency swap, future, option or other interest rate protection or similar agreement, (vi) under or by reason of any foreign currency transaction, forward, option or other similar transaction providing for the purchase of one currency in exchange for the sale of another currency, or in any other manner, or (vii) arising out of overdrafts on deposit or other accounts or out of electronic funds transfers (whether by wire transfer or through automated clearing houses or otherwise) or out of the return unpaid of, or other failure of the Mortgagee to receive final payment for, any check, item, instrument, payment order or other deposit or credit to a deposit or other account, or out of the Mortgagee's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository or other similar arrangements; and any amendments, extensions, renewals and increases of or to any of the foregoing, and all costs and expenses of the Mortgagee incurred in the documentation, negotiation, modification, enforcement, collection and otherwise in connection with any of the foregoing, including reasonable attorneys' fees and expenses; and

(2)     Any sums advanced by the Mortgagee or which may otherwise become due pursuant to the provisions of the Notes or this Mortgage or pursuant to any of the other Loan Documents; and

The Colts Run Obligations together with the Mt. Zion Obligations shall be hereinafter referred to the **"Obligations."**

The Mortgagor, for good and valuable consideration, receipt of which is hereby acknowledged, and intending to be legally bound hereby, does hereby give, grant, bargain, sell, convey, assign, transfer, mortgage, hypothecate, pledge, set over and confirm unto the Mortgagee and does agree that the Mortgagee shall have a security interest in the following described property, all accessions and additions thereto, all substitutions therefor and replacements and proceeds thereof, and all reversions and remainders of such property now owned or held or hereafter acquired (the **"Property"**), to wit:

(a)     All of the Mortgagor's estate in the premises described in Exhibit A, together with all of the easements, rights of way, privileges, liberties, hereditaments, gores, streets, alleys, passages, ways, waters, watercourses, rights and appurtenances thereunto belonging or appertaining, and all of the Mortgagor's estate, right, title, interest, claim and demand therein and in the public streets and ways adjacent thereto, either in law or in equity (the **"Land"**);

(b)    All the buildings, structures and improvements of every kind and description now or hereafter erected or placed on the Land, and all facilities, fixtures, machinery, apparatus, appliances, installations, machinery and equipment, including all building materials to be incorporated into such buildings, all electrical equipment necessary for the operation of such buildings and heating, air conditioning and plumbing equipment now or hereafter attached to, located in or used in connection with those buildings, structures or other improvements (the **"Improvements"**);

(c)    All rents, income, issues, and profits arising or issuing from the Land and the Improvements and advantages and claims against guarantors of any Leases (defined below) (the **"Rents"**) including the Rents arising or issuing from all leases, licenses, subleases or any other use or occupancy agreement now or hereafter entered into covering all or any part of the Land and Improvements (the **"Leases"**), all of which Leases and Rents are hereby assigned to the Mortgagee by the Mortgagor. The foregoing assignment shall include all fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties, and all cash or securities deposited under Leases to secure performance of lessees of their obligations thereunder, whether such cash or securities are to be held until the expiration of the terms of such leases or applied to one or more installments of rent coming due prior to the expiration of such terms. The foregoing assignment extends to Rents arising both before and after the commencement by or against the Mortgagor of any case or proceeding under any Federal or State bankruptcy, insolvency or similar law, and is intended as an absolute assignment and not merely the granting of a security interest. The Mortgagor, however, shall have a license to collect, retain and use the Rents so long as no Event of Default shall have occurred and be continuing or shall exist, strictly subject, however, to the terms of the Loan Agreement. The Mortgagor will execute and deliver to the Mortgagee, on demand, such additional assignments and instruments as the Mortgagee may require to implement, confirm, maintain and continue the assignment of Rents hereunder;

(d)    All proceeds of the conversion, voluntary or involuntary, of any of the foregoing into cash or liquidated claims; and

(e)    Without limiting any of the other provisions of this Mortgage, the Mortgagor, as debtor, expressly grants unto the Mortgagee, as secured party, a security interest in all personal property of the Mortgagor, including the following, all whether now owned or hereafter acquired or arising and wherever located: (i) accounts (including health-care-insurance receivables and credit card receivables); (ii) securities entitlements, securities accounts, commodity accounts, commodity contracts and investment property; (iii) deposit accounts; (iv) instruments (including promissory notes); (v) documents (including warehouse receipts); (vi) chattel paper (including electronic chattel paper and tangible chattel paper); (vii) inventory, including raw materials, work in process, or materials used or consumed in Mortgagor's business, items held for sale or lease or furnished or to be furnished under contracts of service, sale or lease, goods that are returned, reclaimed or repossessed; (viii) goods of every nature, including stock-in-trade, goods on consignment, standing timber that is to be cut and removed under a conveyance or contract for sale, the unborn young of animals, crops grown, growing, or to be grown, manufactured homes, computer programs

embedded in such goods and farm products; (ix) equipment, including machinery, vehicles and furniture; (x) fixtures; (xi) agricultural liens; (xii) as-extracted collateral; (xiii) letter of credit rights; (xiv) general intangibles, of every kind and description, including payment intangibles, software, computer information, source codes, object codes, records and data, all existing and future customer lists, choses in action, claims (including claims for indemnification or breach of warranty), books, records, patents and patent applications, copyrights, trademarks, tradenames, tradestyles, trademark applications, goodwill, blueprints, drawings, designs and plans, trade secrets, contracts, licenses, license agreements, formulae, tax and any other types of refunds, returned and unearned insurance premiums, rights and claims under insurance policies; (xv) all supporting obligations of all of the foregoing property; (xvi) all property of the Mortgagor now or hereafter in the Mortgagee's possession or in transit to or from, or under the custody or control of, the Mortgagee or any affiliate thereof; (xvii) all cash and cash equivalents thereof; and (xviii) all cash and noncash proceeds (including insurance proceeds) of all of the foregoing property, all products thereof and all additions and accessions thereto, substitutions therefor and replacements thereof.  The Mortgagor will execute and deliver to the Mortgagee on demand such financing statements and other instruments as the Mortgagee may require in order to perfect, protect and maintain such security interest under the Uniform Commercial Code ("**UCC**") on the aforesaid collateral.

To have and to hold the same unto the Mortgagee, its successors and assigns, forever.

Provided, however, that if the Obligations shall be paid to the Mortgagee, and if the Mortgagor shall keep and perform each of its other covenants, conditions and agreements set forth herein, in the other Loan Documents and in the Mt. Zion Amended Loan Documents, then, upon the payment in full of the Obligations and upon the termination of all obligations, duties and commitments of the Mortgagor under this Mortgage, and subject to the provisions of the paragraph entitled "Survival; Successors and Assigns", the estate hereby granted and conveyed shall become null and void.

This Mortgage is given for the purpose of creating a lien on real property in order to secure not only existing indebtedness, but also future advances, whether such advances are obligatory or to be made at the option of the Mortgagee, or otherwise, whether such advances are made or incurred before or after a default or Event of Default (as hereinafter defined) or maturity or other similar events, to the same extent as if such future advances were made or incurred on the date of the execution hereof, although there may be no advance made at the time of the execution hereof and although there may be no indebtedness outstanding at the time any advance is made.  The types of future advances secured by and having priority under this Mortgage shall include (i) advances and readvances of principal under the Note or other Loan Documents and, (ii) disbursements and other advances for the payment of taxes, assessments, maintenance charges, insurance premiums or costs relating to the Property, for the discharge of liens having priority over the lien of this Mortgage, for the curing of waste of the Property and for the payment of service charges and expenses incurred by reason of default and including late charges, reasonable attorneys' fees and court costs, together with interest thereon.  The lien of this Mortgage, as to third persons

with or without actual knowledge thereof, shall be valid as to all such indebtedness and future advances, from the date of recordation, in accordance with the provisions of KRS 382.520, as the same may hereafter be amended and the laws of the state in which the Property is situated.  The maximum additional indebtedness and future advances secured hereby shall not exceed $76,807,534.94.

To the extent that the indebtedness evidenced by the Notes or any of the other Obligations is deemed to be a revolving credit plan pursuant to KRS 382.385, the Mortgagor and the Mortgagee intend that this Mortgage secure the revolving credit plan, and the maximum credit limit of the revolving credit plan which may be outstanding at any time or times and which is to be secured by this Mortgage is $76,807,534.94.

Without limiting in any way the indebtedness secured by this Mortgage, Mortgagor acknowledges and agrees that this Mortgage consolidates, amends and restates the Original Senior Mortgage and the Original Mezzanine Mortgage, and continues to secure the Original Senior Loan and the Original Mezzanine Loan, as such loans are being consolidated, amended and restated pursuant to the Loan Agreement, the Notes and the other Loan Documents.

1.    **Representations and Warranties.**  The Mortgagor represents and warrants to the Mortgagee that (i) the Mortgagor has good and marketable title to an estate in fee simple absolute in the Land and Improvements and has all right, title and interest in all other property constituting a part of the Property, in each case free and clear of all liens and encumbrances, except as may otherwise be set forth on an Exhibit B hereto and (ii) its name, type of organization, jurisdiction of organization and chief executive office are true and complete as set forth in the heading of this Mortgage.  This Mortgage is a valid and enforceable first lien on the Property (except as set forth on Exhibit B) and the Mortgagee shall, subject to the Mortgagor's right of possession prior to an Event of Default, quietly enjoy and possess the Property.  The Mortgagor shall preserve such title as it warrants herein and the validity and priority of the lien hereof and shall forever warrant and defend the same to the Mortgagee against the claims of all persons.

2.    **Affirmative Covenants.**  Until all of the Obligations shall have been fully paid, satisfied and discharged the Mortgagor shall:

(a)    Payment and Performance of Obligations.  Pay or cause to be paid and perform all Obligations when due as provided in the Loan Documents.

(b)    Legal Requirements.  Promptly comply with and conform to all present and future laws, statutes, codes, ordinances, orders and regulations and all covenants, restrictions and conditions which may be applicable to the Mortgagor or to any of the Property (the **"Legal Requirements"**).

(c)    Impositions.  Before interest or penalties are due thereon and otherwise when due, the Mortgagor shall pay all taxes of every kind and nature, all charges for any easement or agreement maintained for the benefit of any of the Property, all general and

special assessments (including any condominium or planned unit development assessments, if any), levies, permits, inspection and license fees, all water and sewer rents and charges, and all other charges and liens, whether of a like or different nature, imposed upon or assessed against the Mortgagor or any of the Property (the **"Impositions"**).  Within thirty (30) days after the payment of any Imposition, the Mortgagor shall deliver to the Mortgagee written evidence acceptable to the Mortgagee of such payment.  The Mortgagor's obligations to pay the Impositions shall survive the Mortgagee's taking title to (and possession of) the Property through foreclosure, deed-in-lieu or otherwise, as well as the termination of the Mortgage including, without limitation, by merger into a deed.    Notwithstanding the foregoing, if Mortgagor desires, in good faith, to contest any Impositions, no Event of Default will occur if (a) Mortgagor provides such security as shall be satisfactory to Mortgagee and its title insurance company providing insurance over such Impositions, and (b) Mortgagor shall pay such Impositions forthwith upon the commencement of proceedings to foreclose any lien which secures any such Impositions, unless such foreclosure is stayed by the filing of an appropriate bond in a manner satisfactory to Mortgagee.

(d)     Maintenance of Security.  Use, and permit others to use, the Property only for its present use or such other uses as permitted by applicable Legal Requirements and approved in writing by the Mortgagee.  The Mortgagor shall keep the Property in good condition and order and in a rentable and tenantable state of repair and will make or cause to be made, as and when necessary, all repairs, renewals, and replacements, structural and nonstructural, exterior and interior, foreseen and unforeseen, ordinary and extraordinary, provided, however, that no structural repairs, renewals or replacements shall be made without the Mortgagee's prior written consent.  The Mortgagor shall not remove, demolish or alter the Property nor commit or suffer waste with respect thereto, nor permit the Property to become deserted or abandoned.  The Mortgagor covenants and agrees not to take or permit any action with respect to the Property which will in any manner impair the security of this Mortgage or the use of the Property as set forth in the Loan Documents.

3.     **Leases.**  The Mortgagor shall not (a) execute an assignment or pledge of the Rents or the Leases other than in favor of the Mortgagee; (b) accept any prepayment of an installment of any Rents more than thirty (30) days prior to the due date of such installment; or (c) enter into or amend any of the terms of any of the Leases without the Mortgagee's prior written consent, except in Mortgagor's ordinary course of business of leasing individual apartments to residents thereof on market terms and conditions and a lease term of not more than two (2) years.  Any or all Leases of all or any part of the Property shall be subject in all respects to the Mortgagee's prior written consent, shall be subordinated to this Mortgage and to the Mortgagee's rights and, together with any and all rents, issues or profits relating thereto, shall, without further documentation, automatically be assigned at the time of execution to the Mortgagee as additional collateral security for the Obligations pursuant to the granting clauses above in this Mortgage.

4.     **Due on Sale Clause.**    The Mortgagor shall not sell, convey or otherwise transfer any interest in the Property (whether voluntarily or by operation of law), or agree to do so, without the Mortgagee's prior written consent, including (a) any sale, conveyance, encumbrance, assignment, or other transfer of (including installment land sale

11

contracts), or the grant of a security interest in, all or any part of the legal or equitable title to the Property, except as otherwise permitted hereunder; provided, however, Mortgagor may dispose of impaired or obsolete furniture, fixtures or equipment in the ordinary course of Mortgagor's business to a person or entity other than Mortgagor or Guarantor or any affiliate of Mortgagor or Guarantor (x) that is replaced with new furniture, fixtures or equipment or (y) that does not exceed $25,000 in value in aggregate for all such dispositions in any consecutive twelve (12) month period; (b) any lease of all or any portion of the Property; or (c) any sale, conveyance, assignment, or other transfer of, or the grant of a security interest in, any share of stock of the Mortgagor (or the general partner of Mortgagor), if a corporation or any partnership interest in the Mortgagor (or the general partner of Mortgagor), if a partnership, or any membership interest in Mortgagor (or the general partner of Mortgagor), if a limited liability entity, except in favor of the Mortgagee. Any default under this Section shall cause an immediate acceleration of the Obligations without any demand by the Mortgagee.

        5.    **Mechanics' Liens.**    Prior to the Mortgagor performing any construction or other work on or about the Property for which a lien could be filed against the Property, the Mortgagor shall enter into a written contract (**"Construction Contract"**) with the contractor who is to perform such work, or materialman providing materials (each a **"Contractor"**), containing a provision whereby (i) the Contractor shall, at the request of the Mortgagor or Mortgagee, verify in an affidavit in a form approved by the Mortgagee that all labor and materials furnished by the Contractor, including all applicable taxes, have been paid by the Contractor up to the date of such requested affidavit, (ii) the Contractor shall, upon the request of the Mortgagor or Mortgagee, at no cost to Mortgagee, post a bond guaranteeing payment for labor and materials provided by all subcontractors, sub-subcontractors and materialmen and subsequently obtain customary lien waivers from such parties in a form acceptable to Mortgagee, (iii) the Contractor agrees to subordinate any lien against the Property, whether obtained under the mechanics' lien laws or otherwise, to the lien, right, title and terms of the Loan Documents and all advances to be made thereunder and to include a similar provision in contracts with all subcontractors, sub-subcontractors and materialmen with respect to liens obtained by such parties and (iv) the Contractor agrees that foreclosure or a conveyance in lieu of a foreclosure of the liens and security interests securing the Loan shall be fully and automatically effective to terminate and extinguish all of Contractor's liens and claims of any kind against the Property and to include a similar provision in contracts with all subcontractors, sub-subcontractors and materialmen with respect to liens obtained by such parties. Notwithstanding the foregoing, if mechanics' or other liens shall be filed against the Property purporting to be for labor or material furnished or to be furnished on behalf of the Mortgagor, or for any other reason relating to the acts or omissions of the Mortgagor, then the Mortgagor shall at its expense, cause such lien to be discharged of record by payment, bond or otherwise within fifteen (15) days after the filing thereof. If the Mortgagor shall fail to cause such lien to be discharged of record within the fifteen (15) day period, the Mortgagee may, in Mortgagee's sole discretion, cause such lien to be discharged by payment, bond or otherwise without investigation as to the validity thereof or as to any offsets or defenses thereto, and the Mortgagor shall, upon demand, reimburse the

Mortgagee for all amounts paid and costs incurred in connection therewith including, without limitation, attorneys' fees and disbursements.

6. **Insurance.** The Mortgagor shall keep the Property continuously insured as provided in the Loan Agreement. Pursuant to the requirements of the Illinois Collateral Protection Act, 815 ILCS 180/1, et seq. (**"Collateral Protection Act"**), Mortgagor is hereby notified that unless the Mortgagor provides the Mortgagee with evidence of the insurance coverage required by this Mortgage and each other Loan Document, Mortgagee may purchase insurance at Mortgagor's expense to protect Mortgagee's interest in the Property or any other collateral for the Obligations. This insurance may, but need not protect Mortgagor's interests. The coverage the Mortgagee purchases may not pay any claim that Mortgagor makes or any claim that is made against Mortgagor in connection with the Property or any other collateral for the Obligations. Mortgagor may later cancel any insurance purchased by Mortgagee but only after providing Mortgagee with evidence that Mortgagor has obtained insurance as required by this Mortgage and each other Loan Document. If Mortgagee purchases insurance for the Property or any other collateral for the Obligations, Mortgagor will be responsible for the costs of that insurance, including interest in any other charges that Mortgagee may lawfully impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to the total outstanding Obligations. The costs of the insurance may be more than the cost of insurance that Mortgagor may be able to obtain on its own.

7. **Rights of Mortgagee to Insurance Proceeds.** In the event of loss, the Mortgagee shall have the exclusive right to adjust, collect and compromise all insurance claims, and the Mortgagor shall not adjust, collect or compromise any claims under said policies without the Mortgagee's prior written consent. Each insurer is hereby authorized and directed to make payment under said policies, including return of unearned premiums, directly to the Mortgagee instead of to the Mortgagor and the Mortgagee jointly, and the Mortgagor appoints the Mortgagee as the Mortgagor's attorney-in-fact to endorse any draft therefor. All insurance proceeds may, at the Mortgagee's sole option, be applied to all or any part of the Obligations and in any order (notwithstanding that such Obligations may not then otherwise be due and payable) or to the repair and restoration of any of the Property under such terms and conditions as the Mortgagee may impose.

8. **Intentionally Omitted.**

9. **Condemnation.** The Mortgagor, immediately upon obtaining knowledge of the institution of any proceedings for the condemnation or taking by eminent domain of any of the Property, shall notify the Mortgagee of the pendency of such proceedings. The Mortgagee may participate in any such proceedings and the Mortgagor shall deliver to the Mortgagee all instruments requested by it to permit such participation. Any award or compensation for property taken or for damage to property not taken, whether as a result of such proceedings or in lieu thereof, is hereby assigned to and shall be received and collected directly by the Mortgagee, and any award or compensation shall be applied, at the Mortgagee's option, to any part of the Obligations and in any order (notwithstanding that

13

any of such Obligations may not then be due and payable) or to the repair and restoration of any of the Property under such terms and conditions as the Mortgagee may impose.

10.    **Environmental Matters.**

(a)    For purposes of this Section 10, the term **"Environmental Laws"** shall mean all federal, state and local laws, regulations and orders, whether now or in the future enacted or issued, pertaining to the protection of land, water, air, health, safety or the environment.  The term **"Regulated Substances"** shall mean all substances regulated by Environmental Laws, or which are known or considered to be harmful to the health or safety of persons, or the presence of which may require investigation, notification or remediation under the Environmental Laws.  The term **"Contamination"** shall mean the discharge, release, emission, disposal or escape of any Regulated Substances into the environment.

(b)    The Mortgagor represents and warrants that to the best of Mortgagor's knowledge (i) that no Contamination is present at, on or under the Property and that no Contamination is being or has been emitted onto any surrounding property; (ii) all operations and activities on the Property have been and are being conducted in accordance with all Environmental Laws, and the Mortgagor has all permits and licenses required under the Environmental Laws; (iii) no underground or aboveground storage tanks are or have been located on or under the Property; and (iv) no legal or administrative proceeding is pending or threatened relating to any environmental condition, operation or activity on the Property, or any violation or alleged violation of Environmental Laws.  These representations and warranties shall be true as of the date hereof, and shall be deemed to be continuing representations and warranties which must remain true, correct and accurate during the entire duration of the term of this Mortgage.

(c)    The Mortgagor shall ensure, at its sole cost and expense, that the Property and the conduct of all operations and activities thereon comply and continue to comply with all Environmental Laws.  The Mortgagor shall notify the Mortgagee promptly and in reasonable detail in the event that the Mortgagor becomes aware of any violation of any Environmental Laws, the presence or release of any Contamination with respect to the Property, or any governmental or third party claims relating to the environmental condition of the Property or the conduct of operations or activities thereon.  The Mortgagor also agrees not to permit or allow the presence of Regulated Substances on any part of the Property, except for those Regulated Substances (i) which are used in the ordinary course of the Mortgagor's business, but only to the extent they are in all cases used in a manner which complies with all Environmental Laws; and (ii) those Regulated Substances which are naturally occurring on the Property.  The Mortgagor agrees not to cause, allow or permit the presence of any Contamination on the Property.

(d)    The Mortgagee shall not be liable for, and the Mortgagor shall indemnify, defend and hold the Mortgagee and the Indemnified Parties (as hereinafter defined) and all of their respective successors and assigns harmless from and against all losses, costs, liabilities, damages, fines, claims, penalties and expenses (including reasonable attorneys', consultants' and contractors' fees, costs incurred in the investigation, defense and

14

settlement of claims, as well as costs incurred in connection with the investigation, remediation or monitoring of any Regulated Substances or Contamination) that the Mortgagee or any Indemnified Party may suffer or incur (including as holder of the Mortgage, as mortgagee in possession or as successor in interest to the Mortgagor as owner of the Property by virtue of a foreclosure or acceptance of a deed in lieu of foreclosure) as a result of or in connection with (i) any Environmental Laws (including the assertion that any lien existing or arising pursuant to any Environmental Laws takes priority over the lien of the Mortgage); (ii) the breach of any representation, warranty, covenant or undertaking by the Mortgagor in this Section 10; (iii) the presence on or the migration of any Contamination or Regulated Substances on, under or through the Property; or (iv) any litigation or claim by the government or by any third party in connection with the environmental condition of the Property or the presence or migration of any Regulated Substances or Contamination on, under, to or from the Property; excluding, however, liabilities caused solely by the gross negligence or the willful misconduct of the Mortgagee.   Further, such indemnification obligations, and the obligations of Mortgagor to take actions (or prevent actions from being taken) set forth in the preceding Sections of this Mortgage shall not extend to any matter, event, or condition which solely arises or occurs after the acquisition by Mortgagee of title to and possession of the Property, whether by foreclosure, exercise of power of sale, transfer and/or acceptance of a deed-in-lieu of foreclosure or otherwise, or after acquisition of title to and possession of the Property by any other Person or entity (other than Mortgagor, Guarantor or any affiliate of Mortgagor or Guarantor) through a foreclosure sale, in any such event unless such matter, event, or condition was caused in whole or in part by matters, events or conditions existing or arising prior to the date of such acquisition of title to and possession of the Property.

(e)     Upon the Mortgagee's request, the Mortgagor shall execute and deliver an Environmental Indemnity Agreement satisfactory in form and substance to the Mortgagee, to more fully reflect the Mortgagor's representations, warranties, covenants and indemnities with respect to the Environmental Laws.

11.     **Inspection of Property.**  The Mortgagee shall have the right to enter the Property upon reasonable notice at any reasonable hour for the purpose of inspecting the order, condition and repair of the buildings and improvements erected thereon, as well as the conduct of operations and activities on the Property, subject to the rights of tenants under their Leases. The Mortgagee may enter the Property (and cause the Mortgagee's employees, agents and consultants to enter the Property), upon prior written notice to the Mortgagor, to conduct any and all environmental testing deemed appropriate by the Mortgagee in its sole discretion.   The environmental testing shall be accomplished by whatever means the Mortgagee may deem appropriate, including the taking of soil samples and the installation of ground water monitoring wells or other intrusive environmental tests.  The Mortgagor shall provide the Mortgagee (and the Mortgagee's employees, agents and consultants) reasonable rights of access to the Property as well as such information about the Property and the past or present conduct of operations and activities thereon as the Mortgagee shall reasonably request.

12.    **Events of Default.**    The occurrence of any one or more of the following events shall constitute an **"Event of Default"** hereunder: (a) any Event of Default (as defined in any of the Loan Documents or any of the Mt. Zion Amended Loan Documents); (b) any default under any of the Loan Documents or any of the Mt. Zion Amended Loan Documents that does not have a defined set of "Events of Default" and the lapse of any notice or cure period provided in the Loan Documents or in the Mt. Zion Amended Loan Documents, as applicable, with respect to such default; (c) demand by the Mortgagee under any of the Loan Documents or any of the Mt. Zion Amended Loan Documents that have a demand feature; (d) the Mortgagor's failure to perform any of its obligations under this Mortgage or under any Environmental Indemnity Agreement executed and delivered pursuant to Section 10(e); (e) falsity, inaccuracy or material breach by the Mortgagor of any written warranty, representation or statement made or furnished to the Mortgagee by or on behalf of the Mortgagor; (f) an uninsured material loss, theft, damage, or destruction to any of the Property, or the entry of any judgment against the Mortgagor or any lien against or the making of any levy, seizure or attachment of or on the Property; (g) the Mortgagee's failure to have a mortgage lien on the Property with the priority required under Section 1; (h) any indication or evidence received by the Mortgagee that the Mortgagor may have directly or indirectly been engaged in any type of activity which, in the Mortgagee's discretion, might result in the forfeiture of any property of the Mortgagor to any governmental entity, federal, state or local; (i) foreclosure proceedings are instituted against the Property upon any other lien or claim, whether alleged to be superior or junior to the lien of this Mortgage; or (j) the failure by the Mortgagor to pay any Impositions as required under Section 2(c), or to maintain in full force and effect any insurance required under Section 6.

13.    **Rights and Remedies of Mortgagee.**    If an Event of Default occurs, the Mortgagee may, at its option and without demand, notice or delay, do one or more of the following:

(a)    The Mortgagee may declare the entire unpaid principal balance of the Obligations, together with all interest thereon, to be due and payable immediately.

(b)    The Mortgagee may (i) foreclose its lien on the Property and the interests of the Mortgagor therein and proceed to sale for the collection and recovery of the Obligations, (ii) institute and maintain an action on any instruments evidencing the Obligations or any portion thereof, and (iii) take such other action at law or in equity for the enforcement of any of the Loan Documents and/or the Mt. Zion Amended Loan Documents as the law may allow, and in each such action the Mortgagee shall be entitled to all costs of suit and reasonable attorneys fees.

(c)    The Mortgagee may, in its sole and absolute discretion: (i) collect any or all of the Rents, including any Rents past due and unpaid, (ii) perform any obligation or exercise any right or remedy of the Mortgagor under any Lease, or (iii) enforce any obligation of any tenant of any of the Property. The Mortgage may exercise any right under this subsection (c), whether or not the Mortgagee shall have entered into possession of any of the Property, and nothing herein contained shall be construed as constituting the Mortgagee a "mortgagee in possession", unless the Mortgagee shall have entered into and shall continue

to be in actual possession of the Property. The Mortgagor hereby authorizes and directs each and every present and future tenant of any of the Property to pay all Rents directly to the Mortgagee and to perform all other obligations of that tenant for the direct benefit of the Mortgagee, as if the Mortgagee were the landlord under the Lease with that tenant, immediately upon receipt of a demand by the Mortgagee to make such payment or perform such obligations. The Mortgagor hereby waives any right, claim or demand it may now or hereafter have against any such tenant by reason of such payment of Rents or performance of obligations to the Mortgagee, and any such payment or performance to the Mortgagee shall discharge the obligations of the tenant to make such payment or performance to the Mortgagor.

(d)    The Mortgagee shall have the right, in connection with the exercise of its remedies hereunder, to the appointment of a receiver to take possession and control of the Property or to collect the Rents, without notice and without regard to the adequacy of the Property to secure the Obligations. A receiver while in possession of the Property shall have the right to make repairs and to make improvements necessary or advisable in its or his opinion to preserve the Property, or to make and keep them rentable to the best advantage, and the Mortgagee may advance moneys to a receiver for such purposes. Any moneys so expended or advanced by the Mortgagee or by a receiver shall be added to and become a part of the Obligations secured by this Mortgage.

14.    **Application of Proceeds.** The Mortgagee shall apply the proceeds of any foreclosure sale of, or other disposition or realization upon, or Rents or profits from, the Property to satisfy the Obligations in such order of application as the Mortgagee shall determine in its exclusive discretion.

15.    **Mortgagee's Right to Protect Security.** The Mortgagee is hereby authorized to do any one or more of the following, irrespective of whether an Event of Default has occurred: (a) appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of the Mortgagee hereunder; (b) purchase such insurance policies covering the Property as it may elect if the Mortgagor fails to maintain the insurance coverage required hereunder; and (c) take such action as the Mortgagee may determine to pay, perform or comply with any Impositions or Legal Requirements, to cure any Events of Default and to protect its security in the Property.

16.    **Appointment of Mortgagee as Attorney-in-Fact.** The Mortgagee, or any of its officers, is hereby irrevocably appointed attorney-in-fact for the Mortgagor (without requiring any of them to act as such), such appointment being coupled with an interest, to do any or all of the following:  (a) collect the Rents after the occurrence of an Event of Default; (b) settle for, collect and receive any awards payable under Section 9 from the authorities making the same; and (c) execute, deliver and file, at Mortgagor's sole cost and expense such financing, continuation or amendment statements and other instruments as the Mortgagee may require in order to perfect, protect and maintain its security interest under the UCC on any portion of the Property.

17. **Certain Waivers.** The Mortgagor hereby waives and releases all benefit that might accrue to the Mortgagor by virtue of any present or future law exempting the Property, or any part of the proceeds arising from any sale thereof, from attachment, levy or sale on execution, or providing for any stay of execution, exemption from civil process or extension of time for payment or any rights of marshalling in the event of any sale hereunder of the Property, and, unless specifically required herein, all notices of the Mortgagor's default or of the Mortgagee's election to exercise, or the Mortgagee's actual exercise of any option under this Mortgage or any other Loan Document.

18. **Notices.** All notices, demands, requests, consents, approvals and other communications required or permitted hereunder (**"Notices"**) must be in writing and will be effective upon receipt. Notices may be given in any manner to which the parties may separately agree, including electronic mail. Without limiting the foregoing, first-class mail, facsimile transmission and commercial courier service are hereby agreed to as acceptable methods for giving Notices. Regardless of the manner in which provided, Notices may be sent to a party's address as set forth above (and for Notice to Mortgagee, Notice shall be sent to the Notice Address) or to such other address as any party may give to the other for such purpose in accordance with this Section.

19. **Further Acts.** By its signature hereon, the Mortgagor hereby irrevocably authorizes the Mortgagee to execute (on behalf of the Mortgagor) and file against the Mortgagor one or more financing, continuation or amendment statements pursuant to the UCC in form satisfactory to the Mortgagee, and the Mortgagor will pay the cost of preparing and filing the same in all jurisdictions in which such filing is deemed by the Mortgagee to be necessary or desirable in order to perfect, preserve and protect its security interests. If required by the Mortgagee, the Mortgagor will execute all documentation necessary for the Mortgagee to obtain and maintain perfection of its security interests in the Property. The Mortgagor will, at the cost of the Mortgagor, and without expense to the Mortgagee, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignment, transfers and assurances as the Mortgagee shall, from time to time, require for the better assuring, conveying, assigning, transferring or confirming unto the Mortgagee the property and rights hereby mortgaged, or which Mortgagor may be or may hereafter become bound to convey or assign to the Mortgagee, or for carrying out the intent of or facilitating the performance of the terms of this Mortgage or for filing, registering or recording this Mortgage. The Mortgagor grants to the Mortgagee an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to the Mortgagee under the Note, this Mortgage, the other Loan Documents, at law or in equity, including, without limitation, the rights and remedies described in this Section.

20. **Changes in the Laws Regarding Taxation.** If any law is enacted or adopted or amended after the date of this Mortgage which deducts the Obligations from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Mortgagor or the Mortgagee's interest in the Property, the Mortgagor will pay such tax, with interest and penalties thereon, if any. If the Mortgagee determines that the payment of such tax or interest and penalties by the Mortgagor would be unlawful or taxable

18

to the Mortgagee or unenforceable or provide the basis for a defense of usury, then the Mortgagee shall have the option, by written notice of not less than ninety (90) days, to declare the entire Obligations immediately due and payable.

21.   **Documentary Stamps.**   If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note or this Mortgage, or impose any other tax or charge on the same, the Mortgagor will pay for the same, with interest and penalties thereon, if any.

22.   **Preservation of Rights.**   No delay or omission on the Mortgagee's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will the Mortgagee's action or inaction impair any such right or power.   The Mortgagee's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which the Mortgagee may have under other agreements, at law or in equity.

23.   **Illegality.**   If any provision contained in this Mortgage should be invalid, illegal or unenforceable in any respect, it shall not affect or impair the validity, legality and enforceability of the remaining provisions of this Mortgage.

24.   **Credit Agreements Act; Changes in Writing.**   Mortgagor expressly agrees that for purposes of this Mortgage and the other Loan Documents: (i) this Mortgage and the other Loan Documents shall be a "credit agreement" under the Illinois Credit Agreements Act, 815 ILCS 160/1, et seq. (the **"Credit Agreement Act"**); (ii) the Credit Agreement Act applies to this transaction including, but not limited to, the execution of this Mortgage and the Note; and (iii) any action on or in any way related to this Mortgage and each other Loan Document shall be governed by the Credit Agreement Act. No modification, amendment or waiver of, or consent to any departure by the Mortgagor from, any provision of this Mortgage will be effective unless made in a writing signed by the Mortgagee, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on the Mortgagor will entitle the Mortgagor to any other or further notice or demand in the same, similar or other circumstance.

25.   **Entire Agreement.**   This Mortgage (including the documents and instruments referred to herein) constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.

26.   **Survival; Successors and Assigns.**   This Mortgage will be binding upon and inure to the benefit of the Mortgagor and the Mortgagee and their respective heirs, executors, administrators, successors and assigns; provided, however, that the Mortgagor may not assign this Mortgage in whole or in part without the Mortgagee's prior written consent and the Mortgagee at any time may assign this Mortgage in whole or in part; and provided, further, that the rights and benefits under the Paragraphs entitled "Environmental Matters", "Inspection of Property" and "Indemnity" shall also inure to the benefit of any

19

persons or entities who acquire title or ownership of the Property from or through the Mortgagee or through action of the Mortgagee (including a foreclosure, sheriff's or judicial sale).  The provisions of Paragraphs entitled "Environmental Matters", "Inspection of Property" and "Indemnity" shall survive the termination, satisfaction or release of this Mortgage, the foreclosure of this Mortgage or the delivery of a deed in lieu of foreclosure.

27.    **Interpretation.**    In this Mortgage, unless the Mortgagee and the Mortgagor otherwise agree in writing, the singular includes the plural and the plural the singular; words importing any gender include the other genders; references to statutes are to be construed as including all statutory provisions consolidating, amending or replacing the statute referred to; the word "or" shall be deemed to include "and/or", the words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; references to articles, sections (or subdivisions of sections) or exhibits are to those of this Mortgage; and references to agreements and other contractual instruments shall be deemed to include all subsequent amendments and other modifications to such instruments, but only to the extent such amendments and other modifications are not prohibited by the terms of this Mortgage.  Section headings in this Mortgage are included for convenience of reference only and shall not constitute a part of this Mortgage for any other purpose.    If this Mortgage is executed by more than one party as Mortgagor, the obligations of such persons or entities will be joint and several.

28.    **Indemnity.**    The Mortgagor agrees to indemnify each of the Mortgagee, each legal entity, if any, who controls, is controlled by or is under common control with the Mortgagee and each of their respective directors, officers, employees and agents (the **"Indemnified Parties"**), and to defend and hold each Indemnified Party harmless from and against, any and all claims, damages, losses, liabilities and expenses (including all fees and charges of internal or external counsel with whom any Indemnified Party may consult and all expenses of litigation and preparation therefor) which any Indemnified Party may incur, or which may be asserted against any Indemnified Party by any person, entity or governmental authority (including any person or entity claiming derivatively on behalf of the Mortgagor), in connection with or arising out of or relating to the matters referred to in this Mortgage or in the other Loan Documents, whether (a) arising from or incurred in connection with any breach of a representation, warranty or covenant by the Mortgagor, or (b) arising out of or resulting from any suit, action, claim, proceeding or governmental investigation, pending or threatened, whether based on statute, regulation or order, or tort, or contract or otherwise, before any court or governmental authority; provided, however, that the foregoing indemnity agreement shall not apply to any claims, damages, losses, liabilities and expenses solely attributable to an Indemnified Party's gross negligence or willful misconduct.  The indemnity agreement contained in this Section shall survive the termination of this Mortgage, payment of any Obligations and assignment of any rights hereunder.  The Mortgagor may participate at its expense in the defense of any such action or claim.

29.    **Governing Law and Jurisdiction.**    This Mortgage has been delivered to and accepted by the Mortgagee and will be deemed to be made in the State indicated in the Notice Address (the **"Notice State"**).  THIS MORTGAGE WILL BE INTERPRETED AND THE

RIGHTS AND LIABILITIES OF THE PARTIES HERETO DETERMINED IN ACCORDANCE WITH THE LAWS OF THE NOTICE STATE, EXCLUDING ITS CONFLICT OF LAWS RULES, EXCEPT THAT THE LAWS OF THE STATE WHERE THE PROPERTY IS LOCATED (IF DIFFERENT FROM THE NOTICE STATE) SHALL GOVERN THE CREATION, PERFECTION AND FORECLOSURE OF THE LIENS CREATED HEREUNDER ON THE PROPERTY OR ANY INTEREST THEREIN. The Mortgagor hereby irrevocably consents to the exclusive jurisdiction of any state or federal court for the county or judicial district where the Notice Address above is located; provided that nothing contained in this Mortgage will prevent the Mortgagee from bringing any action, enforcing any award or judgment or exercising any rights against the Mortgagor individually, against any security or against any property of the Mortgagor within any other county, state or other foreign or domestic jurisdiction. The Mortgagee and the Mortgagor agree that the venue provided above is the most convenient forum for both the Mortgagee and the Mortgagor. The Mortgagor waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Mortgage.

30.    **[Intentionally Omitted.]**

31.    **Change in Name or Locations.**  The Mortgagor hereby agrees that if the location of any of the Property changes from the Land or its chief executive office, or if the Mortgagor changes its name, its type of organization, its state of organization (if Mortgagor is a registered organization), its principal residence (if Mortgagor is an individual), its chief executive office (if Mortgagor is a general partnership or non-registered organization) or establishes a name in which it may do business that is not the current name of the Mortgagor, the Mortgagor will immediately notify the Mortgagee in writing of the additions or changes.

32.    **WAIVER OF JURY TRIAL.**    THE MORTGAGOR IRREVOCABLY WAIVES ANY AND ALL RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS MORTGAGE, ANY DOCUMENTS EXECUTED IN CONNECTION WITH THIS MORTGAGE OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS. THE MORTGAGOR ACKNOWLEDGES THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

**IN WITNESS WHEREOF**, Mortgagor has caused this Mortgage to be executed and delivered effective as of the day and year first above written.

> **COLTS RUN, L.L.C.**,
> an Illinois limited liability company
>
> By: _____
> Name: Angelina Djurin
> Title: Manager

**STATE OF ILLINOIS**      )
                              ) SS
**COUNTY OF COOK**         )

I, _____, a Notary Public in and for said County, in the State aforesaid, do hereby certify that ANGELINA DJURIN, Manager of COLTS RUN, L.L.C., an Illinois limited liability company, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument as such Manager, appeared before me this day in person and acknowledged that she signed and delivered the said instrument as her own free and voluntary act and as the free and voluntary act of said limited liability company in its capacity as the Manager of COLTS RUN, L.L.C., for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal, this _____ day of _____, 2012.

_____
**NOTARY PUBLIC**

My Commission Expires: _____

Signature Page to Open End Real Estate Mortgage Security Agreement and Assignment of Leases

**EXHIBIT A**

**LEGAL DESCRIPTION**

Being all of Lot 1, Unit 3, Mapleleaf Subdivision, Fayette County, Kentucky, as shown on the plat thereof of record in Plat Cabinet K, Slide 570, Fayette County Clerk's Office, to which plat reference is hereby made for a more particular description of said property; the improvements thereon being known and designated as 3170 Maple Leaf Drive.

Being apart of the same property conveyed to Colts Run Development LLC, an Ohio limited liability company, by deed dated December 31, 1997, of record in Deed Book 1955, page 91, in the Fayette County Clerk's office.

Common address:     3170 Maple Leaf Drive, Lexington, Kentucky 40509

## DEED IN LIEU ESCROW AGREEMENT

THIS DEED IN LIEU ESCROW AGREEMENT (this "Escrow Agreement") is made and entered into as of the 20th day of March, 2012 (the "Effective Date"), by and among COLTS RUN, L.L.C., an Illinois limited liability company (the "Borrower"), and PNC BANK, NATIONAL ASSOCIATION successor to NATIONAL CITY BANK, a national banking association (the "Bank"), and CHICAGO TITLE INSURANCE COMPANY, as escrow agent (the "Escrow Agent").

## RECITALS

A.     Borrower is the owner of certain property improved with a 252-unit apartment complex known as Colts Run Apartments located at 3170 Mapleleaf Drive, Lexington, Kentucky (the "Property"), which premises is more particularly described in Exhibit A attached hereto.

B.     On or about July 19, 2001, Lender made a loan to Borrower in the original principal sum of FIFTEEN MILLION TWO HUNDRED THOUSAND AND NO/100 DOLLARS ($15,200,000.00) ("Original Loan").

C.     The Original Loan was evidenced by a Note dated July 19, 2001 in the original principal amount of FIFTEEN MILLION TWO HUNDRED THOUSAND SEVEN HUNDRED ELEVEN AND NO/100 DOLLARS ($15,200,000.00) ("Original Note").

D.     The Original Note was secured, in part, by a Real Estate Mortgage, Security Agreement and Assignment of Leases executed by Borrower dated July 19, 2001, and recorded on July 24, 2001, as Document Number 200107240162 in the office of the Fayette County Clerk encumbering the Property ("Original Mortgage"), which Original Mortgage was amended by that certain First Amendment to Mortgage and Assignment of Leases and Rents, dated as of June 16, 2003 and recorded July 17, 2003, as Document Number 200307170312 in the office of the Fayette County Clerk ("First Amendment"), and by that certain Real Estate Mortgage, Security Agreement and Assignment of Leases from Borrower to Lender, dated June 16, 2003, recorded in Mortgage Book 4434, page 523 of the office of the Clerk of Fayette County, Kentucky, as further amended by the Second Amendment to Mortgage and Assignment of Leases and Rents, dated as of March 1, 2005 and recorded March 3, 2005, as Document Number 200503030290, in the office of the Fayette County Clerk ("Second Amendment"), as further amended by the Real Estate Mortgage, Security Agreement and Assignment of Leases dated as of July 14, 2006 and recorded July 20, 2006, as Document Number 200607200212 in the Office of the Fayette County Clerk ("Third Amendment"), as further amended by the Real Estate Mortgage, Security Agreement and Assignment of Leases dated December 3, 2007, recorded in Mortgage Book 6254, page 189 of the office of the Clerk of Fayette County, Kentucky ("Fourth Amendment") (the Original Mortgage, as so amended, the "Existing Borrower Mortgage").

E.     In connection with a transfer of an undivided 15% interest in the Property, the transferee thereof (the "Baldwin Trust") granted a Real Estate Mortgage,

Security Agreement and Assignment of Leases from The Teresa M. Baldwin Trust dated April 8, 1994, to Lender, dated March 1, 2005, recorded in Mortgage Book 5217, page 360 of the office of the Clerk of Fayette County, Kentucky to secure the Original Note, as it had then been modified (the "Original Trust Mortgage"), which was amended by that certain Real Estate Mortgage, Security Agreement and Assignment of Leases from the Baldwin Trust to Lender, dated July 14, 2006, recorded in Mortgage Book 5784, page 622 of the office of the Clerk of Fayette County, Kentucky, and by that certain  Real Estate Mortgage, Security Agreement and Assignment of Leases Mortgage from the Baldwin Trust to Lender, dated December 3, 2007, recorded in Mortgage Book 6254, page 199 of the office of the Clerk of Fayette County, Kentucky (the Original Trust Mortgage, as so amended, the "Existing Trust Mortgage").

        F.     The Baldwin Trust subsequently transferred its interest in the Property back to the Borrower.

        G.     Pursuant to the First Amendment, Borrower borrowed from Lender an additional TWO MILLION EIGHT HUNDRED THOUSAND SEVEN HUNDRED ELEVEN AND NO/100 DOLLARS ($2,800,711.00), thus increasing the outstanding principal balance of the Original Loan as of June 16, 2003 to SEVENTEEN MILLION EIGHT HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($17,850,000.00).

        H.     Pursuant to the First Amendment and in connection with the foregoing increase in the principal balance of the Original Loan, the Original Note was replaced by two (2) separate notes, both dated as of June 16, 2003: (i) an Amended and Restated Adjustable Rate Note in the original principal amount of NINE MILLION TWO HUNDRED FIFTY-TWO THOUSAND NINE HUNDRED NINETY-SEVEN AND 78/100 DOLLARS ($9,252,997.78) ("A & R Adjustable Rate Note"); and (ii) an Amended and Restated Fixed Rate Note in the original principal amount of EIGHT MILLION FIVE HUNDRED NINETY-SEVEN THOUSAND TWO AND 22/100 DOLLARS ($8,597,002.22) ("A & R Fixed Rate Note").

        I.     Pursuant to the Second Amendment, Borrower borrowed from Lender an additional ONE MILLION SIX HUNDRED FIFTEEN THOUSAND SIX HUNDRED SIX AND 78/100 DOLLARS ($1,615,606.78), thus increasing the outstanding principal balance of the Original Loan as of March 1, 2005 to NINETEEN MILLION DOLLARS ($19,000,000.00).

        J.     Pursuant to the Second Amendment and in connection with the foregoing additional increase in the principal balance of the Original Loan, the A & R Adjustable Rate Note was replaced by a Second Amended and Restated Adjustable Rate Note dated March 1, 2005 in the original principal amount of TEN MILLION SIX HUNDRED TWENTY-THREE THOUSAND FOUR HUNDRED FOUR AND 56/100 DOLLARS ($10,623,404.56) ("Second A & R Adjustable Rate Note").

        K.     Pursuant to the Third Amendment, Borrower borrowed from Lender an additional TWO MILLION SEVEN HUNDRED EIGHT THOUSAND SIX HUNDRED NINETY-EIGHT AND 10/100 DOLLARS ($2,708,698.10), thus increasing the outstanding

principal balance of the Original Loan as of July 14, 2006 to TWENTY-ONE MILLION THREE HUNDRED THOUSAND DOLLARS ($21,300,000.00).

L.     Pursuant to the Third Amendment and in connection with the foregoing additional increase in the principal balance of the Original Loan, the Second A & R Adjustable Rate Note was replaced by a Third Amended and Restated Adjustable Rate Note dated July 14, 2006 in the original principal amount of THIRTEEN MILLION ONE HUNDRED TWENTY-EIGHT THOUSAND TWO HUNDRED TWO AND 66/100 DOLLARS ($13,128,202.66) ("Third A & R Adjustable Rate Note ").

M.     Pursuant to the Fourth Amendment, (i) Borrower borrowed from Lender an additional THREE MILLION ONE HUNDRED EIGHTY-SEVEN THOUSAND NINE HUNDRED NINE DOLLARS ($3,187,909.00), thus increasing the outstanding principal balance of the Original Loan as of December 3, 2007 to TWENTY-FOUR MILLION DOLLARS ($24,000,000.00) and (ii) the Maturity Date of the Original Loan was extended to August 25, 2011.

N.     Pursuant to the Fourth Amendment and in connection with the foregoing further increase in the principal balance of the Original Loan and extension of the Maturity Date of the Original Loan, (i) the Third A&R Adjustable Rate Note was replaced by a Fourth Amended and Restated Adjustable Rate Note dated as of December 3, 2007 in the original principal amount of SIXTEEN MILLION THIRTY-THREE THOUSAND TWO HUNDRED THIRTEEN DOLLARS ($16,033,213) ("Fourth A & R Adjustable Rate Note") and (ii) the A & R Fixed Rate Note was replaced by a Second Amended and Restated Fixed Rate Note dated as of December 3, 2007 in the original principal amount of SEVEN MILLION NINE HUNDRED SIXTY-SIX THOUSAND SEVEN HUNDRED EIGHTY-SEVEN DOLLARS ($7,966,787) ("Second A & R Fixed Rate Note")(The Second A & R Fixed Rate Note and Fourth A & R Adjustable Rate Note are collectively referred to as the "A & R Notes").

O.     The A & R Notes are further secured, in part, by a Guaranty executed by Ivan Djurin ("Guarantor") dated July 19, 2001, as amended by that certain Reaffirmation of Guaranty, dated as of June 16, 2003, to and for the benefit of Lender (as so amended, the "Original Guaranty").

P.     The Original Guaranty was amended and replaced by the Amended and Restated Guaranty dated September 22, 2004 executed by Guarantor to and for the benefit of Lender, which was amended and replaced by the Second Amended and Restated Guaranty dated as of March 1, 2005 executed by Guarantor to and for the benefit of Lender, which was amended and replaced by the Third Amended and Restated Guaranty dated as of July 14, 2006 executed by Guarantor to and for the benefit of Lender, which was amended and replaced by the Fourth Amended and Restated Guaranty dated as of December 3, 2007 executed by Guarantor to and for the benefit of Lender (the Original Guaranty, as so amended and replaced, the "Existing Guaranty").

Q.     Lender is the successor in interest to the Original Lender.

R.    Various "Defaults" as defined in the A & R Notes occurred (the "Existing Defaults").  Among the Existing Defaults was that Borrower filed for federal bankruptcy protection.

S.    Lender has agreed to forebear taking action as a result of the Existing Defaults, subject to the terms of a certain Loan Agreement dated as of the date hereof between Borrower and the Bank (as it may be amended, restated, extended or replaced from time to time, the "Loan Agreement") and the other Loan Documents (as defined in the Loan Agreement).  In connection therewith, the parties have agreed to amend the terms of the Original Loan as provided in this Agreement and the other Loan Documents, including the extension of the maturity date of such loan.

T.    In order to effectuate the aforesaid amendment, the A & R Notes are being consolidated, amended and restated pursuant to the Agreement and the other Loan Documents, and the Existing Borrower Mortgage and the Existing Trust Mortgage are also being consolidated, amended and restated.

U.    As a condition for the Bank to agree to the forbearance and amendments of the Original Loan, the Bank has required that the Borrower establish this Escrow Agreement and provide the Bank with the rights set forth herein.  Borrower acknowledges and agrees that the Bank would not agree to enter into or accept the Loan Agreement and the other Loan Documents, or to vote in favor of the Colts Run Plan, without the establishment of this Escrow Agreement.

V.    This Escrow Agreement, the Loan Agreement and the other Loan Documents are being entered pursuant to the Colts Run Plan (as defined in the Loan Agreement.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Incorporation of Recitals; Definitions.  The Recitals above are hereby incorporated into this Agreement.  Capitalized terms used herein without definition shall have the meanings provided in the Loan Agreement.  This Escrow Agreement constitutes one of the Loan Documents, and the obligations of Borrower hereunder constitute Obligations.

2.    Appointment of Escrow Agent.  Bank and Borrower hereby appoint the Escrow Agent to hold the "Closing Documents" (as defined below) in trust and in accordance with the terms of this Escrow Agreement, and the Escrow Agent agrees to act as such.

3.    Deposit of the Closing Documents.  Concurrent with the parties' execution and delivery of the Loan Agreement, except as noted below, Borrower shall deposit with the Escrow Agent the following documents (the "Closing Documents"), which have been duly executed by and on behalf of Borrower.

(a)    Special Warranty Deed (subject only to the "Permitted Exceptions" as set forth on Schedule 1) (the "Deed" or "deed");

(b)    Bill of Sale and Assignment;

(c)    ALTA Statement;

(d)    Affidavit of Title, subject only to the "Permitted Exceptions" as set forth on Schedule 1;

(e)    GAP Statement;

(f)    FIRPTA Affidavit;

(g)    State, County and City, transfer tax declarations, if applicable;

(h)    Articles of Organization of Borrower;

(i)    Certificate of Good Standing showing that Borrower is currently in good standing with the Secretary of State of Kentucky;

(j)    Borrower's limited liability company resolutions authorizing the conveyance of the Property to Bank; and

(k)    Such other documents as the Escrow Agent, Bank or its attorneys may reasonably require in order to effectuate or further evidence the intent of any provision of this Escrow Agreement.

4.    <u>Deposit of the Escrowed Funds</u>.  Concurrent with the parties' execution and delivery of the Loan Agreement, Borrower shall deposit with the Escrow Agent funds in the amount of _____ and No/100 Dollars ($_____) (the "Escrowed Funds"), which Escrowed Funds shall be used to pay all costs and expenses related to (collectively, the "Escrow Expenses"): (i) the issuance of the owner's title insurance policy in accordance with the terms of this Escrow Agreement; (ii) all recording charges and all state, county and local transfer taxes related to the recording of the Deed; and (iii) all escrow charges and fees related to, or arising out of, the actions to be taken by Escrow Agent pursuant to this Escrow Agreement.

5.    <u>Disposition of the Closing Documents and the Escrowed Funds</u>.

(a)    It shall constitute a "Triggering Event" hereunder if: (i) there is a monetary default under the Loan Documents and said default continues without cure beyond any applicable notice and cure periods as provided in said Loan Documents, or (ii) any of Borrower, Individual Pledgor or Corporate Pledgor:

(1)    shall file a voluntary petition in bankruptcy or for arrangement, reorganization or other relief under any chapter of the Federal Bankruptcy Code or any similar law, state or federal, now or hereafter in effect;

(2)    shall file an answer or other pleading in any proceedings admitting insolvency, bankruptcy, or inability to pay his, her or its debts as they mature;

-5-

(3)   shall have any involuntarily proceeding under the Federal Bankruptcy Code or similar law, state or federal, now or hereafter in effect, filed against any one of them, and such proceedings shall not have been vacated within forty-five (45) days after the filing thereof;

(4)   shall have an order appointing a receiver, trustee or liquidator entered against any of them or for all or a major part of his, her or its property or the Property and the same shall not have been vacated within forty-five (45) days following entry thereof;

(5)   shall be adjudicated a bankrupt; or

(6)   shall make an assignment for the benefit of creditors or shall admit in writing his, her or its inability to pay his or its debts generally as they become due or shall consent to the appointment of a receiver or trustee or liquidator of all or the major part of his, her or its property, or the Property.

(b)   The Escrow Agent shall continue to hold the Closing Documents in its possession pursuant to the terms hereof until such time as it is directed to, pursuant to a written notice signed and delivered to Escrow Agent by Bank or its authorized attorney: (i) which states that a Triggering Event has occurred, in which case Escrow Agent shall complete the Closing Documents by completing the amount of consideration set forth in the Deed as 94% of the then most decent appraised value of the Property (as provided to Escrow Agent by Bank or its authorized attorney), adding dates where needed and by adding the name of the Bank or its designee (as directed by Bank or its authorized attorney) as the grantee or assignee of the Deed and the Bill of Sale and Assignment (and the other Closing Documents, as applicable), record the deed, deliver the Bill of Sale and Assignment to the Bank or its designee, issue the owner's title insurance policy in accordance with the terms of this Escrow Agreement and pay all Escrow Expenses with the Escrowed Funds; or (ii) release or otherwise dispose of the Closing Documents and the Escrowed Funds.  Upon receipt of any direction from the Bank or its authorized attorney to record the deed, release the Closing Documents, or otherwise, the Escrow Agent may provide notice to the Borrower of such direction and the Borrower will have five (5) business days to obtain a court order to enjoin the Escrow Agent from releasing any Closing Documents.  If Borrower is unable to obtain such court order within the said five (5) business day period, then Escrow Agent shall immediately comply with the direction provided by the Bank or its authorized attorney.  As this Escrow Agreement is being entered into pursuant to the Colts Run Plan, nothing in the prior two sentences is intended to give rise to any right on Borrower's part (or on behalf of any direct, or indirect owner of Borrower) to challenge the Colts Run Plan or the Bank's rights hereunder to have the deed recorded and to receive (or have its designee receive) the Bill of Sale and Assignment and take possession of the Property.  Bank and Borrower acknowledge and agree that deducting 6% of the appraised value from the consideration recited for the Property in the Deed is a fair and reasonable estimate of the costs to be incurred by Bank or its designee after the recording of the Deed in selling the Property to a third party, including real estate brokerage fees, title insurance costs, legal fees, etc.

(c)   In the event the Escrow Agent is not prepared to issue an ALTA owner's title insurance policy in favor of the Bank or its designee as the insured, dated as of

the date of recording of the deed (and subject only to the Permitted Exceptions set forth on Schedule 1) in the amount of $22,970,920.53 and including the endorsements set forth on Exhibit B hereto upon recording of the deed by the date thirty (30) days after a written notice has been signed and delivered to Escrow Agent by Bank or its authorized attorney pursuant to the terms of Section 4(b) above, Escrow Agent is directed by the Bank and the Borrower to continue to comply with this Escrow Agreement in all other respects, and Borrower shall cooperate in all respects to correct any conditions necessary to allow Escrow Agent to be able to issue such title policy to the Bank or its designee (and Borrower shall pay any additional costs and expenses necessary to do so).

(d)     In the event that the Escrow Expenses are in an amount that exceeds the Escrowed Funds, Borrower shall promptly, upon written request from Bank, provide to Escrow Agent funds in the amount of such shortfall. In the event that there are remaining Escrowed Funds after all Escrow Expenses have been paid, the remaining Escrowed Funds shall be: (i) applied against amounts owed to Bank pursuant to the Loan Agreement or otherwise; or (ii) returned to Borrower, as deemed appropriate by Bank.

(e)     In the event that the applicable Recorder's Office or State, County or City have any additional requirements related to the recording of the deed that are not otherwise satisfied by delivery of the Closing Documents or payment of amounts from the Escrow Funds, Borrower and Bank will reasonably cooperate with Escrow Agent and will provide any additional items or documentation required to record the deed.

(f)     In the event that the deed is recorded in accordance with the terms of this Escrow Agreement, Borrower shall provide Escrow Agent with an updated ALTA statement within two (2) business days of Escrow Agent's request.

(g)     Upon payment in full of all Obligations prior to recording the deed, the Bank shall direct Escrow Agent to return all documents and funds held pursuant to this Escrow Agreement to Borrower.

6.     Indemnification, Duties, Compensation, Etc.  The Escrow Agent's duties are only such as are specifically provided herein, and the Escrow Agent shall incur no liability whatsoever to any party hereto except as shall result from the negligence or willful misconduct of the Escrow Agent. The Escrow Agent shall have no responsibility hereunder other than to follow faithfully the instructions herein contained. The Escrow Agent may consult with counsel and shall be fully protected in any action taken in good faith in accordance with such advice.  The Escrow Agent shall be fully protected in acting in accordance with any written instructions given to it hereunder and believed by it to have been executed by the proper parties. The Escrow Agent covenants and agrees that it shall not charge any fees for its services rendered in accordance with this Escrow Agreement.

(a)     Bank and Borrower agree jointly and severally to hold the Escrow Agent harmless and to indemnify the Escrow Agent against any loss, liability, expense (including reasonable attorney's fees and expenses), claim, or demand arising out of or in connection with the performance of its obligations in accordance with the provisions of this Escrow Agreement, except as shall result from the negligence or willful misconduct of the

-7-

Escrow Agent (the "Agent Indemnified Amounts"). The foregoing indemnities in this Section 6(a) shall survive the resignation of the Escrow Agent and the termination of this Escrow Agreement.

(b)    Without limiting the rights of the Escrow Agent pursuant to Section 6(a) above, Bank and Borrower agree that as between themselves their liability for Agent Indemnified Amounts shall borne solely by Borrower unless the Escrow Agent's claim for Agent Indemnified Amounts shall be based upon any act or omission of either of them in which event the respective proportionate liability of Bank and Borrower shall be determined as agreed between such parties or by a court of competent jurisdiction before whom the proceeding giving rise to the Escrow Agent's claim for indemnity shall have been brought, or if no such proceeding shall have been brought, then by another court of competent jurisdiction in a proceeding initiated by the party seeking a modified allocation.

(c)    The Escrow Agent may resign at any time by giving written notice thereof to the other parties hereto, but such resignation shall not become effective until a successor escrow agent shall have been appointed unanimously by the parties hereto and shall have accepted such appointment in writing. If an instrument of acceptance by a successor escrow agent shall not have been delivered to the Escrow Agent within 30 days after the giving of such notice of resignation, the resigning Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor escrow agent.

(d)    Deposits made pursuant to these instructions may be invested on behalf of any party or parties hereto; provided that any direction to Escrow Agent for such investment shall be expressed in writing and contain the consent of all parties to this Escrow Agreement, and also provided that Escrow Agent is in receipt of the taxpayer's identification number and investment forms as required. Escrow Agent will, upon request, furnish information concerning its procedures and fee schedule for investment. In the event Escrow Agent is requested to invest deposits hereunder, Chicago Title and Trust Company is not to be held responsible for any loss of principal or interest which may be incurred as a result of making the investments or redeeming said investment for the purposes of this Escrow Agreement.

(e)    Except as to deposits of funds for which Escrow Agent has received express written direction concerning investment or other handling, the parties hereto direct the Escrow Agent NOT to invest any funds deposited by the parties under the terms of this Escrow Agreement and waive any rights which they may have under Section 2-8 of the Corporate Fiduciary Act (205 ILCS 620/2-8) to receive interest on funds deposited hereunder. In the absence of an authorized direction to invest funds, the parties hereto agree that Escrow Agent shall be under no duty to invest or reinvest any such funds at any time held by it hereunder; and, further, that Escrow Agent may commingle such funds with other deposits or with its own funds in the manner provided for the administration of funds under said Section 2-8 and may use any part or all of such funds for its own benefit without obligation to any party for interest or earnings derived thereby, if any. Provided, however, nothing herein shall diminish Escrow Agent's obligation to apply the full amount of such funds in accordance with the terms of this Escrow Agreement.

(f)    The undersigned authorize and direct Escrow Agent to disregard any and all notices, warnings or demands given or made by the undersigned (other than as provided for in this Escrow Agreement) or by any other person. The undersigned also hereby authorize and direct Escrow Agent to accept, comply with, and obey any and all writs, orders, judgments or decrees entered or issued by any court with or without jurisdiction; and in case Escrow Agent obeys or complies with any such writ, order, judgment or decree of any court, it shall not be liable to any of the parties hereto or any other person, by reasons of such compliance, notwithstanding any such writ, order, judgment or decree be entered without jurisdiction or be subsequently reversed, modified, annulled, set aside or vacated. In case Escrow Agent is made a party defendant to any suit or proceedings regarding this Escrow Agreement, the undersigned, for themselves, their heirs, personal representatives, successors, and assigns, jointly and severally, agree to pay to said Escrow Agent, upon written demand, all costs, attorney's fees, and expenses incurred with respect thereto. The Escrow Agent shall have a lien on the deposit(s) herein for any and all such costs, fees and expenses. If said costs, fees and expenses are not paid, then Escrow Agent shall have the right to reimburse itself out of the said deposit(s).

7.    Conveyance of Real Estate Absolute. Borrower acknowledges and agrees that the recording of the Deed will be an absolute conveyance and transfer of all of Borrower's right, title. and interest in the Property, in fact as well as form, and will not be and is not now intended as a mortgage, trust, conveyance, deed of trust, or security instrument of any kind; that the consideration for such conveyance and transfer is exactly as recited herein; and that the Borrower shall have no further interest (including rights of possession, repurchase, cure, or redemption) or claim in and to the Property, or to the proceeds and profits, if any. which may be derived therefrom, during the period of ownership of or upon subsequent resale or conveyance by the Bank or its designee, of any kind whatsoever. In the event that upon a sale of any collateral for the Obligations ("Collateral"), whether obtained by Lender pursuant to the Deed, the Bill of Sale and Assignment referenced above or otherwise, the Bank obtains from such sale or sales an amount which is in excess of the amounts due and payable to the Bank on the Senior Note, the Junior Note and the Loan, such surplus shall be the sole property of the Bank and Borrower shall have no claim upon it or any right or interest in such surplus. Notwithstanding the foregoing, however, the Bank is not assuming any of the obligations, liabilities or indebtedness regarding the Property or other Collateral at the Effective Date, but only following the recording of the Deed. Upon any recording of the Deed, Borrower will be deemed to have forever released and waived all right, title and interest, both legal and equitable, in and to the Property, and every part thereof, including without limitation all of its right (whether statutory, equitable or otherwise) to redeem the Property or any part thereof from any proceeding to foreclose the Mortgage and all of their right of possession with respect to the Property and every part thereof. Borrower acknowledges and agrees that after recording of the Deed, the Borrower will have no interest in any income, rentals, profits or other sums derived from or attributable to the Property, and that all such income, rentals, profits or other sums (collectively, the "Revenues") which come into the possession of the Borrower shall be the sole and exclusive property of the Bank or its designee, as applicable. The Borrower acknowledges and agrees that: (i) the consideration for such transfer is legally adequate and provides a reasonably equivalent value for such transfer; and (ii) the Borrower will have no

further interest (including rights of redemption) or claims in or to the Property or to the Revenues which after the date of recording may be derived therefrom, of any kind whatsoever. The transfer of the Property to the Bank or its designee, and the other acts taken and to be taken by Borrower or the Escrow Agent pursuant to this Escrow Agreement and the Closing Documents are being made at the request of Borrower and are the free and voluntary acts of the Borrower, and that in executing and delivering this Agreement, the Deed and the other Closing Documents and in directing the execution thereof, the Borrower is not acting under a misapprehension as to the effect thereof, nor under any duress, undue influence or misrepresentation by the Bank.

The undersigned acknowledge that they have been represented by competent and experienced legal counsel in connection with the negotiation of this Escrow Agreement.

8.   No Merger. The recording of the Deed shall not: (i) result in a merger of the interest of the Bank or its designee pursuant to the Loan Documents into the interest of the Bank or its designee as fee holder of the Property and as owner of the personalty; (ii) be deemed a waiver by the Bank of any claim of priority pursuant to the Mortgage or other Loan Documents over any other liens, mortgages. security interests or encumbrances of any kind or nature, now existing or hereafter placed upon the Collateral, or any part thereof; or (iii) affect or prejudice in any way the right of the Bank to foreclose any Mortgage by judicial proceedings or otherwise or to proceed as provided in the Loan Documents and as otherwise provided at law or in equity in the event that other liens, mortgages, security interests or encumbrances, resulting from the act or deed of Borrower, shall he asserted against any Collateral. The Loan Documents and the liens imposed thereby shall. in all respects, survive the recording and acceptance of the Deed, and in this connection, Borrower hereby ratifies and confirms the Loan Documents in all respects.

9.   Possession. Concurrently with the recording of the Deed, Borrower shall deliver possession to the Bank or its designee of the Property and other Collateral and the Bank or its designee shall have the right to manage, operate, lease, use and possess such Property and other Collateral to the total exclusion of Borrower and shall have the immediate right to sell and/or transfer the same or any part thereof for its own account to the total exclusion of Borrower. Borrower shall cooperate with the Bank to ensure the Bank's or its designee's possession and control over all such Collateral.

10.   No Opposition. Borrower covenants and agree that it shall not interfere with or oppose the Bank in or to the recording of the Deed, or in proceedings to quiet title or perfect the Bank's or its designee's right, title and interest in or to Collateral, in any action to foreclose any of the Mortgage, or in any sale or conveyance of the Collateral entered into by the Bank or its designee or in proceedings of any nature affecting the Collateral following the recording of the Deed. Specifically, Borrower waives any right to a hearing in connection with the Deed, including any requirement that foreclosure proceedings or other suit or cause he instituted by the Bank prior to the recording of the Deed.

11.   Costs. The fees and other costs of Escrow Agent (including without limitation, escrow fees, title insurance premiums, recording taxes and fees and any other fees

or expenses of Escrow Agent) associated with this Escrow Agreement shall be paid by Borrower to the extent not paid from Escrowed Funds.

        12.    Termination. This Escrow Agreement shall terminate (other than as to obligations of Borrower) and all obligations of the Escrow Agent hereunder shall cease when, in accordance with the terms of Section 4 or Section 5 hereof, all of the Closing Documents and the Escrowed Funds, shall have been released or delivered by the Escrow Agent.

        13.    Notices. All notices required or desired to be given under this Escrow Agreement shall be in writing and either delivered by (i) messenger or overnight courier service, or mailed by certified mail, postage prepaid, return receipt requested, and shall be deemed delivered when so delivered or, if mailed, the day after the date so deposited in the United States Post Office facilities, or (ii) by facsimile with an original and proof of transmittal to follow by U.S. Mail, and shall be deemed delivered on the date of transmittal, each addressed as follows:

|  |  |
|---|---|
| If to Borrower: | Colts Run, L.L.C.<br>1 Conway Park<br>100 North Field Drive, Suite 110<br>Lake Forest, Illinois 60045<br>Attention: Angelina Djurin<br>Telephone:_____<br>Facsimile:_____<br>Email:_____ |
| With a copy to: | David K. Welch<br>Crane, Heyman, Simon, Welch & Clar<br>135 S. LaSalle Street, Suite 3705<br>Chicago, Illinois 60603<br>Telephone: (312) 641-6777<br>Facsimile: (312) 641-7114<br>Email: dwelch@craneheyman.com |
| If to Bank: | PNC Bank, National Association<br>1 North Franklin Street, Suite 2150<br>Chicago, Illinois 60606<br>Attention: Jason Rockwell<br>Telephone: (312) 338-2217<br>Facsimile: (312) 384-4623<br>Email: Jason.Rockwell@pnc.com |

With a copy to:               PNC Bank, National Association
One PNC Plaza
249 Fifth Avenue
Pittsburgh, Pennsylvania 15222
Attention: Mark Fogel
Telephone: (412) 762-0200
Facsimile: (412) 762-6763
Email: mark.fogel@pnc.com

If to Escrow Agent:        Chicago Title Insurance Company
171 North Clark Street, 3rd Floor
Chicago, Illinois 60601
Attention: Amanda Quas-Ley
Telephone: (312) 223-2710
Facsimile: (312) 223-4952
Email: Amanda.Quas-Ley@ctt.com

or to such other address of a party that such party may have furnished to the other parties in the manner required by this Section.

14.    Successors and Assigns; No Third Party Beneficiaries. This Escrow Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. Notwithstanding anything herein to the contrary, neither this Escrow Agreement nor any of the rights, interests or obligations hereunder shall be assignable by any party hereto without the consent of the other parties hereto; provided however, the Bank may assign its rights hereunder without the need for any such consent (in which case it shall notify the other parties hereto of such assignment). Nothing in this Escrow Agreement, expressed or implied, shall or is intended to confer upon any person other than the parties hereto or their respective successors or assigns, any rights or remedies of any nature or kind whatsoever under or by reason of this Escrow Agreement.

15.    Amendments, Etc. This Escrow Agreement may not be released, discharged, abandoned, changed or modified in any manner, except by an instrument in writing signed by or on behalf of each of the parties hereto by their duly authorized officers or representatives. The failure of any party hereto to enforce at any time provision hereof shall not in any way affect the validity of this Escrow Agreement or any part thereof or the right of any party thereafter.

16.    Counterparts. This Escrow Agreement may be signed in any number of counterpart copies and by the parties hereto on separate counterparts, but all such copies shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Escrow Agreement by facsimile transmission or via electronic delivery of a PDF shall be effective as delivery of a manually executed counterpart. Any party so executing this Agreement by facsimile transmission or electronic delivery of a PDF shall promptly deliver a manually executed counterpart, provided that any failure to do so shall not affect the validity of the counterpart executed by facsimile transmission or electronic delivery of a PDF.

17.   Governing Law and Jurisdiction.   This Escrow Agreement will be interpreted and the rights and liabilities of the parties hereto determined in accordance with the laws of the State of Illinois, excluding its conflict of laws rules.  The Borrower hereby irrevocably consents to the exclusive jurisdiction of any state or federal court in the Cook County, Illinois or the Northern District of Illinois; provided that nothing contained in this Escrow Agreement will prevent the Bank or the Escrow Agent from bringing any action, enforcing any award or judgment or exercising any rights against the Borrower individually, against any security or against any property of the Borrower within any other county, state or other foreign or domestic jurisdiction.  The parties agree that the venue provided above is the most convenient forum for all of the parties hereto.  The Borrower waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Escrow Agreement.

18.   WAIVER OF JURY TRIAL.  EACH OF THE BORROWER, THE BANK AND THE ESCROW AGENT IRREVOCABLY WAIVES ANY AND ALL RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS ESCROW AGREEMENT, ANY DOCUMENTS EXECUTED IN CONNECTION WITH THIS ESCROW AGREEMENT OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS.  THE BORROWER, THE BANK AND THE ESCROW AGENT ACKNOWLEDGE THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.

**WITNESS** the due execution hereof as a document under seal, as of the date first written above.

**COLTS RUN, L.L.C.,**
an Illinois limited liability company

By: _____
Name: Angelina Djurin
Title: Manager

**PNC BANK, NATIONAL ASSOCIATION,
successor to NATIONAL CITY BANK,**
a national banking association

By: _____
Print Name: Jason A. Rockwell
Its: Vice President

**CHICAGO TITLE INSURANCE COMPANY**

By: _____
Name: _____
Title: _____

The undersigned Loan Parties hereby consent to the foregoing Escrow Agreement.

_____
Ivan Djurin

_____
Angelina Djurin, not personally, but solely as
the Trustee of the Angelina Djurin Self
Declaration of Trust Dated April 2, 2001

_____
Teresa M. Baldwin, Trustee of the Teresa M.
Baldwin Trust Dated April 8, 1994 n/k/a
Teresa Flanagan Matre Restatement of Trust
Dated February 7, 2007

## EXHIBIT A

### Legal Description of the Property

Being all of Lot 1, Unit 3, Mapleleaf Subdivision, Fayette County, Kentucky, as shown on the plat thereof of record in Plat Cabinet K, Slide 570, Fayette County Clerk's Office, to which plat reference is hereby made for a more particular description of said property; the improvements thereon being known and designated as 3170 Maple Leaf Drive.

Being apart of the same property conveyed to Colts Run Development LLC, an Ohio limited liability company, by deed dated December 31, 1997, of record in Deed Book 1955, page 91, in the Fayette County Clerk's office.

Common address:    3170 Maple Leaf Drive, Lexington, Kentucky 40509

**EXHIBIT B**

**Endorsements**

1. Access

2. Comprehensive ALTA 9

3. Contiguity, if applicable

4. Environmental ALTA 8.1

5. Separate Lot Tax, if applicable

6. Subdivision, if applicable

7. Successor Owner, if applicable

8. Survey

9. Waiver of Arbitration

10. Zoning ALTA 3.1 With Parking

# SCHEDULE I

## Permitted Exceptions

## DEPOSIT ACCOUNT CONTROL AGREEMENT

THIS **DEPOSIT ACCOUNT CONTROL AGREEMENT** ("Agreement") is entered into as of March 20, 2012, by and among **COLTS RUN, L.L.C.**, an Illinois limited liability company ("Company"), **PNC BANK, NATIONAL ASSOCIATION** ("Lender"), **MIDLAND LOAN SERVICES, a division of PNC Bank, National Association** ("Servicer") and **PNC BANK, NATIONAL ASSOCIATION**, a national banking association ("Bank").

## RECITALS

A.    Pursuant to one or more promissory notes executed and delivered by Company to Lender as the same may have been modified, amended, replaced or superseded from time to time (collectively, the "Note"), Lender agreed to make one or more loans (singly and collectively, the "Loan") to Company. To secure the Loan and other obligations of the Company to Lender, the Company or other obligor on the Loan granted Lender a mortgage lien on certain real property owned by such obligor, along with certain rents, leases, profits and proceeds therefrom and related cash and other liquid assets of Company, as more fully described in the Note and all documents executed in connection therewith (collectively, the "Loan Documents").

B.    Servicer, on behalf of Company, has established with Bank an account through which wire transfer and Automated Clearing House ("ACH") transactions are processed by Bank for deposit into Account No. _____ (the "Operating Account").

C.    The parties hereto desire to enter into this Agreement in order to set forth their rights and duties with respect to the Operating Account and all funds on deposit therein from time to time.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Effective Date. This Agreement shall take effect immediately upon its execution by all parties hereto and shall supersede any blocked account or similar agreement, if any, between any of all of the parties, pre-dating the date of this Agreement with respect to the Operating Account. Bank shall have no obligation to Lender for Bank's or the Company's actions prior to the effective date of this Agreement.

2.    Security Interest; Agency. This Agreement constitutes notice to Bank of Lender's security interest in (a) the Operating Account; (b) all contract rights and claims in respect of the Operating Account; and, (c) all cash, checks, money orders, wire, ACH and other electronic transfers and other items of value payable to Company now or hereafter paid, deposited, credited, held (whether for collection, provisionally or otherwise) or otherwise in the possession or under the control of Bank or any agent, bailee or custodian of Bank and all proceeds of the foregoing (collectively, "Receipts"). Bank acknowledges that this Agreement constitutes notice of Lender's security interest in the Operating Account and all Receipts and the proceeds thereof

A-1

and that this Agreement is a control agreement for the purpose of perfecting Lender's security interest in the Operating Account. Company hereby agrees that Bank, on behalf of Lender, shall be entitled to exercise, upon the written instructions of Lender, any and all rights that Lender may have under the Loan, the other Loan Documents described therein or under applicable law with respect to the Operating Account, all Receipts and the proceeds thereof as described in this Section 2. Bank shall endeavor to maintain the Operating Account as a "deposit account" as defined in Section 9-102(a)(29) of the UCC.

3.    Control of Operating Account. The Operating Account shall be under the sole dominion and control of Lender. Company shall not have any control over the use of or any right to withdraw any amount from the Operating Account. Bank shall comply with instrucitons originated by Lender directing the dispostiion of funds in the Operating Account without further consent by Company. Notwithstanding the foregoing, unless Bank shall have received written notice from Lender that an "Event of Default" has occurred under the Loan Documents between Company and Lender, Lender agrees that Company shall have full right of access to and withdrawal from the Operating Account in the ordinary course of business.

4.    Procedures for Operating Account. With respect to the Operating Account, Bank shall (subject to Federal Reserve Regulation CC and Bank's customary procedures):

    4.1    Apply and credit to or for deposit to the Operating Account all Receipts and all other funds from time to time tendered by or on behalf of Company for deposit therein, including, without limitation, all wire, ACH and other electronic transfers and other payments directed to the Operating Account as referenced in Exhibit A attached hereto.

    4.2    Statements and Other Information. Bank, or its designee, shall send written notification to Company of all returned and dishonored Receipts. Bank, or its designee, shall provide Company and Lender with a copy of the regular monthly bank statement regarding the Operating Account. Bank shall provide Lender with such other information relating to the Operating Account as Lender shall reasonably request.

5.    Fees. Company and Lender agree that Bank shall be authorized to charge the Operating Account for all usual and customary service charges, transfer fees and account maintenance fees associated with the Operating Account, the items deposited therein and the funds withdrawn therefrom, as well as for all services provided by Bank pursuant to the Agreement (collectively "Fees"), which are further described in Exhibit B and made a part hereof. If the balances in the Operating Account are not sufficient to pay Bank for any Fees that are or become due Bank, Company agrees to pay Bank promptly upon written demand the amount then due Bank. In the event Bank shall be unable to recover its Fees from Company or by charge to the Operating Account, Lender shall pay the Fees upon written demand by Bank. Company shall reimburse Lender for any Fees actually paid by Lender to Bank.

6.    Returned or Dishonored Items; Adjustment and Corrections; Cash Management Services. If any Receipt deposited in, or credited to, the Operating Account is returned unpaid or otherwise dishonored at any time, for any reason, Bank may charge the amount of such Receipt against the Operating Account. Bank may also charge or set off against the Operating Account for adjustments and corrections in respect of transactions in the Operating Account, and for